Raymond P. Boucher, State Bar No. 115364
  *ray@boucher.la*
Amanda J.G. Walbrun, State Bar No. 317408
  *walbrun@boucher.la*
BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California 91367-4903
Tel:   (818) 340-5400 / Fax: (818) 340-5401

David K. TeSelle (*Pro Hac Vice*)
  *dteselle@burgsimpson.com*
Lisa R. Marks (*Pro Hac Vice*)
  *lmarks@burgsimpson.com*
Morgan L. Carroll (*Pro Hac Vice*)
  *mcarroll@burgsimpson.com*
BURG SIMPSON ELDREDGE HERSH & JARDINE, P.C.
40 Inverness Drive East
Englewood, Colorado 80112
Tel:   (303) 792-5595 / Fax: (303) 708-0527

*Attorneys for Plaintiff Jane Doe*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| JANE DOE, f/k/a KRISTY ALTHAUS, an individual,<br><br>              Plaintiff,<br><br>       v.<br><br>AYLO GLOBAL ENTERTAINMENT INC., a Delaware corporation; AYLO USA INCORPORATED, a Delaware corporation; AYLO BILLING US CORP., a Delaware corporation; ETHICAL CAPITAL PARTNERS, LTD, a foreign entity; AYLO HOLDINGS S.A.R.L., a foreign entity; AYLO FREESITES, LTD., d/b/a "PORN HUB," a foreign entity; 9219-1568 QUEBEC, INC., a foreign entity; and AYLO PREMIUM LTD., a foreign corporation,<br><br>              Defendants. | Case No. 2:23-cv-7488 MWF (AGRx)<br><br>**FIRST AMENDED COMPLAINT**<br><br>The Hon. Michael W. Fitzgerald<br><br>Trial Date:         Not Set<br><br>**1. 18 U.S.C. §§ 1591(a)(2), 1595**<br>**2. 18. U.S.C. §§ 1591(a)(1), 1595**<br>**3. 18 U.S.C. §§ 1594(c), 1591(a), 1595**<br>**4. 18 U.S.C. §§ 1594(a), 1591, 1595**<br>**5. 15 U.S.C. § 1125(a) – False Advertising**<br>**6.  15 U.S.C. § 1125(a) – False Endorsement**<br>**7. Cal. Civ. Code § 52.5**<br>**8. Cal. Civ. Code § 1708.85**<br>**9. Cal. Civ. Code § 3344(a)**<br>**10. Right of Publicity**<br>**11. Right of Privacy**<br>**12. False Light**<br>**12. IIED**<br><br>[Pseudonym Status Warranted, Action Based on Civil Code § 1708.85]<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

**Page**

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL ................. 1

I.     INTRODUCTION .................................................................................... 1

II.    PARTIES ................................................................................................. 5

       A.   PLAINTIFF .................................................................................. 5

       B.   DEFENDANTS ............................................................................ 5

            1.    AYLO HOLDINGS S.À.R.L. ............................................ 5

            2.    AYLO FREESITES, LTD. .................................................. 7

            3.    AYLO PREMIUM, LTD. ................................................... 10

            4.    9219-1568 QUEBEC, INC. ............................................... 12

            5.    AYLO USA INCORPORATED ......................................... 14

            6.    AYLO GLOBAL ENTERTAINMENT, INC. ................... 15

            7.    AYLO BILLING US CORP D/B/A PROBILLER. ........... 16

            8.    ETHICAL CAPITAL PARTNERS, LTD. ......................... 18

       C.   DEFENDANTS OPERATE AS A SINGLE ENTERPRISE .............. 20

III.   JURISDICTION AND VENUE .............................................................. 22

       A.   THE COURT HAS SUBJECT MATTER JURISDICTION ............... 22

            1.    The Court has Federal Question Jurisdiction. ................... 22

            2.    The Court has Diversity Jurisdiction. ............................... 23

       B.   THE COURT MAY EXERCISE PERSONAL JURISDICTION OVER ALL DEFENDANTS .............................................................. 23

            1.    The Court Has Rule 4(K)(2) Personal Jurisdiction Over All Foreign Defendants .................................................... 23

                  i.  Rule 4(k) Jurisdiction: Aylo Holdings S.à.r.l. ........................ 25

                  ii.  Rule 4(k) Jurisdiction: Aylo Freesites, Ltd. ......................... 31

                  iii.  Rule 4(k) Jurisdiction: Aylo Premium Ltd. ......................... 33

                  iv.  Rule 4(k) Jurisdiction: 9219-1568 Quebec, Inc. .................. 34

                  v.  Rule 4(k) Jurisdiction: Ethical Capital Partners, Ltd. .......... 36

ii

2. The Court Also Has Specific Jurisdiction Over Foreign Aylo Defendants. ...................................................................40

    i. Specific Jurisdiction: Aylo Holdings S.à.r.l. .........................40

    ii. Specific Jurisdiction: Aylo Freesites, Ltd. ..........................45

    iii. Specific Jurisdiction:  Aylo Premium, Ltd...........................47

    iv. Specific Jurisdiction: 9219-1568 Quebec, Inc. ...................48

3. Alternatively, The Court Also Has Specific Jurisdiction Over Foreign Aylo Defendants Based On Alter Ego Theory. ...........................................................................................49

    i. Aylo Entities Are Alter-Egos of One Another Through their Controlling Owners Bergmair, Antoon and Tassillo. ..............................................................................49

    ii. Unity of Interest...................................................................50

    iii. Aylo Entities Use Same Offices and Employees .................51

    iv. Each of the Aylo Entities Is Inadequately Capitalized.........51

    v. The Aylo Entities and Their Owners Disregard The Corporate Form. ...............................................................52

    vi. Aylo Entities Are Used as a Mere Shell to Conduct Affairs of Other Aylo Entities or Personal Affairs of the Owners and they Commingled Funds. ......................53

    vii. Failure to Disregard Separate Entities Would Result in Fraud or Injustice. ........................................................53

4. The Court Has General Jurisdiction and Specific Jurisdiction Over Domestic Aylo Defendants. ...........................54

    i. Jurisdiction: Aylo USA Incorporated - Domestic .................54

    ii. Jurisdiction: Aylo Billing US Corp. - Domestic ..................55

    iii. Jurisdiction: Aylo Global Entertainment, Inc. - Domestic.............................................................................55

5. Additionally, The Court Can Impute General Jurisdiction to The Foreign Defendants from The Alter-Ego Domestic Subsidiaries That They Control. .................................................56

6. The Court Has Personal Jurisdiction Over ECP. .........................58

    i. The Court has specific personal jurisdiction over ECP under successor liability theory. .......................................58

    ii. The Court has Direct Specific Jurisdiction over ECP............66

iii

C.    VENUE ..................................................................................... 69

IV.    FACTUAL ALLEGATIONS.................................................................. 70

A.    AYLO INTENTIONALLY IMPLEMENTED A BUSINESS MODEL WHEREBY IT SOLICITED, PROMOTED, & MONETIZED SEX TRAFFICKING CONTENT FOR PROFIT........ 70

1.    Aylo's Choice to Allow Unrestricted Pornographic Content in its Business Resulted in the Worldwide Distribution, Advertisement, & Use of Nonconsensual Content for its Profit. ................................................... 70

2.    AYLO Used Sophisticated SEO Technology to Actively Commercialize Nonconsensual Content and Impede the Moderation and Removal of Unlawful Content ......................... 74

B.    AYLO UTILIZED CONTENT DISTRIBUTION NETWORKS, SEO TECHNOLOGY & SERVERS IN THE UNITED STATES TO ASSIST CONTENT PARTNERS WITH MAXIMIZING ILLEGAL CONTENT, WEB TRAFFIC, & REVENUE..................... 78

1.    Aylo's Global Platform and Distribution Channels for Content, Including Unlawful Content, is Vast and Worldwide. ................................................................. 78

2.    Aylo Utilized SEO Technology to Assist Content Partners in Maximizing Website Traffic, Views, and Revenue. ............. 80

3.    Aylo Utilized Content Distribution Networks, in the United States, Servers in the United States, Earned Substantial Revenue in the United States, and Processed Payments through Financial and Banking Institutions in the United States to Support Its Unlawful Conduct. ................ 83

4.    Aylo Knowingly Participated in The California-Based GDP Sex Trafficking Venture, Assisted GDP, Financially Benefited Therefrom, And Continued the Unauthorized Use of Plaintiff's Name, Videos, Images And / Or Identity for Its Own Financial Gain. ....................................... 84

5.    Aylo Had Knowledge of and Was Indifferent to Its Widespread Distribution, Advertisement, and Use of Plaintiff's Nonconsensual Content Throughout its Numerous Websites for Profit. .................................... 90

C.    AYLO ADMITTED LIABILITY FOR PARTICIPATING IN AND ASSISTING GDP'S SEX TRAFFICKING VENTURE. ........... 95

D.    AYLO & GDP EXPLOITED PLAINTIFF. ..................................... 97

E.    AYLO DEFENDANTS OPERATE AS A SINGLE, UNITARY BUSINESS & CREATED A FICTITIOUS CORPORATE STRUCTURE TO PURPOSEFULLY EVADE LAWS & HIDE THE FLOW OF MONIES. BETWEEN ENTITIES. ........................ 106

iv

FIRST AMENDED COMPLAINT

1. Aylo Defendants' Fictitious and Secretive Corporate Structure Used for Illegal Purposes Should Be Disregarded and Treated as a Single, Unitary Business Enterprise. ............ 106

2. Aylo Intentionally Took Further Action to Avoid Liability for Unlawful Conduct by Creating Layers of New Sham ECP Entities. ........... 108

V.   CAUSES OF ACTION ................................................................ 109

FIRST CAUSE OF ACTION ............................................................. 109

Benefitting from Participation in a Sex Trafficking Venture in Violation of the TVPRA 18 U.S.C. §§1591(a)(2), 1595 ................... 109

SECOND CAUSE OF ACTION ........................................................ 113

Advertising a Sex Trafficking Victim in Violation of the TVPRA ............. 113

18 U.S.C. §§ 1591(a)(1), 1595 ...................................................... 113

THIRD CAUSE OF ACTION ........................................................... 116

Conspiracy to Commit Violations of the TVPRA ..................................... 116

18 U.S.C. §§ 1594(c), 1591, 1595 ................................................ 116

FOURTH CAUSE OF ACTION ........................................................ 119

Attempt to Commit Violations of the TVPRA ............................................. 119

18 U.S.C. §§ 1594(a), 1591, 1595 ................................................ 119

FIFTH CAUSE OF ACTION ............................................................. 121

Violation of the Lanham Act – False Advertising ....................................... 121

15 U.S.C. § 1125(a) ................................................................... 121

1. Single Publication Rule ............................................................. 125

SIXTH CAUSE OF ACTION ............................................................. 127

Violation of the Lanham Act – False Endorsement ..................................... 127

15 U.S.C. § 1125(a) ................................................................... 127

SEVENTH CAUSE OF ACTION ....................................................... 131

Distribution of Private Sexually Explicit Materials in Violation of ............. 131

Cal. Civ. Code § 1708.85 ............................................................ 131

EIGHTH CAUSE OF ACTION ......................................................... 133

Commercial Misappropriation of Likeness in Violation of .......................... 133

Cal. Civ. Code § 3344(a) ............................................................................ 133

NINTH CAUSE OF ACTION ...................................................................... 135

Violation of California's Right of Publicity Misappropriation of
Likeness ................................................................................................... 135

TENTH CAUSE OF ACTION ..................................................................... 136

Violation of Right to Privacy ..................................................................... 136

Cal. Const., Art. 1, § 1 ............................................................................... 136

ELEVENTH CAUSE OF ACTION .............................................................. 138

False Light Invasion of Privacy ................................................................. 138

TWELFTH CAUSE OF ACTION ................................................................ 140

Intentional Infliction of Emotional Distress .............................................. 140

VI.    PRAYER FOR RELIEF ....................................................................... 142

VII.   DEMAND FOR JURY TRIAL ............................................................ 144

FIRST AMENDED COMPLAINT

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

Plaintiff Jane Doe, f/k/a Kristy Althaus, ("Plaintiff"), by and through her attorneys, BOUCHER LLP and BURG SIMPSON ELDREDGE HERSH & JARDINE, P.C., hereby submits her First Amended Complaint for damages and other relief for violations of the United States anti-sex trafficking statute, the Trafficking Victim Protection Reauthorization Act (TVPRA), 18 U.S.C. §§ 1591, 1595 et seq., The Lanham Act, 15 U.S.C. § 1125(a), California Distribution of Private Sexually Explicit Materials, Cal. Civ. Code § 1708.85, California Commercial Misappropriation of Likeness, Cal. Civ. Code § 3344(a), California's right of publicity, California's constitutional right to privacy, Cal. Const., Art. I § 1, California's false light invasion of privacy, and intentional infliction of emotional distress against Defendants AYLO GLOBAL ENTERTAINMENT INC., a Delaware corporation; AYLO USA INCORPORATED, a Delaware corporation; AYLO BILLING US CORP., a Delaware corporation; ETHICAL CAPITAL PARTNERS, LTD, a foreign entity; AYLO HOLDINGS S.À.R.L., a foreign entity; AYLO FREESITES, LTD., d/b/a "PORN HUB," a foreign entity; 9219-1568 QUEBEC, INC., a foreign entity; and AYLO PREMIUM LTD., a foreign corporation.

## I.    INTRODUCTION

1.    Defendants comprise the Aylo pornography empire (formerly known as MindGeek) who knowingly profited from sex trafficking content, of Plaintiff and hundreds of other victims, for over a decade. Once apprehended by law enforcement, shut off by credit card companies, and exposed in the press, Aylo was compelled to remove between 70 - 80% of its entire content as unlawful and nonconsensual.

2.    Aylo, for purposes of this complaint, includes Defendants Aylo Holdings S.à.r.l., Aylo Freesites, Ltd, Aylo Premium, Ltd., 9129-1568 Quebec, Inc., Aylo Billing U.S. Corp., Aylo Global Entertainment, Inc., and Aylo USA Incorporated, hereinafter "Aylo" or "Aylo Defendants," acting, jointly and severally.

3.    Ethical Capital Partners became the successor to Aylo in 2023.

1
FIRST AMENDED COMPLAINT

4. Plaintiff was only 18 years old when her life was destroyed by the trafficking enterprise each of the Aylo Defendants knowingly and intentionally joined to exploit her and more than 400 other young women, profiting from their nonconsensual content.

5. For more than a decade, Aylo has held the dominant monopoly amongst online pornography companies in the world.

6. The Aylo pornography enterprise includes hundreds of websites owned and operated by various Aylo alter-ego, shell and subsidiary companies, including Pornhub. Pornhub alone, generates 42 billion views per year and is the 8th most popular site in the United States and the 10th most popular site in the world.

7. From 2013 through 2024, the Aylo entities operated collectively as a consolidated, single business enterprise with each entity having a specific role and purpose in the enterprise.

8. Aylo was directly controlled and operated by its majority owner, Berg Bergmair ("Bergmair"), and minority owners, Feras Antoon ("Antoon") and David Tassillo ("Tassillo"), who also served as its CEO and COO, respectively, and their carefully selected directors until purchased by ECP.

9. Bergmair, Antoon, and Tassillo built the Aylo empire by knowingly and intentionally adopting and implementing an ***unrestricted content business model*** under which they solicited, produced, promoted, distributed and monetized nonconsensual content, including sex trafficking, child pornography, and rape.

10. Aylo's owners did not merely provide a platform for others to post pornographic content. Rather, they actively assisted content providers, whether lawful or unlawful, in order to maximize the amount and variety of content on their numerous online sites in order to maximize views, paid subscriptions, and revenue.

11. In doing so, Aylo's owners intentionally disregarded the horrendous exploitation and abuse of multiple thousands of human beings, including children, teenagers, and other vulnerable populations, facilitated the generation of content

2

procured by criminal conduct, and then globally distributed and promoted such content on their websites to the horror and detriment of the victims.

12. Additionally, Aylo's business model assisted content partners in how to maximize views for every post and make as much money as possible.

13. In 2011, Aylo began its content partnership with sex traffickers GirlsDoPorn ("GDP") and provided its vast worldwide viewership network and experience with disseminating adult content to this sex trafficking operation. Aylo maximized distribution, advertising, viewers, subscribers, sales, and profits for GDP by creating its own dedicated GDP channel on Pornhub.

14. The GDP sex trafficking venture was one of Aylo's most popular and successful content partners. GDP's channel became the 13th most popular channel out of thousands on Aylo's Pornhub.

15. Beginning in 2013, Aylo and GDP sex trafficked Plaintiff through this unlawful business of unrestricted content. GDP coerced and brutalized Plaintiff in a sex trafficking operation targeting young novice women, filming her repeated sexual assaults for content. In partnership and profit, Aylo then distributed, promoted, and monetized the unlawful content throughout its worldwide network.

16. Despite hundreds of GDP victims notifying Aylo that they were featured in nonconsensual criminal content appearing on Aylo's websites, Aylo obstructed or refused to remove the content. Aylo further directed employees to format the unlawful content, add search terms, and maximize its advertising performance in order to appeal to the broadest possible worldwide audience and generate the largest amount of revenue possible. Prioritizing these profits, Aylo had a policy of not even reviewing a video for the purpose of removal until there had been at least *fifteen* complaints.

17. In 2014, Plaintiff's GDP sex trafficking video was viewed at least 49 million times on Aylo's Pornhub website alone.

18. This content was the second most viewed video on all of Pornhub in

FIRST AMENDED COMPLAINT

2014, a fact Aylo proudly publicized in its 2014 Year in Review.

19.    Aylo and ECP continued to host, distribute, and advertise Plaintiff's nonconsensual sex trafficking content for profit through 2023 because of her popularity.

20.    Even after Plaintiff's videos were mostly removed, Aylo and ECP continued to use Plaintiff's name as "click bait" via Aylo's algorithms and SEO technology to generate website traffic and revenue into 2024. By leaving her tags active and optimized, users searching for Plaintiff's nonconsensual content on Google, Yahoo, and other search engines would still be directed to Pornhub or another of Aylo's websites.

21.    Plaintiff's life was irrevocably changed.

22.    Plaintiff lost her career as a professional model.  She was stripped of her runner up title for Miss Teen Colorado and was forced to withdraw from college due to harassment from both students and staff.  She lost her passions, her jobs, and her relationships.

23.    Aylo falsely portrayed Plaintiff as a voluntary porn star and accelerated the worldwide dissemination of her trafficking content, ruining her daily life and personal safety.

24.    While GDP sex traffickers, Michael Pratt, Matthew Wolf, and Andre Garcia, are finally imprisoned for their crimes, Aylo continues to wrongfully profit from Plaintiff's exploitation.

25.    This lawsuit seeks to hold Aylo and its current owner and controller, Ethical Capital Partners, Ltd. ("ECP"), responsible for their role in enabling, distributing, advertising, promoting, and profiting from Plaintiff's GDP sex trafficking videos, the harm they knowingly caused her, and to enforce Plaintiff's rights under the law.

FIRST AMENDED COMPLAINT

## II.     PARTIES

### A.     PLAINTIFF

26.     Plaintiff Jane Doe, formerly known as Kristy Althaus, is a United States ("U.S.") citizen who, at all relevant times alleged herein, resided in the state of Colorado.

27.     Plaintiff proceeds under a pseudonym pursuant to Cal. Civil Code §1708.85(f)(1) to protect her identity because of the sensitive, personal nature of this matter and Plaintiff's safety.  Plaintiff has faced constant stalking, intimidation, and threats of harm through the present day.  Plaintiff's legitimate concerns outweigh any prejudice to Defendants by allowing her to proceed anonymously.

### B.     DEFENDANTS

#### 1.     AYLO HOLDINGS S.À.R.L.

28.     Aylo Holdings S.à.r.l. is a foreign entity organized and existing under the laws of Luxembourg and is significantly more than a "holding" company.  Their registered address is 32 Boulevard Royal · Luxembourg City, 2449, Luxembourg.

29.     However, Aylo Holdings S.á.r.l. in practice operates out of their main office located at 7777 Décarie Blvd. Montréal, Quebec H4P 2H2 and satellite offices in, among other places, Los Angeles, San Diego, and San Francisco, California.

30.     Aylo Holdings S.à.r.l. was previously known as MindGeek S.à.r.l.  The name was changed in August of 2023 as part of a "rebranding" effort, but it is the same company and for purpose of this First Amended Complaint will be used synonymously and interchangeably.

31.     Aylo Holdings S.à.r.l. is the controlling parent of numerous domestic and foreign subsidiaries.

32.     Each of Aylo Holdings S.à.r.l.'s subsidiary entities, named herein, had a specific role to effectuate and support the Company's consolidated business enterprise, and none operated independently or separately from the parent or other subsidiary entities.

5

33.    From 2013 to 2023, Aylo Holdings S.à.r.l. and its subsidiaries were owned and controlled by the same individuals—Bernd Bergmair ("Bergmair"), Feras Antoon ("Antoon"), and David Tassillo ("Tassillo") and their carefully selected Class A Managers Andreas Alkiviades Andreou ("Andreou") and Anis Baba ("Baba").

34.    At all relevant times alleged herein, Aylo Holdings S.à.r.l., directly and through various subsidiaries, owns the domains to, controls, and operates a vast network of pornographic websites (tube sites and paysites), including Pornhub, RedTube, Tube 8, YouPorn, PornIQ, gaytube, Thumbzilla, Peeperz, PornMD, Xtube, Brazzers, Babes.com, Reality Kings, Digital Playground, Twistys, Men.com, Mofos, MyDirtyHobby, SexTube and Webcams.

35.    Aylo Holdings S.à.r.l. owns, optimizes, and monetizes the majority of pornography websites and content on the Internet.

36.    Aylo Holdings S.à.r.l. directs all of the policies and activities of its subsidiaries, as a consolidated business enterprise, at the direction of owners Bergmair, Antoon, and Tassillo, until purchased by ECP.

37.    Aylo Holdings S.à.r.l. conducts business in and directs content to the U.S, including in the State of California and this District.

38.    Aylo Holdings S.à.r.l., acting on behalf of and at the direction of the individual owners, Bergmair, Antoon, Tassillo, knowingly implemented an unrestricted content business model and encouraged, promoted, advertised, distributed, commercialized, and profited from nonconsensual content, publishing material from victims of sex trafficking and abuse, including Plaintiff.

39.    Aylo Holding's S.à.r.l. knowingly benefitted from participation in GDP's sex trafficking venture and further engaged in prohibited conduct causing Plaintiff to participate in a commercial sex act, advertising, and monetizing these sex acts.

40.    Aylo Holdings S.à.r.l. *admits* liability to the U.S. Department of Justice, in its Deferred Prosecution Agreement ("DPA," attached hereto as **Exhibit 1**) on behalf of itself and its subsidiaries for partnering with, hosting, promoting, and

FIRST AMENDED COMPLAINT

profiting from the GDP sex trafficking venture.

41. Aylo Holdings S.à.r.l. through its owners and directors, refused to moderate for, or remove, GDP sex trafficking content, even upon repeated requests by GDP victims like Plaintiff, because it was too profitable, and those profits flowed up through the parent company and were distributed to shareholders (Bergmair, Antoon, Tassillo).

## 2. **AYLO FREESITES, LTD.**

42. Defendant Aylo Freesites, Ltd. is a foreign company incorporated in the Republic of Cyprus with a principal place of business at 195-197 Old Nicosia-Limassol Road, Block 1 Dali Industrial Zone, Cyprus, 2540.

43. Aylo Freesites, Ltd. was previously known as MG Freesites, Ltd. The name was changed in August of 2023 as part of a "rebranding" effort, but it is the same company and for purpose of this First Amended Complaint will be used synonymously and interchangeably.

44. Aylo Freesites, Ltd. is a wholly owned subsidiary of Aylo Holdings S.à.r.l., either directly or indirectly through intermediary companies, but at all relevant times was owned and controlled by Bergmair, Antoon, and Tassillo, and their carefully selected directors Andreou and Baba, until purchased by ECP.

45. Aylo Freesites, Ltd. is responsible for operating Aylo's free sites or tube sites, including Pornhub.com, RedTube.com, YouPorn.com, You8.com, and subscription site PornhubPremium.com.

46. To obtain a continuous stream of vast, new, and different content for its pornographic websites, Aylo Freesites, Ltd., through the policies and directions of its parent company and owners, implemented an unrestricted content business model which commercialized content from its content partners and users without verification of its lawfulness.

47. The unrestricted content business model allowed content partners and users to upload their own content.

7

48.     Aylo Freesites, Ltd. knowingly benefitted from participation in GDP's sex trafficking venture and further engaged in prohibited conduct causing Plaintiff to participate in a commercial sex act, advertising, and monetizing these sex acts.

49.     Rather than moderate for potentially illegal material, employees working for Aylo Freesites, Ltd. were instead responsible for assisting and advising content providers and users on how to use the best search terms, tags, and titles to optimize their content and reach the largest possible audience.

50.     Aylo Freesites, Ltd. was the broadest distribution system that made Plaintiff's trafficking content to go viral online.  Aylo Freesites, Ltd. is designed to hook profits for Aylo through self-advertising, paid advertisers and converting free viewers into paying members, including through use and popularity of Plaintiff's videos.

51.     Aylo Freesites, Ltd.'s received the red flag alerts, complaints, and requests to take down content and ignored those requests, including those of Plaintiff, at the policy direction of Aylo Holdings, S.á.r.l. and their owners Tassillo, Antoon and Bergmair.

52.     Aylo Freesites, Ltd. is not a stand-alone, arms-length corporation, but instead relies upon the services of other alter-ego sister and subsidiary entities to make Aylo Holdings S.à.r.l. and its group of consolidated business entities work as a whole.

53.     Specifically, Aylo Freesites, Ltd. relies upon Aylo Holding's S.á.r.l for licensing, ownership, and executive management and direction, Aylo Billing US to process payments, and 9219-1658 Quebec, Inc. for administrative support, hiring and employing staff, and internet technology work and optimization.

54.     Despite being incorporated in Cyprus, Aylo Freesites Ltd. is controlled by directors, officers, and employees working in Aylo's offices in the U.S. and Canada.  It also operates the Model Hub Program and the Content Partner Program.

55.      Aylo Freesites, Ltd. conducts substantial business in the U.S., including in the State of California and in this District, targets the U.S. and California for use of

FIRST AMENDED COMPLAINT

its websites, and utilizes servers in the U.S. for its business purposes.

56. Aylo Freesites, Ltd. entered into a content partner agreement with the San Diego-based GDP sex trafficking venture and generated substantial business from GDP in California.

57. GDP became one of Aylo Freesites, Ltd.'s most popular and successful channels, but through numerous complaints of victims, knew or should have known its content was produced through sex trafficking and was nonconsensual.

58. Aylo Freesites, Ltd. knowingly promoted, advertised, published, distributed, and profited from sex trafficking and other nonconsensual content, including Plaintiff's nonconsensual content.

59. Aylo Freesites, Ltd. is a named defendant in the DPA for conduct directly related to the GDP sex trafficking venture.

60. Aylo Freesites, Ltd.'s servers located in the U.S. contain its redundant library of pornographic content, including vast amounts of nonconsensual content from sex trafficking or minors.

61. Additionally, Aylo Freesites, Ltd. runs a significant advertising business through a sub-persona called TrafficJunky, which focuses primarily on selling ads to US and Canadian markets.

62. In a hearing before the Canadian House of Commons on February 5, 2021, Antoon stated that advertising makes up 50% of the revenues. *See* **Exhibit 2:** Canadian Findings Regarding Aylo's Compliance with Canadian Person Information Protection and Electronic Documents Act (PIPEDA) (Feb. 29, 2024).

63. TrafficJunky charges customers for ad impressions on a Cost Per Millenia (CPM) basis, meaning advertisers pay TrafficJunky for every 1,000 impressions that ad receives. The more traffic to the websites, the more revenue TrafficJunky generates.

64. In its own website, www.trafficjunky.com, Aylo Freesites, Ltd. makes the following disclosure:

## Terms of Use **Advertisers**

*Last Updated: July 8, 2024*

By accessing this Website, you will be deemed to have agreed to these Terms of Use, as well as our Policies, including, but not limited to, our referral program (https://www.trafficjunky.com/referral-program-terms) terms and conditions, our Listing Policy, and our Privacy Notice (https://www.trafficjunky.com/privacy-notice) (hereinafter the/our **"Terms"**). If you do not intend to be legally bound by our Terms, you must not access or use our website or any services on it.

### 1. INTERPRETATION

In these Terms of Use unless the context otherwise requires:

"Ad Space" means the space contained on the Seller's website, email newsletters, or other property for Advertisement.

"Advertisement" includes all forms of digital text, graphics, rich media, and other advertisements of the Buyer whether being broadcast visually and/or aurally via the internet including all content contained therein.

"TrafficJunky" means Aylo Freesites Ltd.

"Buyer" includes any Member who bids on, wins, or buys Ad Space or any person acting on their behalf with express or implied authority.

65.    Defendant Aylo Premium, Ltd. is a company incorporated in the Republic of Cypress with a principal place of business at 195-197 Old Nicosia-Limassol Road, Block 1 Dali Industrial Zone, Cyprus, 2540.

66.    Aylo Premium Ltd was previously known as MG Premium Ltd.  The name was changed in August of 2023 as part of a "rebranding" effort, but it is the same company and for purpose of this First Amended Complaint will be used synonymously and interchangeably.

67.    Aylo Premium, Ltd. is a wholly owned subsidiary of Aylo Holdings S.à.r.l., either directly or indirectly through intermediary companies but under the direct control of Bergmair, Antoon and Tassillo.  The same executives controlling Aylo Holdings S.á.r.l. also control Aylo Premium, Ltd. The Class A Managers of Aylo Holdings S.a.r.l., Andreou and Baba, are also the directors of Aylo Premium, Ltd. and act under the direction of controlling owners Bergmair, Antoon, and Tassillo, until purchased by ECP.

68.    Aylo Premium, Ltd. owns and operates Aylo Holdings S.à.r.l.'s premium

and pay websites, which offer subscription-based content for a monthly fee. These websites are supported by Aylo Holdings S.à.r.l.'s network of free tube sites, which are used as a means of creating traffic to, and revenues for, these premium services.

69. When the company places internally promoting ads on its various websites, it is commonly pointing to one of the subscription-based paysites.

70. Aylo Premium, Ltd. operates websites including Brazzers.com, FakeTaxi.com and SpiceVids.com, Aylo Premium Ltd. writes scripts, formats content, writes titles and tags, optimizes, monetizes and does the pre- and post-production work for this content. Aylo Premium Ltd uploads user generated content, including nonconsensual content, to both Brazzers and to other pornography websites, including PornhubPremium.com.

71. Aylo Premium, Ltd. conducts substantial business in the U.S., including in the State of California and in this District, targets the U.S. and California for use of its websites, and utilizes servers in the U.S. for its business purposes.

72. Aylo Premium, Ltd. provides a significant portion of the company's revenue through their subscription services. Aylo's premium sites use ads containing nonconsensual sex trafficking content and uses them to attract and more deeply engage users on those sites.

73. Aylo Premium, Ltd. relies upon Aylo Holding's S.á.r.l for licensing, ownership, and executive management and direction, Aylo Billing US to process payments, and 9219-1658 Quebec, Inc. for administrative support, hiring and employing staff, internet technology work and optimization.

74. Aylo Premium, Ltd. knowingly promoted, advertised, published, distributed, commercialized, and profited from sex trafficking and other nonconsensual content, including Plaintiff's trafficking content.

75. Aylo Premium, Ltd. knowingly benefitted from participation in GDP's sex trafficking venture and further engaged in prohibited conduct causing Plaintiff to participate in a commercial sex act, advertising, and monetizing these sex acts.

FIRST AMENDED COMPLAINT

76.     Aylo Premium, Ltd. was the beneficiary of Plaintiff's sex trafficking videos in the form of ads that converted to paying subscribers and advertisers. Members of paysites would get the benefit of *full videos* teased or truncated on Pornhub or other freesites.  Plaintiff's likeness and image in the form of her sex trafficking videos were both used as click-bait to take viewers to paysites operated by Aylo Premium Ltd, but Plaintiff's sex trafficking videos also were also directly posted on paysites owned by Aylo.

### 4.     9219-1568 QUEBEC, INC.

77.     9219-1568 Quebec, Inc. is incorporated in Canada with its principal place of business located at 7777 Decarie Boulevard, Montreal, Quebec, H4P 2H2, Canada.

78.     9219-1568 Quebec, Inc.is a wholly owned subsidiary of Aylo Holdings S.à.r.l., either directly or indirectly through intermediary companies, but from 2013 to 2023 times was controlled by Bergmair, Antoon and Tassillo.

79.     The 9219-1568 Quebec, Inc. was used to employ the company's executives and staff. 9219-1568 Quebec, Inc. directly employed Antoon and Tassillo as President and Vice President of the Aylo Holdings S.à.r.l. consolidated business enterprise from 2012 until they were forced to resign in 2022.

80.     Antoon and Tassillo routinely utilized this entity for personal matters and commingled funds, purposes, and accounts.

81.     9219-1568 Quebec, Inc. hires and employs staff to serve other Aylo entities, such as Aylo Freesites, Ltd. and Aylo Premium, Ltd., provides essential information technology work and optimization for the Aylo tube sites and paysites owned by Aylo Holdings S.à.r.l. and operated by Aylo Freesites, Ltd. and Aylo Premium, Ltd., respectively.

82.     9219-1568 Quebec, Inc., at the direction of Aylo Holdings, S.à.r.l. and the owners Tassillo, Bergmair and Antoon, provided essential Information Technology (IT), human resources and general administrative support to for Aylo's

websites.

83.    At all relevant times herein, 9219-1568 Quebec, Inc. hired and utilized formatters that received pornographic content from content partners and users, and assisted and advised them in developing content and advertisements, editing, and optimizing search engines and terms to maximize marketing and revenue.

84.    9219-1568 Quebec, Inc. knowingly benefitted from participation in GDP's sex trafficking venture and further engaged in prohibited conduct causing Plaintiff to participate in a commercial sex act, advertising, and monetizing these sex acts.

85.    9219-1568 Quebec, Inc. conducts substantial business in the U.S., including in the State of California and in this District, targets the U.S. and California for optimizing the marketing and use of the Aylo tube sites and paysites, and utilizes servers in the U.S.

86.    9219-1568 Quebec, Inc. owns the trademarks to the new Aylo brand logos, which it uses on the www.aylo.com website and to advertise for all jobs available across the Aylo subsidiaries.

87.    9219-1568 Quebec, Inc. also owns the domain for Aylo's main website, www.aylo.com. This website claims "Aylo is an ECP company" at the bottom of every page and provides information related to employment opportunities available across the company to service Aylo Holdings S.à.r.l.'s consolidated business enterprise.

88.    The www.aylo.com website also provides information about Aylo Holdings S.à.r.l.'s numerous tube sites, pay sites, technology services, as well as contact information for each of Aylo's many offices under the umbrella of Aylo's consolidated business and brand.

89.    9219-1568 Quebec, Inc. is now majority owned by Fady Mansour, Managing Partner of ECP, with 75% voting rights. His address is listed at 403-200 Elgin Street, Ottawa, Canada K2P1L5, which is the same address as the new owner of Aylo Holdings S.á.r.l., Ethical Capital Partners.

FIRST AMENDED COMPLAINT

### 5.    AYLO USA INCORPORATED

90.    Aylo USA Incorporated is incorporated in Delaware, and at all relevant times herein, had its principal place of business at 21800 Oxnard Street, Suite 150, Woodland Hills, California.

91.    Aylo USA Incorporated was previously known as MindGeek USA Incorporated.  The name was changed in August of 2023 as part of a "rebranding" effort, but it is the same company and for purposes of this First Amended Complaint will be used synonymously and interchangeably.

92.    Aylo USA Incorporated, either directly or through intermediary companies, is a wholly owned subsidiary and under the control of Aylo Holdings S.à.r.l. but was controlled by Bergmair, Antoon, and Tassillo, until purchased by ECP.

93.    At all relevant times herein, Aylo USA Incorporated provided support for the operation of Aylo's free tube sites through Aylo Freesites, Ltd.

94.    Aylo USA Incorporated is a named defendant in the DPA for conduct directly related to the GDP sex trafficking venture.

95.    Aylo USA Incorporated *admitted* through their parent, Aylo Holdings, S.à.r.l., to benefitting and profiting from the GDP sex trafficking venture in the DPA.

96.    Contrary to the Declaration of Andreou, Aylo USA Incorporated does not solely distribute DVDs pursuant to the terms of one contract.  Aylo USA Incorporated operates the consolidated company's merchandise and product sales through websites, Pornhub Apparel, and the Brazzers Store, which specifically, advertised merchandise alongside Plaintiff's name and image to increase its sales.

97.    Aylo USA Incorporated used Plaintiff's image without her consent to promote sales in their merchandise stores.

98.    Aylo USA Incorporated at the direction of Aylo Holdings, S.à.r.l. and the owners Tassillo, Bergmair and Antoon, support the operations of Aylo's vast network of websites through support services, industry outreach, influencing, lobbying and media relations in the United States, including the State of California.

14
FIRST AMENDED COMPLAINT

99. Aylo USA Incorporated conducts substantial business in the U.S., including in the State of California and in this District, targets the U.S. and California for use of its websites, and utilizes servers in the U.S. for its business purposes.

100. Aylo USA Incorporated knowingly promoted, advertised, distributed, and profited from sex trafficking and other nonconsensual content, including Plaintiff's nonconsensual content.

101. Aylo USA Incorporated knowingly benefitted from participation in GDP's sex trafficking venture and further engaged in prohibited conduct causing Plaintiff to participate in a commercial sex act, advertising, and monetizing these sex acts.

### 6.  AYLO GLOBAL ENTERTAINMENT, INC.

102. Aylo Global Entertainment, Inc. is incorporated in Delaware, and at all relevant times, had its principal place of business at 21800 Oxnard Street, Suite 150, Woodland Hills, California.

103. Aylo Global Entertainment, Inc. was previously known as MindGeek USA Incorporated (and before that as PlayboyPlus Entertainment, Inc.). The name was changed in August of 2023 as part of a "rebranding" effort, but it is the same company and for purpose of this First Amended Complaint will be used synonymously and interchangeably.

104. Aylo Global Entertainment is a wholly owned subsidiary of Aylo Holdings S.à.r.l., either directly or indirectly through intermediary companies, but was controlled by Bergmair, Antoon, and Tassillo, until purchased by ECP.

105. Aylo Global Entertainment provides support for Aylo Holdings S.à.r.l.'s websites, including subscription sites and services operated by Aylo Premium Ltd., with a focus on television services, cable operators, hotels, cruise ships, and the hospitality industries.

106. Aylo Global Entertainment, Inc. is used to support, market, and commercialize Aylo Holdings S.à.r.l.'s tube sites and paysites.

FIRST AMENDED COMPLAINT

107. Aylo Global Entertainment, Inc. at the direction of Aylo Holdings, S.à.r.l. and the owners Tassillo, Bergmair and Antoon, *support the operations of Pornhub and other Aylo tubesites and paysites* through support services such as *"moderation", formatting review,* and *approval of* content.

108. Aylo Global Entertainment, Inc. supported the paysites and tubesites where Plaintiff's content appeared, and their review of content and moderation policies failed to remove Plaintiff's sex trafficking content from Aylo's websites.

109. Aylo Global Entertainment, Inc. conducts substantial business in the U.S., including in the State of California and in this District, targets the U.S. and California for use of its websites, and utilizes servers in the U.S. for its business purposes.

110. Aylo Global Entertainment, Inc. knowingly promoted, advertised, distributed, and profited from sex trafficking and other nonconsensual content, including Plaintiff's nonconsensual content.

111. Aylo Global Entertainment, Inc. knowingly benefitted from participation in GDP's sex trafficking venture and further engaged in prohibited conduct causing Plaintiff to participate in a commercial sex act, advertising, and monetizing these sex acts.

**7.    AYLO BILLING US CORP D/B/A PROBILLER.**

112. Defendant Aylo Billing US Corp., d/b/a Probiller, is a Delaware corporation, and at all relevant times herein, had its principal place of business located at 21800 Oxnard Street, Suite 150, Woodland Hills, California 91367.

113. Aylo Billing US Corp. was previously known as MindGeek Billing US Corp. The name was changed in August of 2023 as part of a "rebranding" effort, but it is the same company and for purpose of this First Amended Complaint will be used synonymously and interchangeably.

114. Aylo Billing US Corp. is a wholly owned subsidiary of Aylo Holdings S.à.r.l., either directly or indirectly through intermediary companies.

16

FIRST AMENDED COMPLAINT

115. Aylo Billing US Corp. provides billing services for Aylo Holdings S.à.r.l.'s subsidiaries, including among others, Aylo Freesites, Ltd., Aylo USA Incorporated, Aylo Premium Ltd., and Aylo Global Entertainment, Inc. which necessarily facilitates the processing of payments and generating revenue for the consolidated business enterprise.

116. Aylo Billing US Corp. conducts substantial business in the U.S., including in the State of California and in this District, targets the U.S. and California for use of its websites, utilizes servers in the U.S. for its business purposes, generates sales, and processes payments for the consolidated business.

117. Aylo Billing US Corp. knowingly promoted, advertised, distributed, and profited from sex trafficking and other nonconsensual content, including Plaintiff's nonconsensual content.

118. Plaintiff's name, image, search terms, hashtags, and nonconsensual videos were monetized through Aylo Billing US Corp.

119. Aylo Billing US Corp. benefited financially from advertising and promoting Plaintiff's sex trafficking videos for the benefit of their owners Aylo Holdings S.à.r.l. and Bergmair, Tassillo, and Antoon.



17

## 8.    ETHICAL CAPITAL PARTNERS, LTD.

120.    Ethical Capital Partners, Ltd. ("ECP") is an entity created in Ontario on December 21, 2021, with its principal address at 200 Elgin Street, Suite 403, Ottawa, Ontario K2P 1L5.  ECP later registered the same entity in the British Virgin Islands on May 12, 2022.

121.    Due to civil and criminal investigations and legal actions, as well as a scathing 2020 New York Times article and other press disclosing Aylo Holdings S.à.r.l.'s known promotion, advertising, distribution, and profit from sex trafficking and other nonconsensual content, Aylo's Control Group restructured its business and rebranded as "Aylo."

122.    ECP was created for the sole purpose of acquiring all shares of MindGeek S.à.r.l. (now Aylo Holdings S.à.r.l.), which gave them control of the Aylo consolidated business and group of entities.

123.    In March 2023, Bergmair, Antoon, and Tassillo transferred their ownership interest in Aylo Holdings S.á.r.l. to ECP using ECP One Limited, ECP Three Limited, and ECP Four Limited to hide their identities.

124.    ECP One Limited acquired 310,095 shares from FDCO Holding, a Montreal-based holding company founded in 2013 (parent company of Aylo S.á.r.l). Antoon and Tassillo are FDCO Holding President and Secretary, respectively.

125.    ECP Three Limited acquired 590,161 shares from ACAJU Investments. Upon information and belief, the beneficial owner of Acaju investments was Bergmair.

126.    ECP Four Limited acquired 100,017 shares from RK Holdings, LLC (owner Aylo S.á.r.l.).  Upon information and belief, the beneficial owner of RK Holdings was Bergmair.

127.    ECP is now the parent company of Aylo Holdings S.à.r.l. and its subsidiary entities, including among others, Aylo Freesites Ltd., Aylo Premium, Ltd., Aylo USA Incorporated, Aylo Global Entertainment, 9219-1568 Quebec Inc., and

18

Aylo Billing US Corp.

128.   Criminal defense attorney, Fady Mansour, is the President, Managing Director, Secretary and more than 75% beneficial owner of ECP, and thus Aylo Holdings S.à.r.l. and its subsidiary entities. Mr. Mansour is also majority owner of 9219-1568 Quebec, Inc. which employs Aylo executives and staff and provides assistance and advice to website content partners and users.[1]

129.   ECP acquired Aylo Holdings S.à.r.l. and its consolidated group of subsidiary entities with full knowledge of the claims against it for promoting and profiting from nonconsensual content featuring child pornography and victims of sex trafficking, including Plaintiff.

130.   ECP knowingly received assets and revenue from Aylo Holdings S.à.r.l. and its consolidated group of subsidiary entities and owners Bergmair, Antoon, and Tassillo arising from their predecessors' unlawful and fraudulent conduct.

131.   With the continuation of Aylo Holdings S.à.r.l.'s pornography enterprise, through its pervasive control of its consolidated group of subsidiary entities and pornography websites described and named herein, ECP conducts substantial business in the U.S. including in the State of California and this District, utilizing servers in the U.S. and promoting and monetizing its websites, content, and services.

132.   As the parent company of Aylo Holdings S.á.r.l., ECP is the successor in interest, and a mere continuation of the same pornography empire created by its predecessors.

133.   ECP *consented to the debts and liabilities* of the entire Aylo enterprise by contractual terms required by the DPA.

134.   ECP is liable for knowingly financially benefitting from sex trafficking and other nonconsensual content by the hosting, distributing, and monetizing of illegal content, including Plaintiff's nonconsensual content.

---

[1] Mansour is also the director of ECP's parent companies 10000498476 Ontario and FMSM Holdings.

FIRST AMENDED COMPLAINT

135. ECP is also liable for the new and continued publications of false advertising of Plaintiff's nonconsensual content occurring after the stock acquisition and/or fraudulent transfer of profits and assets from Aylo entities to ECP.

136. ECP was willingly *part of a fraudulent transfer* by Aylo Holdings S.á.r.l. and its controlling owners to defraud American sex trafficking victims from recourse in U.S. Courts.

137. The promotion of Plaintiff's videos, name, and likeness continued even after ECP announced their ownership and claimed to be turning over a new leaf.

138. Specifically, Plaintiff's trafficking content was still being posted and promoted on their sites as recently as February 2024. This is after ECP and Aylo Holdings S.à.r.l. accepted responsibility for ensuring Compliance with the DPA on November 10, 2023.



DEFENDANT STRUCTURE

### C.   DEFENDANTS OPERATE AS A SINGLE ENTERPRISE

139. Whereas traditional companies following the requirements of corporate formalities create divisions or departments within their entities for marketing, sales, customer service, shipping, billing, accounting, human resources, Aylo Holdings S.à.r.l.'s owners, Bergmair, Antoon, and Tassillo, with their carefully selected directors incorporated separate entities for each division, yet, operated the Aylo

20
FIRST AMENDED COMPLAINT

entities collectively as a consolidated, single business enterprise.

140.   Each Aylo entity has a specific role and purpose within the consolidated, single business enterprise. Thus, the entities are all interrelated in one business and operate as a whole.

141.   Aylo Holdings S.à.r.l.'s owners, Bergmair, Antoon, and Tassillo, implemented such a complex web of entities for purposes of evading strict pornography laws, regulations, taxes, jurisdiction and liabilities, and concealing identities of ownership and/or executive management.

142.   From 2013 to 2023, the *entire* Aylo structure, policy decisions, and business operations have been pervasively directed and controlled by owners Bergmair, Antoon, and Tassillo through Aylo Holdings S.à.r.l.

143.   Bergmair, Antoon and Tassillo carefully selected the directors, officers and managers they appointed and controlled, including among others Corey Urman, Andreou, Baba, Andrew Link, and Aylo's Chief Legal Officer, Anthony Penhale (collectively "Aylo's Control Group").

144.   No individual Aylo entity could function independently without the support and interaction of Aylo Holdings S.à.r.l. and its owners, as well as the sister alter-ego subsidiaries which worked together in unison to produce, distribute, market, commercialize, and monetize pornographic content on the Internet, regardless of its source or lawfulness.

145.   Aylo Holdings S.à.r.l. and its owners, Bergmair, Antoon, and Tassillo, purposefully implemented an unrestricted content business model where they developed, promoted, and commercialized for profit a vast amount of pornographic content regardless of its source or illegality.

146.   The directors within Aylo's Control Group were beholden to the owners of Aylo Holdings S.à.r.l., Bergmair, Antoon, and Tassillo, who appointed them, set their compensation, and had authority to remove them.

147.   At all relevant times alleged herein, Aylo Holdings S.à.r.l. and its

FIRST AMENDED COMPLAINT

subsidiaries, including the defendants named herein, act at the direction or take orders from Aylo's Control Group and operate as a single business enterprise dedicated to producing, distributing, promoting, and monetizing their pornography monopoly on the Internet, including commercializing nonconsensual and unlawful content.

148. Aylo Holdings S.á.r.l. created and is the sole owner of Licensing IP International S.á.r.l. to license its intellectual property (trademarks, patents, copyrights) which is fundamental to the operation of the single business enterprise.

149. Singular control is demonstrated by the authority of Aylo Holdings S.á.r.l., and Licensing IP International S.á.r.l., to grant or deny permission to other Aylo subsidiaries to use its intellectual property.

150. Without the use of Aylo's intellectual property, brand name, and websites the Aylo's subsidiaries would cease to have any purpose.  In practice, this would never be done because Aylo Holdings S.á.r.l. and Aylo's Control Group controls the entire network of subsidiaries, as a consolidated, single business, for the ultimate benefit of the same owners: Bergmair, Antoon, and Tassillo.

151. "Aylo Defendants" or "Aylo" hereinafter includes Defendants Aylo Holdings S.à.r.l., Aylo Freesites, Ltd, Aylo Premium, Ltd., 9129-1568 Quebec, Inc., Aylo Billing U.S. Corp., Aylo Global Entertainment, Inc., and Aylo USA Incorporated, acting, jointly and severally.

## III.   JURISDICTION AND VENUE

### A.   THE COURT HAS SUBJECT MATTER JURISDICTION.

#### 1.   The Court has Federal Question Jurisdiction.

152. This action arises under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §§ 1589-1595 and the Lanham Act, 15 U.S.C. § 1125(a).  The Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff proceeds under federal law.

153. The Court has supplemental jurisdiction over pendent state-law claims under 28 U.S.C. § 1367(a) because all the claims alleged herein are part of a uniform

pattern and practice and form part of the same case or controversy.

### 2.      The Court has Diversity Jurisdiction.

154.   The Court has original jurisdiction under 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000, exclusive of interest and costs and the matter in controversy is between citizens of different states, and some defendants are not citizens of any state.

### B.      THE COURT MAY EXERCISE PERSONAL JURISDICTION OVER ALL DEFENDANTS.

155.   The Court has jurisdiction over all defendants pursuant to 18 U.S.C. § 1596, which gives this Court "extra-territorial jurisdiction over any offense (or any attempt or conspiracy to commit an offense) under section . . .1591 . . .if . . .an alleged offender is present in the United States, irrespective of the nationality of the alleged offender.  All corporate defendants have an active and deliberate presence in the U.S.

156.   The Court may properly exercise jurisdiction over all defendants under California's Long Arm Statute. (Cal. Civ. Proc. Code § 410.10 and the Due Process Clause of the Fourteenth Amendment of the United States Constitution because each defendant, directly and through agents, transacts business within the state, committed tortious acts and omissions within the state; committed tortious injury in the state caused by an act or omission outside the state; regularly does business, engages in persistent course of conduct, and derives substantial revenue from services rendered in the state; owns, uses, and possesses real property within the state; or is registered to do business in and has consented to personal jurisdiction in the United States.

### 1.      The Court Has Rule 4(K)(2) Personal Jurisdiction Over All Foreign Defendants.

157.   This Court has personal jurisdiction over the foreign defendants under Rule 4(k)(2) of the Federal Rules of Civil Procedure which provides a federal forum for federal and pendant claims over foreign defendants.

158.   Rule 4(k) jurisdiction as most recently defined in *Doe v. WebGroup*

FIRST AMENDED COMPLAINT

*Czech, A.S.*, 93 F.4th 442 (9th Cir. 2024) provides that a U.S. Court has jurisdiction over a foreign defendant if (1) Plaintiff's claim arises under federal law, (2) that the foreign defendant is not otherwise subject to the jurisdiction of any state courts of general jurisdiction; and (3) that the exercise of jurisdiction would comport with Due Process.

159. Due Process in this context is satisfied because the foreign defendants named herein have certain minimum contacts with the relevant forum such that maintenance of the suit does not offend traditional notions of fair play and substantial justice. *Doe v. WebGroup Czech, A.S.*, 93 F.4th 442 (9th Cir. 2024) (quoting *Walden v. Fiore*, 571 U.S. 277 (2014)).

160. Under Rule 4(k), the relevant forum for assessing whether minimum contacts exist is the United States "as a whole". *Doe v. WebGroup Czech, A.S.*, 93 F.4th 442 (9th Cir. 2024) (quoting *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201 (9th Cir. 2020). The Ninth Circuit specifically requires that: (1) the defendant performed an act or consummated a transaction, (2) defendant purposefully directed or purposefully availed themselves to the forum, and (3) the underlying claims must arise or relate to forum-related activities.

161. Here, Plaintiff's claims explicitly arise under federal law. Plaintiff's primary claims against Aylo Holdings S.à.r.l., Aylo Freesites Ltd., Aylo Premium Ltd., and ECP are under the Trafficking Victims Protection Reauthorization Act (TVPRA) under 18 U.S.C. § 1591(a)(1), 18 U.S.C. § 1591(a)(2), § 1594(a), § 1594(c), § 1595 and the Lanham Act 15 U.S.C. § 1125(a)(1)(A) and (B) which arise under federal law (and any related state claims would be pendant.) *Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972 (9th Cir. 2021).

162. There are no state courts of general jurisdiction that would have jurisdiction over the foreign defendants—Aylo Holdings S.à.r.l. Aylo Freesites Ltd., Aylo Premium Ltd., and ECP—unless alternatively, the Court were to ultimately find that these entities are alter egos of one another.

FIRST AMENDED COMPLAINT

163.   The exercise of jurisdiction comports with Due Process. Each of the foreign defendants played an essential role in the Aylo enterprise and has sufficient, *differentially* targeted, minimum contacts with the forum that relate to the conduct underlying these claims to comport with Due Process.  The foreign defendants under the direction and control of Aylo's Control Group *chose* to do daily, targeted, continuous and substantial business in the United States for over a decade.

i.  Rule 4(k) Jurisdiction: Aylo Holdings S.à.r.l.

164.   Aylo Holdings S.à.r.l. is not merely a passive "holding" company, but rather a controlling vehicle for Bergmair, Antoon and Tassillo and their carefully selected directors, i.e. Aylo's Control Group, to direct and control the policies and practices of Aylo's pornography business enterprise that targets and utilizes the U.S. and the State of California for business resources, markets, customers, employees, and revenue for the sale of products and services.

165.   Local economists estimated that the porn industry in the San Fernando Valley generated 10,000 to 20,000 jobs annually and had $4 billion in annual sales. (Verrier, *Porn Studio Is Among 10 Busiest Sites for On Location Filming in L.A.* (2011) Los Angeles Times.

166.   Aylo Holdings S.à.r.l. directly and through its alter ego subsidiaries *purposefully* and *intentionally* performed or *consummated* the following acts *directed and aimed at* the forum of U.S. and Plaintiff's claims arise from these forum-related activities:

167.   Owns the majority of the pornography industry in the world and the majority of this industry is targeted to the U.S. through its advertisers, performers, content partners, viewers, subscribers, and profits.

168.   Derives the majority of its profits from the U.S. and these profits were achieved by *differentially targeting* to the U.S. both in how it deployed its human resources and employees and how it used its technology for targeting and optimization.

FIRST AMENDED COMPLAINT

169. Provided a dedicated channel to US-based sex traffickers, GDP, from 2009 through 2020 on Pornhub with supported marketing for all of the sex trafficking content from this US-partnership.

170. Invested in and modified features (VPN, Tor, dark web) to make it as easy as possible for people to upload illegal content anonymously and with added privacy features to protect their U.S. content partners uploading trafficking, child pornography and rape and to help avoid the detection and enforcement of the FBI and U.S. law enforcement.

171. Partnered with U.S.-based sex trafficking operation, GDP, and entering into a Content Partnership Agreement with them for more than a decade create profitable illegal sexual content for Aylo Holdings S.à.r.l. and its owners.

172. Promoted, advertised, benefited and profited from all of the victims from the U.S.-based GDP-Aylo sex trafficking partnership, including Plaintiff.

173. Offered preferred terms to Content Partners in the U.S. and Canada by offering direct deposit where they are not offered to content partners in other countries.

174. Signed the U.S. DPA for illegally benefitting and profiting from the partnership with US-based sex trafficking operation, GDP. They consented to the jurisdiction of the U.S. for the very same conduct at issue civilly in this case. They were the party signing the admissions on behalf of the single Aylo enterprise.

175. *Chose* to incorporate, acquire, and operate Aylo Billing US Corp, Aylo Global Entertainment and Aylo USA Incorporated in the U.S. They share a principal places of business in the U.S. The entire Aylo enterprise would halt without the operations of these subsidiaries in the U.S. (e.g. getting paid.)

176. Moved all its U.S. subsidiaries in unison from one location in the U.S. (California) to another location in the U.S. in December of 2023 (Texas).

177. *Chose* to locate servers in the U.S. (Massachusetts) to provider for faster, higher-definition experience for U.S. users.

FIRST AMENDED COMPLAINT

178.  *Chose* to host its website in the U.S. (MYIP.US. 738 Main St Pmb 140, Waltham, MA, 02451, US).

179.  *Chose* to uniquely boost its service to favor U.S. viewers by using a U.S. based Content Deliver Network (CDN).  (A CDN is a number of connected proxy servers that communicate between a central computer and other devices that enable information, images, video, etc. to be shared and load more quickly on the internet.)

180.  *Chose* to use U.S.-based CDNs to deliver a preferred experience for U.S. users in the form of speed, reliability and resolution of image content to end users. As compared with the U.S, for example, locations like Cyprus and Luxembourg load anywhere from 336% to 3,700% *slower* than data sent from CDN server in the U.S. (see https://wondernetwork.com/pings).

181.  *Chose* to use a U.S.-based company, Reflected Networks CDN, for their core business for PornHub.com, YouPorn.com, RedTube.com, Xtube.com Tube8.com, and many other websites that illegally featured Plaintiff.

182.  Optimized search engine optimization across multiple U.S-based search engines to differentially and preferentially target the U.S.;

183.  Designed their websites to *differentially* target the U.S. through an intentional choice:

    i.    To provide content in the English language; (even though the official languages of Luxembourg are German, French and Luxembourgish.)

    ii.    To cater customer preferences and advertising markets by region, including heavily to the U.S.;

    iii.    To tailor search terms for the world to use through U.S.-based search engines, including Google (California), Yahoo (California), Bing (Microsoft-Washington), and DuckDuckGo (Pennsylvania), including for Plaintiff's nonconsensual content.

    iv.    To put disclaimers on their global websites about U.S. Laws (but

FIRST AMENDED COMPLAINT

*not* the laws of other jurisdictions), specifically DMCA (Digital Millenium Copyright Act); California Consumer Protection Act; California Consumer Privacy Act; and U.S. Copyright laws.

184.   Targeted the U.S. for financial transactions through U.S. banks, backed by the FDIC, through California based Visa, Mastercard, and PayPal, regulated by the laws of the U.S., and chose to conduct business with the U.S. Dollar, availing itself of the stability and relative strength of the Dollar in the global economy.

185.   Partnered with U.S. investors;

186.   Targeted the United States Patent, Trademark & Copyright laws as a core part of their business enterprise. This U.S. intellectual property allowed Aylo to maximize views and monetize Plaintiff's sex trafficking content.  They have chosen to enforce these intellectual rights in the United States District Courts, even against foreign defendants.

187.   Hired an estimated 200 to 1,400 employees in the U.S. from 2012 through 2023 subject to the labor and employment laws of the U.S.

188.   Contributed to the US-based "Free Speech Coalition" which lobbies for the pornography industry's interests to oppose age verification laws and mandatory use of condoms in filming.

189.   Spent funds and advertised to influence elections and public policy in the U.S. by opposing age verification laws, use of condom in pornography laws and general get out the vote messaging in this U.S.



An ad campaign targeted U.S. voters.

FIRST AMENDED COMPLAINT

190. Hired primarily American models, actors, videographers, editors and producers for their own content-creation.

191. Advertised uniquely and heavily in the U.S. to attract U.S. customers both online and in the form of physical billboards located in U.S. cities.


Billboard in Los Angeles, CA


Billboard in New York, NY



Digital ad campaign targeted U.S. users:

*"DIY
America's Largest Do-It-Yourself
Website"*

/ / /

/ / /

/ / /

/ / /

/ / /

FIRST AMENDED COMPLAINT

Before that, Pornhub had a campaign called Pornhub Gives America Wood: after each 100 Big Dick videos watched, Pornhub planted a tree. If you recall how many people watch Pornhub daily, that's a lot of trees!



Pornhub Care PR Campaign targeting U.S.:

*"Pornhub Gives America Wood"*

192.   Plaintiff's claims arise out of these U.S. forum-related activities. Plaintiff was trafficked, deceived, threatened, assaulted and prohibited from leaving in the U.S., which was the location of where she was lured, detained and filmed without consent.  That content was then uploaded in the U.S. and distributed from the U.S. to Aylo S.à.r.l.'s worldwide distribution network.

193.   The exercise of Rule 4(k) jurisdiction over Aylo Holdings, S.à.r.l. is *reasonable* because:

    a.   They significantly interjected itself into the affairs of the U.S.,

    b.   Their burden of defending in the U.S. is minimal as they have over a decade of business and legal experience in the U.S.,

    c.   They have a longstanding relationship with an experienced U.S. legal team, and they have experience as both plaintiff and defendant in the Courts of the U.S.,

FIRST AMENDED COMPLAINT

d. There is no meaningful conflict with the sovereignty of Luxembourg as they do not enforce these underlying laws and defendant does not actually operate out of Luxembourg,

e. The forum of the U.S. is the most efficient judicial resolution of the controversy because the tort occurred in the U.S. and pertains to the enforcement of the laws of the United States,

f. The forum is critical to the interests of Plaintiff, a sex trafficking victim, who has done nothing wrong and should not be hailed into the court of a foreign country when she was victimized in the U.S. and the resource differential between the parties is so vast that denying access to Aylo S.á.r.l. in this forum would render her rights under the TVPRA illusory.  Additionally, it would be a perverse public policy outcome if foreign actors could profit from sex trafficking American citizens on American soil, but domestic ones could not; and

g. Unless the Court finds Personal Jurisdiction in California as to some or all of the Defendants,  there are no state courts of general jurisdiction that would have jurisdiction over the foreign defendants (Aylo Holdings S.à.r.l., Aylo Freesites Ltd., Aylo Premium Ltd, and ECP) – unless alternatively the Court were to ultimately find that these entities are alter egos of one another.

ii. <u>Rule 4(k) Jurisdiction: Aylo Freesites, Ltd.</u>

194.   Aylo Freesites, Ltd. Operates and services all of Aylo Holdings S.à.r.l.'s tube sites, including Pornhub.com, RedTube.com, YouPorn.com, and You8.com and is controlled and operated out of the U.S. and Canada, and targets users in the U.S.

195.   Aylo Freesites, Ltd. is wholly owned and fully controlled by Aylo Holding's S.á.r.l. and therefore incorporates by reference and realleges each and every example of purposeful, intentional, targeted acts to the U.S. in the foregoing paragraphs 164-166 (a) - (y) as if fully alleged herein.

31

196. Aylo Freesites, Ltd. directly and through its alter ego subsidiaries *purposefully* and *intentionally* performed or *consummated* the following additional acts *directed and aimed at* the forum of U.S. and Plaintiff's claims arise from these forum-related activities:

    a. Captured, used and sold data of users from the U.S. to the U.S.;

    b. Designed Aylo Freesites, Ltd.'s websites to maximize interaction with users and content providers with the financial goals of converting free viewers to paid subscribers, such that the highest percentage of viewers and subscribers every year are in the U.S.

    c. Failed to create policies that would meaningfully review and remove content of known U.S. sex traffickers and purveyors of child pornography because the revenue it generated was more important to them than the lives it destroyed.

    d. Hosted, promoted and profited by posting sex trafficking videos on its worldwide network of websites, including Plaintiff, from the U.S. and processed millions of dollars through the U.S. on an annual basis. The free tube sites are some of the most trafficked websites on the internet and generated over $460 million in 2018.

    e. Reported in every Pornhub Year in Review that the United States is the number one country for viewers every year in the world -- by a significant margin. In 2020 Aylo's tube sites received an average of 3.17 trillion monthly web impressions, more than internet giants Amazon (2.58 trillion), Netflix (2.47 trillion, and Reddit (1.55 trillion).

    f. Advertised differentially to the U.S. through its sub-persona, "TrafficJunky". In their terms of use for advertisers as recently as July 8, 2024, they say "TrafficJunky" means Aylo Freesites, Ltd." TrafficJunky *only* provides Zip code and income targeting in the U.S. for the prerential benefit of advertisers targeting U.S. customers.

FIRST AMENDED COMPLAINT

197. The foregoing purposeful, intentional acts consummated in the U.S. gave rise to Plaintiff's claims.

198. Exercise of Rule 4(k) jurisdiction over Aylo Freesites would be reasonable. See Paragraph 168.

199. Unless the Court finds Personal Jurisdiction in California as to some or all of the Defendants, there are no state courts of general jurisdiction that would have jurisdiction over the foreign defendants (Aylo Holdings S.à.r.l., Aylo Freesites Ltd., Aylo Premium Ltd, and ECP) – unless alternatively the Court were to ultimately find that these entities are alter egos of one another.

### iii. Rule 4(k) Jurisdiction: Aylo Premium Ltd.

200. Similar to Aylo Freesites, Ltd., Aylo Premium Ltd. operates and services Aylo's premium sites and/or paysites which offer subscription-based content and include, RedTubePremium.com, YouPornPremium.com, You8VIP.com, and Brazzers.com, which sites they target at the U.S.

201. Aylo Premium, Ltd. is functionally a sister company of Aylo Freesites, Ltd., except that it operates the majority of the paysites and subscriptions.

202. Aylo Premium, Ltd. is wholly owned and fully controlled by Aylo Holding's S.á.r.l. and therefore incorporates by reference and realleges each and every example of purposeful, intentional, targeted acts to the U.S. in the foregoing paragraphs 164-166 (a) - (y) as if fully alleged herein.

203. Aylo Premium, Ltd. is interrelated and works in conjunction with the U.S. Defendants, Aylo Global Entertainment, Aylo Billing U.S. Corp, and Aylo USA Incorporated to provide the necessary billing services for subscriptions and paysites, to sell and ship its merchandise from the merchandise stores, all of which are located in the U.S.

204. Aylo Premium Ltd. writes scripts, hires the production team and does the pre- and post-production work. Aylo created some of its own content and videos and frequently did so in California, using California actors, videographers, editors, and

33

FIRST AMENDED COMPLAINT

producers such that they were essentially "at home" in California.

205. Aylo Premium Ltd knowingly promoted, advertised, distributed, and profited from nonconsensual materials by publishing content from victims of sex trafficking, including GDP victims and Plaintiff in the U.S.

206. Those premium sites are one of the more frequent subjects of advertisements placed on Pornhub and other Aylo tube sites, including its nonconsensual sex trafficking content used to attract and more deeply engage users on those sites.

207. Plaintiff's U.S.-originating sex trafficking images were used as banners and advertising to get paying subscribers and Plaintiff's images also appeared on Brazzers.com and other paysites.

208. Exercise of Rule 4(k) jurisdiction over Aylo Premium, Ltd. is reasonable.

209. Unless the Court finds Personal Jurisdiction in California as to some or all of the Defendants, there are no state courts of general jurisdiction that would have jurisdiction over the foreign defendants (Aylo Holdings S.à.r.l., Aylo Freesites Ltd., Aylo Premium Ltd, and ECP) – unless alternatively the Court were to ultimately find that these entities are alter egos of one another.

iv. Rule 4(k) Jurisdiction: 9219-1568 Quebec, Inc.

210. 9129-1568 Quebec Inc. has sufficient minimum contacts with the U.S. that relate to the conduct underlying these claims to comport with Due Process.

211. 9219-1568 Quebec, Inc. filled an essential and significant role within the Aylo enterprise. Under the direction of Aylo Holdings S.à.r.l. and Aylo's Control Group, 9219-1568 Quebec, Inc. is interrelated and works in conjunction with Aylo Freesites Ltd., Aylo USA Incorporated (located in California) Aylo Premium Ltd., Aylo Global Entertainment (located in California), and Aylo Billing US Corp. (located in California) as one business and operates as a whole.

212. 9219-1568 Quebec, Inc. hired and managed U.S. employees in the U.S. that advised content providers as well as developed, published, maintained,

34

FIRST AMENDED COMPLAINT

advertised, edited, and optimized GDP's videos on Aylo's tube sites and paysites, directed at U.S. audiences, including the videos and images of Plaintiff.

213.   9219-1568 Quebec, Inc. is wholly owned and fully controlled by Aylo Holding's S.á.r.l. and therefore incorporates by reference and realleges each and every example of purposeful, intentional, targeted acts to the U.S. in the foregoing paragraphs 164-166 (a) - (y) as if fully alleged herein.

214.   Plaintiff's claims arise out of and are related to 9219-1568 Quebec, Inc.'s ties to the forum of the U.S., the Aylo-GDP content partnership in the U.S., and the exploitation of U.S. Plaintiff's videos by the employees of Aylo's 9219-1568 Quebec, Inc. who advised and worked with the San Diego-based GDP sex traffickers.

215.   9219-1568 Quebec, Inc. employees thus took the U.S.-generated sex trafficking content and assisted in maximizing worldwide view, and thus, exponential harm to Plaintiff.

216.   The exercise of jurisdiction over 9219-1568 Quebec, Inc. is reasonable because of the essential function and role of this entity within Aylo's global enterprise, including conducting substantial business in the U.S, and the tortious acts of Aylo's Control Group and employees to optimize and monetize GDP's U.S. sex trafficking content, including Plaintiff's videos, and other illegal content.

217.   Contrary Fady Mansour's Declaration that ECP is distinct from the Aylo entities and does not participate in or exercise control of the Aylo entities' operations, Mansour himself is a majority owner of Aylo's subsidiary 9219-1568 Quebec, Inc. with majority control and voting rights.

218.   Unless the Court finds Personal Jurisdiction in California as to some or all of the Defendants,  there are no state courts of general jurisdiction that would have jurisdiction over the foreign defendants (Aylo Holdings S.à.r.l., Aylo Freesites Ltd., Aylo Premium Ltd, and ECP) – unless alternatively the Court were to ultimately find that these entities are alter egos of one another.

/ / /

35

FIRST AMENDED COMPLAINT

v.  <u>Rule 4(k) Jurisdiction: Ethical Capital Partners, Ltd.</u>

219.   ECP has sufficient, targeted, minimum contacts with the U.S. that relate to the conduct underlying these claims to comport with Due Process.

220.   ECP knowingly purchased and became the new controlling owner and parent of the same underlying Aylo single enterprise and chose to continue the seller's business, including their targeted ties to the forum of the U.S., and therefore incorporates by reference and realleges each and every example of purposeful, intentional, targeted acts to the U.S. in the foregoing paragraphs 164-166 (a) - (y) as if fully alleged herein.

221.   ECP directly and through its alter ego subsidiaries *purposefully* and *intentionally* performed or *consummated* the following acts *directed and aimed at* the forum of U.S. and Plaintiff's claims arise from these forum-related activities:

    a.  Targeted Aylo for purchase with knowledge that they entered into a Content Partnership Agreement with US-based sex traffickers, GDP, from 2009 through 2020, including providing a dedicated "channel" on Pornhub with marketing for all of the sex trafficking content from this U.S.-partnership.

    b.  Targeted Aylo for purchase with knowledge that they are providing home offices in the U.S. for several subsidiaries under the control of Aylo Holdings S.à.r.l., specifically for Aylo Global Entertainment, Inc, Aylo USA Incorporated and Aylo Billing US Corp.

    c.  Moved the Aylo offices in the U.S. from California to Texas in December of 2023.

    d.  Agreed to the terms U.S. DPA and consented to be subject to its U.S. jurisdiction as the "new owner" of Aylo Holdings S.à.r.l. and Aylo enterprise.

    e.  Admitted, as the new owner, that the enterprise had profiting illegally from their partnership with the U.S. GDP sex trafficking venture.

36

FIRST AMENDED COMPLAINT

222. Plaintiff's claim arises from same illegal conduct and sex trafficking partnership.

223. Once ECP purchased the Aylo consolidated enterprise their main asset was the pornography empire created primarily in the U.S, with U.S. actors, models, or sex trafficking victims, in the English language for a disproportionately American audience.

224. ECP is presently using and continuing Aylo's pornography websites and the search engine optimization through U.S. companies and deriving the majority of their profits from advertisers and subscribers in the U.S. Through the continuation of the Aylo business enterprise after its acquisition and continuing to target the U.S. with its pornography websites, including Plaintiff's name and images, ECP is subject to jurisdiction.

225. ECP continues to use servers in the U.S, boosted by CDNs, to create faster download times and higher definition content preferentially and differentially for US audiences compared to other countries.

226. ECP through its intermediaries and subsidiaries, including Aylo Freesites, Ltd. use a CDN ("CDN") to deliver significantly preferential experience to U.S. users.

227. The revenue, dividends and profits for ECP continues to rely on routinely billing and processing credit card payments in the U.S. through California processing companies Visa, Mastercard, and PayPal, among others.

228. ECP continues to design their websites and interactive features *differentially* targeted to the U.S. through an intentional choice:

    a. to provide content in the English language;

    b. to cater customer preferences and advertising markets by region, including heavily to the United States;

    c. to tailor search terms for the world to use through U.S.-based search engines, including Google (California), Yahoo (California),

Bing (Microsoft-Washington), and DuckDuckGo (Pennsylvania), including for Plaintiff's nonconsensual content.

    d.  to put disclaimers on their global websites about U.S. Laws (but not the laws of other jurisdictions), specifically DMCA (Digital Millenium Copyright Act) take down instructions.

229. ECP *purposefully* directed or availed themselves of the benefits, infrastructure, privileges, and laws of the U.S. by committing multiple intentional acts, expressly aimed at the forum of the U.S, and failing to remediate, refund, or compensate profits illegally obtained from the U.S. sex trafficking victims, including Plaintiff.  ECP knowingly has invested, earned interest, and grown profits from the sex trafficking partnership between Aylo and GDP.

230. ECP directly and through its intermediaries have *purposefully and intentionally* targeted the U.S. as the number one location for the highest number viewers and subscribers in the world.  The U.S. is also their #1 profit center in the world and this status has been achieved by *differentially targeting* to the U.S. both in how it deployed is human resources and employees and how it used its technology for targeting and optimization.

231. ECP, *purposefully and intentionally* chose to create or acquire the Aylo enterprise, including its subsidiaries in the United States: Aylo Billing US Corp (Delaware), Aylo Global Entertainment (Delaware), Aylo USA Incorporated (Delaware), Aylo Holdings USA Corp (Delaware), FTSA, LLC (Delaware), Clixir US, Ltd (Delaware), MG D.P. Corp (Delaware), MG Processing II Corp. (Delaware), Club Jenna, Inc. (Delaware), and Dolce Amore, Inc. (Delaware).

232. ECP directly and through its intermediaries has *purposefully and intentionally* targeted the U.S. because its owners *chose* to continue locating its servers in the U.S. (Massachusetts) to provide for faster, higher-definition experience for U.S. users.  (MYIP.US. 738 Main St Pmb 140, Waltham, MA, 02451, US)**.**

233. Aylo Premium, Ltd. (owned and controlled by ECP at the time) claimed

FIRST AMENDED COMPLAINT

$285 billion in lost revenue for copyright infringement *from the U.S. alone*. (*MG Premium Ltd.. v. Hoi* (C.D.Cal. Nov. 6, 2023, No. 2:23-cv-00349-CBM-PVCx) 2023 U.S.Dist.LEXIS 230565.)

234. Aylo Premium Ltd. claimed that unauthorized free access to Premium's content for even one month would amount to 27.6 million x $9.99 or $275 billion in lost revenue. This means ECP earns at least $275 billion per month from the U.S. through their Premium accounts. Therefore, the financial destiny or profits or losses for ECP largely rise and fall based on business in the U.S.

235. Plaintiff's claims directly *arise out of* Aylo's conduct and partnerships in the U.S. and ECP's continued hosting and promotion of Plaintiff's name and videos up through February of 2024 under ECP's ownership.

236. Plaintiff's claims arise out of ECP knowingly financially benefiting from U.S. sex trafficking ventures and their role in facilitating the fraudulent transfer of the Aylo consolidated business' assets to avoid liability in the U.S.

237. ECP is the beneficial owner of the profits derived from GDP sex trafficking venture, and any investment revenue and interest derived therefrom.

238. Plaintiff's claims directly *arise out of* Aylo's conduct and partnerships in the U.S. and ECP's continued hosting and promotion of Plaintiff's name and videos.

239. The exercise of Rule 4(k) jurisdiction over ECP is *reasonable* because:

    a. ECP significantly interjected itself into U.S. affairs.

    b. ECP's burden of defending in the U.S. is minimal as they have over a decade of business and legal experience in the United States.

    c. There is no meaningful conflict with the sovereignty of the British Virgin Islands as they do not enforce these underlying laws and defendant does not actually operate out of the British Virgin Islands.

    d. The forum of the U.S. is the most efficient judicial resolution of the controversy because the tort occurred in the U.S. and pertains to the enforcement of the laws of the U.S.

FIRST AMENDED COMPLAINT

e. The forum is critical to the interests of Plaintiff, a sex trafficking victim, who has done nothing wrong and should not be hailed into the court of a foreign country when she was victimized in the United States and the resource differential between the parties is so vast that denying access to ECP in this forum would amount to rendering her rights under the TVPRA being empty and unenforceable.

240. Unless the Court finds Personal Jurisdiction in California as to some or all of the Defendants,  there are no state courts of general jurisdiction that would have jurisdiction over the foreign defendants (Aylo Holdings S.à.r.l., Aylo Freesites Ltd., Aylo Premium Ltd, and ECP) – unless alternatively the Court were to ultimately find that these entities are alter egos of one another.

241. The foreign parent companies continue to *choose* daily, targeted, continuous and substantial business in the U.S.

**2.** **The Court Also Has Specific Jurisdiction Over Foreign Aylo Defendants.**

i. Specific Jurisdiction: Aylo Holdings S.à.r.l.

242. Additionally, and/or in the alternative, this Court maintains specific personal jurisdiction over each foreign defendant because their respective California-based contacts give rise to and are related to, the Plaintiff's claims alleged herein, specifically, that Aylo Holdings S.à.r.l., Aylo's Control Group and subsidiaries, implemented policies and practices which enticed, promoted, and monetized nonconsensual content across its tube sites and paysites, engaged in a partnership and contractual relationship with San Diego-based sex traffickers, and published, distributed, promoted, and exploited Plaintiff's videos acquired by the sex traffickers on Aylo's tube sites and pay sites.

243. This Court has specific jurisdiction over Aylo Holdings S.à.r.l. because Aylo Holdings S.à.r.l. has sufficient minimum contacts with the State of California comport with traditional notions of fair play and substantial justice.

FIRST AMENDED COMPLAINT

244. Aylo Holdings S.à.r.l. owns and controls the vast collection of domain names and websites for its tube sites and paysites, a substantial portion of which upload *content created in California* and are *served to California viewers*, *advertisers* and *subscribers*.

245. Aylo Holdings S.à.r.l. through Aylo's Control Group directed and controlled the operations of its subsidiaries and websites allowing nonconsensual and illegal content to be hosted, distributed, and monetized through California.

246. Aylo Holdings S.à.r.l. through Aylo's Control Group and agents *purposefully and intentionally chose* to target California for conducting and *operating* its business, *marketing to California* and U.S, users and consumers, and earning profits, especially because *Los Angeles had the 4th highest traffic* in the world.  For decades California has been known as the *"Pornography Capital of the World"* – and Aylo is the dominant owner of worldwide pornography.

247. Aylo Holdings S.à.r.l. chose to operate its business in, California.

248. Aylo Holdings S.à.r.l. through Aylo's Control Group and agents *purposefully and intentionally* chose a business model where the majority of viewers that find their way to one of Aylo Holdings S.à.r.l.'s websites do so through "organic searches" such as one of the following California-based search engines (according to Similar Web):

      a.  Google (California)

      b.  Yahoo (California)

      c.  You Tube (California),

      d.  Reddit (California)

      e.  Twitter (X) (California)

      f.  Facebook (California) and

      g.  Instagram (California)

249. Aylo's worldwide business model includes identifying the "best" search terms and other search engine optimization strategies *purposefully and intentionally*

FIRST AMENDED COMPLAINT

*targeted to* these California-based companies in order to place first or at least on the first page of any given internet search.

250. Aylo Holdings S.à.r.l. through Aylo's Control Group and agents *purposefully and intentionally chose* to locate several of their shell subsidiaries to operate and facilitate its business enterprise in the United States with a *place of business* at 21800 Oxnard Street, Suite 150, Woodland Hills, California from at least 2012 at all relevant times until December 2023, including defendants Aylo Billing US Corp. (California), Aylo USA Incorporated (California), and Aylo Global Entertainment (California).

251. Aylo Holdings S.à.r.l. through Aylo's Control Group and intermediaries *purposefully and intentionally* hired and maintained 200 – 1,400 employees in the State of California from 2012 through 2023.

252. Aylo Holdings S.à.r.l. through its Control Group and agents has *purposefully and intentionally* targeted the U.S. and California because Aylo Holdings S.à.r.l. and its owners *chose* to make California the epicenter for its *content-creation* (*California* actors, videographers, producers, set design, editors, administrative and technology support – even for their websites owned or incorporated in other countries.)

253. Aylo Holdings S.à.r.l. through Aylo Freesites, Ltd. and Aylo Premium, Ltd. and agents were significant contributors in the *California-based* "Free Speech Coalition" which advocates for the pornography industry's interests to oppose age verification laws and mandatory use of condoms in filming. Aylo Freesites and Aylo Premium, acting on behalf of Aylo Holdings S.a.r.l., through their shared managers and directors, joined the Free Speech Coalition in petitioning the Attorney General of both Texas and Indiana regarding age verification laws in these states.

254. Aylo Holdings S.à.r.l. through Aylo's Control Group and subsidiaries Aylo Freesites Ltd. and Aylo Premium Ltd. entered into a partnership and agreements with *San Diego-based sex traffickers* GDP and GDT as content providers of

42

FIRST AMENDED COMPLAINT

nonconsensual and illegal content for Aylo's tube sites and paysites.

255.   *California*-based GDP and GDT sex trafficking venture became one of Aylo's most popular and profitable content provider on Aylo's tube sites and paysites, becoming the 13th most popular channel on Pornhub.

256.   Over 400 young women were sex trafficked through *California-based* GDP, and GDT using its airports, roads, hotels, branding, in partnership with Aylo Holdings S.à.r.l., Aylo's Control Group, its subsidiaries and agents.

257.   Plaintiff was one of the many victims of the GDP-Aylo sex trafficking venture and her claims arise out of Aylo Holdings S.à.r.l.'s *forum-related* activities.

258.   The *tortious conduct occurred*, repeatedly, against Plaintiff and other victims in California.

259.   The GDP and GDT nonconsensual *videos were created* in California, *uploaded* in California, *distributed* from California, *distributed* in California, *promoted* in and from California, and *monetized* in California.

260.   Aylo Holdings S.à.r.l. through Aylo's Control Group used California-based Aylo Billing US Corp. for billing and *financial transactions*.

261.   Aylo Holdings S.à.r.l. through Aylo's Control Group entered into and signed a DPA with the U.S. Attorney admitting liability for its partnership and illegal conduct relating to the GDP sex trafficking venture.

262.   In *Pres. Techs. LLC v. Mindgeek United States, Inc.*, No. 2:17-cv-08906-DOC-JPR) 2020 U.S. Dist. LEXIS 258311 (C.D. Cal. Dec. 18, 2020), Aylo Holdings, S.à.r.l, in its Answer and Counterclaims states that it "waives its objections as to personal jurisdiction and venue in the Court" and "admits the venue properly lies in this district and a defendant has a place of business at 2300 West Empire Avenue, 7th Floor, Burbank, California  91504."

263.   In *MindGeek S.á.r.l. v. WGCZ S.R.O.*, No. CV 15-08023-AB (AFMx), 2016 U.S. Dist. LEXIS 22633 (C.D. Cal. Feb. 24, 2016)*,* Aylo Holdings S.à.r.l *chose* to file suit in the Central District of California when it wanted to enforce its copyright

FIRST AMENDED COMPLAINT

interests over a foreign defendant, and as such availed itself of the California courts and has consented to the jurisdiction if this Court in the past.

264.   Aylo chose to host its annual "Pornhub Awards" in Los Angeles and use American celebrities such as Kanye West, Rick Ross, and Stormy Daniels to promote the red carpet event.

265.   Exercising specific jurisdiction over Aylo Holdings S.à.r.l. in the forum State of California is *reasonable* because:

   a. They interjected itself into the affairs of the California through its *daily business*, daily *marketing*, *local politics*, procuring, creating and disseminating *content* through local offices, and by entering *a decade-long contract with the California-based sex trafficking operation* that gives rise to Plaintiff's claims.

   b. The defendant's burden of defending in the State of California is minimal as they have over a decade of business and legal experience in California.   The defendant has a longstanding relationship with an experienced California legal team, and they have experience as both plaintiff and defendant in the Courts of California;

   c. The forum of California is the most efficient judicial resolution of the controversy because the conduct and tortious acts occurred in California, a significant number of witnesses are in California, and there is judicial experience in California on the laws in question which will be most efficient in adjudicating the claims at issue;

   d. The forum is critical to the interests of Plaintiff, a sex trafficking victim, who has done nothing wrong and should not be hailed into the court of a foreign country when she was victimized in California in a manner that violated the laws of the United States. The resource differential between the parties is so vast that

44

FIRST AMENDED COMPLAINT

denying Plaintiff access to hold Aylo Holdings S.á.r.l and its Control Group in this forum would amount to rendering her rights under the TVPRA meaningless.  Neither foreign nor domestic actors sould be able profit from sex trafficking American citizens on American soil;

e.  The only way to ensure that any judgment issued by this Court is enforceable is to hold parent company Aylo Holdings S.à.r.l. and the other defendants jointly and severally liable as alter egos; and

f.  There is no other alternative forum with greater targeted and relevant ties, which in practice would mean Plaintiff's rights would be illusory and on paper only and would leave Aylo Holdings S.à.r.l. beyond the reach of U.S. laws despite controlling the culpable decisions and illegal conduct at issue in this case.

ii.  <u>Specific Jurisdiction: Aylo Freesites, Ltd.</u>

266.  Aylo Freesites, Ltd. has sufficient minimum contacts with the State of California comport with traditional notions of fair play and substantial justice.

267.  Under the direction and control of Aylo Holdings S.à.r.l. and Aylo's Control Group, Aylo Freesites Ltd. operates Aylo's popular interactive tube sites, including the *production, distribution*, and *promotion* of nonconsensual and illegal content in California, purposefully directed at California users.

268.  At all relevant times, the operations of Aylo Freesites, Ltd. were directly supported by *California-based* subsidiaries Aylo USA Incorporated, and Aylo Global Entertainment for administrative support including operating and maintaining servers and back up library of content, and Aylo Billing US Corp. for billing and financial transactions, both with a principal place of business located at 21800 Oxnard Street, Suite 150, Woodland Hills, California.

269.  Aylo Freesites, Ltd. is wholly owned and fully controlled by Aylo Holding's S.á.r.l., and is an integral component of the Aylo business, and therefore

45

FIRST AMENDED COMPLAINT

incorporates by reference and realleges each and every example of purposeful, targeted acts directed at California. in the foregoing paragraphs 164-166 (a) – (y) as if fully alleged herein.

270.  California-based CDNs and servers are set up to maximize viewer experience and supporting the operations of Aylo's tube sites.

271.  Aylo Freesites, Ltd., through its sub-persona of TrafficJunky has built advertising software that specifically targets the U.S, and California.  For example, in the YouTube *tutorials* for how to use the software specifically show the "United States" and "California" and all US Zip codes available for targeting.

272.  California has been targeted as and is one of Aylo's *largest markets* for users, viewers, subscribers, and content partners for the tube sites operated by Aylo Freesites, Ltd.

273.  California has been targeted because it has been a significant source for *profits* for Pornhub and the host of Aylo's tube sites and paysites.

274.  Aylo Freesites, Ltd. through Aylo Holdings S.à.r.l. and its Control Group *chose* to engage in press, media, advertising, public policy and lobbying to protect the brand of "Pornhub," which site contained illegal content *created and produced* in California and chose to *actively advocate* for the pornography industry in California.

275.  Aylo Freesites, Ltd. *contracted* with San Diego-based GDP sex trafficking venture through its Content Partner Program and Premium Viewshare Program for *a decade* until GDP was forcibly shut down by the U.S. Department of Justice in October 2019.

276.  Aylo's contractual relationship with California-based GDP enticed and financially facilitated the fraudulent recruitment of more than 400 young women, including Plaintiff, in or *to California* where they faced entrapment, fraud, deception, intimidation, threats, coercion and/or force to create nonconsensual content for the mutual profit of Aylo and GDP.

277.  The *tortious conduct* which forms the basis of Plaintiff's claims occurred

46
FIRST AMENDED COMPLAINT

in San Diego, California and was monetized in California (filmed, edited, uploaded, advertised, promoted, search-engine optimized) and is related to Aylo Freesite Ltd.'s activities in the forum state of California.

278. But for the California-centered Aylo Freesites Ltd. operations and content partnership with California-based GDP, Plaintiff would not have been *trafficked in California* and there would not have been videos created of those encounters, produced, distributed or advertised for over a decade that stole her life, future, safety, freedom and identity.

279. The exercise of jurisdiction over Aylo Freesites, Ltd. is *reasonable* because Aylo Freesites Ltd., in conjunction with Aylo Holdings S.á.r.l., Aylo's Control Group, and U.S.-based Aylo USA Incorporated and Aylo U.S. Billings Corp., conduct substantial business in California and this District for more than a decade, entered into content partnership contracts with GDP in California, tortious conduct was committed in California as a result of that content partnership, earned revenue from producing, distributing, and monetizing illegal content, and conducted financial transactions in California.

280. Additionally, Aylo Freesites Ltd. is a named defendant in the DPA for its illegal conduct relating to the California-based GDP's sex trafficking venture. They admitted jurisdiction in other lawsuits in California, through representation by its long-term, experienced California-based attorneys, for its illegal business activities with GDP's sex trafficking venture was foreseeable and is just.

iii.  <u>Specific Jurisdiction:  Aylo Premium, Ltd</u>.

281. Aylo Premium, Ltd. has sufficient minimum contacts with and California to comport with traditional notions of fair play and substantial justice.

282. Aylo Premium, Ltd. is wholly owned and fully controlled by Aylo Holding's S.á.r.l. and therefore incorporates by reference and realleges each and every example of acts targeted to California in the foregoing paragraphs as if fully alleged herein.

47

FIRST AMENDED COMPLAINT

283.   Under the direction and control of Aylo Holdings S.à.r.l. and Aylo's Control Group, Aylo Premium Ltd. operates Aylo's popular interactive paysites, including the production, distribution, and promotion of nonconsensual and illegal content in California and purposefully directed at California users.

284.   Aylo Premium Ltd. is interrelated and operates as one business with Aylo Holdings S.a.r.l., Aylo Freesites Ltd., 9219-1568 Quebec, Inc., Aylo USA Incorporated, as well as California-based subsidiary Aylo Global Entertainment, for administrative support and Aylo Billing US Corp. for billing and financial transactions, both with a principal place of business located at 21800 Oxnard Street, Suite 150, Woodland Hills, California.

285.   Aylo Premium, Ltd.'s websites and business model is an inseparable, tandem sister site to those run by Aylo Freesites, Ltd. and as such Plaintiff incorporates by reference and realleges each and every example of acts targeting California in the foregoing paragraphs 266 – 280.

286.   The exercise of jurisdiction over Aylo Premium Ltd. is *reasonable* because Aylo Premium Ltd., in conjunction with Aylo Holdings S.à.r.l., Aylo's Control Group, U.S.-based Aylo Global Entertainment and Aylo U.S. Billings Corp., *conducted substantial business in California* for more than a decade, entered into Premium Viewership partnership contracts with GDP in California, *tortious conduct* was committed in California as a result of that *content partnership*, earned revenue from producing, distributing, and monetizing illegal content, and conducted *financial transactions* in California.

iv.   Specific Jurisdiction: 9219-1568 Quebec, Inc.

287.   9219-1568 Quebec, Inc. has sufficient minimum contacts with the U.S. and California to comport with traditional notions of fair play and substantial justice.

288.   Plaintiff incorporates by reference and realleges each and every allegation set forth in the foregoing paragraphs 266 – 286 as if fully alleged herein regarding the essential and significant role and function of 9219-1568 Quebec, Inc.

48

FIRST AMENDED COMPLAINT

and its employees within Aylo's consolidated business enterprise directed by Aylo Holdings S.à.r.l. and Aylo's Control Group.

289. 9219-1568 Quebec, Inc. is the entity that employed executives and staff for the Aylo business enterprise and provided essential technology support and development to content partners and users, as well as administrative support and services to subsidiaries Aylo Freesites, Ltd, Aylo Premium, Ltd., among others in the single business enterprise, including defendants named herein, that knowingly developed, promoted, advertised, distributed, and profited from nonconsensual and unlawful content, including Plaintiff's nonconsensual content.

290. Specifically, 9219-1568 Quebec, Inc. hired formatters on behalf of the Aylo enterprise in California and/or who worked with San Diego-based GDP sex trafficking venture to receive content, develop it, format it, edit it, and advertise it, and optimize it with its sophisticated technology and marketing resources for profit, including for the unlawful content of Plaintiff.

291. The GDP content of Plaintiff was created, formatted, distributed, and promoted by GDP, Aylo Holdings S.a.r.l., and its subsidiaries named herein, from California.

**3.     Alternatively, The Court Also Has Specific Jurisdiction Over Foreign Aylo Defendants Based On Alter Ego Theory.**

i. Aylo Entities Are Alter-Egos of One Another Through their Controlling Owners Bergmair, Antoon and Tassillo.

292. From 2013 to 2023, Aylo Holdings S.à.r.l. and its subsidiaries and sister entities operated as a single business enterprise controlled by Bergmair, Antoon, and Tassillo by:

a.     having unified financial interest and control across and throughout the entire Aylo enterprise;

b.     commingling their funds and other assets, failing to segregate funds between them, and diverting corporate funds and assets without authorization

49

FIRST AMENDED COMPLAINT

for noncorporate uses;

    c.    treating each other's assets as their own;

    d.    holding themselves out as being personally liable for the debts of each other;

    e.    failing to keep *bona fide*, accurate, and complete corporate and financial records;

    f.    using the same business locations and employing the same employees;

    g.    failing to adequately capitalize;

    h.    using each other as a conduit for a single venture of themselves; and

    i.    diverting assets without consideration from / to one another to the detriment of creditors, including Plaintiff.

293.   In doing all acts alleged herein, and operating as a consolidated, single business enterprise, Aylo Holdings S.à.r.l. and its subsidiaries, including the defendants named herein, were and are alter egos of one another.

ii. Unity of Interest.

294.   Aylo Holdings S.à.r.l.'s owners used the same directors, offices, and personnel across the consolidated, single business enterprise.

295.   Aylo's Control Group implemented self-serving contracts between Aylo subsidiaries.

296.   There are no arm's length "contracts" between Aylo entities because the Aylo Control Group controls *both sides* of the negotiations.

297.   To give the appearance of arm's length transactions, the Aylo Control Group claims to use "third parties to conduct transfer pricing studies" to set prices in the contracts between Aylo Holdings S.á.r.l. and its subsidiaries.

298.   The price set by these supposedly neutral third parties is meaningless because it is a zero-sum game within Aylo's web of subsidiaries. Every dollar paid by

FIRST AMENDED COMPLAINT

one subsidiary under the intercompany contracts is a dollar earned by another subsidiary, and in the end all profits flow back to Aylo Holdings S.à.r.l., where profits are distributed to Aylo's controlling owners, Bergmair, Antoon, and Tassillo.

iii.  Aylo Entities Use Same Offices and Employees

299.  Aylo's Control Group has centralized employment for Aylo Holdings S.á.r.l.'s consolidated business enterprise utilizing subsidiary, 9219-1568 Quebec, Inc. as the entity for the employment of executives and staff.

300.  Upon centralizing Aylo hiring, employees are told they will work across "various departments", but those departments are really interchangeable subsidiaries of Aylo.

301.  Aylo shares the same offices and employees. In California, three of its subsidiaries share an office at 21800 Oxnard Street, Suite 150, California 91367.  In Canada, Aylo shares offices out of 7777 Decarie Boulevard, Montreal, Quebec, H4P 2H2, Canada.

iv.  Each of the Aylo Entities Is Inadequately Capitalized.

302.  When Aylo (formerly MindGeek) purchased ManWin because Fabian Thylmann was investigated and charged with financial crimes and tax evasion, the new owners (Aylo and now ECP) inherited $362 million in debt, with interest rates as high as twenty percent (20%).

303.  Amid mounting civil and criminal actions due to Aylo's development, hosting, distributing, advertising, and monetizing illegal and nonconsensual content, Aylo Holdings S.á.r.l. increased the dividends it paid to its owners in 2020 to shield the assets (fraudulently) from liability.

304.  Revenue was generated from Aylo Holdings S.á.r.l.'s subsidiary entities, including the defendants named herein, but profits were paid to the owners through the parent company, Aylo Holdings S.á.r.l.

305.  The individual Aylo entities, alone, are inadequately capitalized because the Company operates as a single, consolidated business enterprise and the assets were

FIRST AMENDED COMPLAINT

depleted, transferred, and "sold" to ECP to protect Bergmair, Tassillo and Antoon.

306. Most of Aylo's estimated 150 subsidiary and shell organizations have little to no assets of their own, and whatever assets do exist on a given day can be transferred at the whim of Aylo's owners to be beyond reach of Plaintiff and other victims.

307. Aylo had to remove 70 - 80% of its profitable, but not consensual content in 2020, which presumably meant a loss of revenue. The Financial Times reports that Aylo is highly indebted, with hefty interest payments, sometimes exceeding profits.

v. The Aylo Entities and Their Owners Disregard The Corporate Form.

308. The owners of Aylo used each and every corporate entity in any manner they saw fit.

309. The intellectual property claimed by one entity (IP International S.à.r.l.) was used and claimed by all Aylo entities.

310. The fiduciary duty to represent the best interests of the corporate entity to follow the laws against sex trafficking and child pornography were routinely disregarded and subordinated to the direction and personal interests of the owners to maximize profit, even if it meant accepting, promoting, advertising and profiting off of nonconsensual and illegal acts.

311. The shell entities were not arms-length, distinct corporate entities and even if there is separate paperwork, they each in fact acted as extensions of the wishes and whims of the owners.

312. Public statements about the sex trafficking and child pornography scandals by "MindGeek" or "Aylo" were routinely made by Corey Urman or one of his *aliases* without regard for any separate corporate form.

/ / /

/ / /

/ / /

FIRST AMENDED COMPLAINT

vi. Aylo Entities Are Used as a Mere Shell to Conduct Affairs of Other Aylo Entities or Personal Affairs of the Owners and they Commingled Funds.

313. Aylo Holdings S.à.r.l.'s owners, Bergmair, Antoon and Tassillo, used corporate funds for personal travel, personal projects, personal real estate transactions, and transferred funds for improper purposes not related to the business and corporate form.

314. Upon centralizing Aylo hiring, employees are told they will work across "various departments", but those departments are really interchangeable subsidiaries of Aylo.

315. Corporate funds were also used or transferred to cover the debts and liabilities of other Aylo entities to the benefit of the Aylo enterprise and its owners.

vii. Failure to Disregard Separate Entities Would Result in Fraud or Injustice.

316. Aylo Holdings S.à.r.l., its subsidiaries, and Aylo's Control Group purposefully implemented their complex, multi-jurisdictional corporate structure for illegal purposes and to insulate Defendants from liability for promoting an unrestricted content business model and monetizing unlawful content.

317. The controlling owners and directors ignored the corporate forms in their operations across the entities that gave rise to knowingly promoting, distributing, advertising and profiting from child pornography, sex trafficking and other nonconsensual content, including content depicting Plaintiff.

318. In committing all acts alleged herein, and by operating as a single, consolidated business enterprise, Aylo Holdings S.à.r.l. and its subsidiaries, including the named defendants, were and are alter egos of one another.

319. The only way to ensure that any judgment issued by this Court is enforceable is to hold Defendants jointly and severally liable as alter egos.

320. Treating the promoters and profiteers of sex trafficking as corporately

FIRST AMENDED COMPLAINT

distinct, when they *in fact* were one singular, consolidated business enterprise, would shield those who violate the laws of the U.S. pertaining to sex trafficking and child pornography, reward fraud, and result in profound injustice to sex trafficking victims, including Plaintiff.

321. Treating each of Aylo's subsidiary entities as if they were separate and independent entities would promote injustice, unfairness and fraud.

322. In addition to being alter egos, Aylo Holdings, S.à.r.l., its subsidiaries, including defendants named herein, were agents, servants, representatives, partners, joint venturers, co-conspirators, affiliates, parents, subsidiaries, and / or employees of each other.

323. Defendants acted within the course and scope of their authority as such agents, servants, representatives, partners, joint venturers, co-conspirators, affiliates, parents, subsidiaries, and / or employees and with the permission, authorization, consent and ratification of each other.

**4.**     <u>**The Court Has General Jurisdiction and Specific Jurisdiction Over Domestic Aylo Defendants.**</u>

324. This Court has general and specific personal jurisdiction over the domestic Aylo Defendants.

i. <u>Jurisdiction: Aylo USA Incorporated - Domestic</u>

325. At all relevant times, Aylo USA Incorporated was *at home in California* with a principal office, employees, and daily operations occurring in California.

326. Aylo USA Incorporated is incorporated in the State of Delaware and registered with the State of California to transact business in California.

327. Aylo USA Incorporated had a principal place of business and transacted business in California for over ten years. They maintained their principal place of business at 21800 Oxnard Street, Suite 150, Woodland Hills, California 91367 at all relevant times until December 2023.

328. From 2013 to 2023, Aylo USA Incorporated was directed and controlled

FIRST AMENDED COMPLAINT

by Bergmair, Antoon and Tassillo through Aylo Holdings S.à.r.l.

329. Plaintiff incorporates by reference and realleges each and every allegation identifying ties to California set forth in Section III.B.2 as if fully alleged herein.

330. Aylo USA Incorporated owns and operates Pornhub Apparel and the Brazzers Store, which among other things discloses under its terms of service on its website that, "To the extent the parties are allowed under these Terms to initiate litigation in court, both you and us agree that Claims will be exclusively litigated in either a small claims court of competent jurisdiction or the state *or federal courts located in the city of Los Angeles, California*."

331. The CEO of Pornhub Apparel resides in Sacramento, California and does business from Sacramento, California.

#### ii. Jurisdiction: Aylo Billing US Corp. - Domestic

332. At all relevant times, Aylo Billing US Corp was *at home in California*, with a principal office, employees, and daily operations occurring in California.

333. Aylo Billing US Corp. is incorporated in the State of Delaware and registered with the State of California to transact business in California.

334. Aylo Billing US Corp. transacted business in California and domiciled and maintained their principal place of business at 21800 Oxnard Street, Suite 150, Woodland Hills, California 91367 at all relevant times until December 2023.

335. Plaintiff incorporates by reference and realleges each and every allegation identifying ties to California set forth in the foregoing paragraphs in Section III.B.2. as if fully alleged herein.

336. From 2013 to 2023, Aylo Billing US Corp. was directed and controlled by Bergmair, Antoon and Tassillo through Aylo Holdings S.à.r.l.

#### iii. Jurisdiction: Aylo Global Entertainment, Inc. - Domestic

337. At all relevant times, Aylo Global Entertainment, Inc. was *at home in California*, with a principal office, employees, and daily operations occurring in

FIRST AMENDED COMPLAINT

California.

338.   Aylo Global Entertainment Inc. is incorporated in the State of Delaware and registered with the State of California to transact business in California.

339.   Aylo Global Entertainment, Inc. transacted business in California and domiciled and maintained their principal place of business at 21800 Oxnard Street, Suite 150, Woodland Hills, California 91367 at all relevant times until December 2023.

340.   Aylo Global Entertainment was directed and controlled by Bergmair, Antoon and Tassillo through Aylo Holdings S.à.r.l., until purchased by ECP.

341.   Plaintiff incorporates by reference and realleges each and every allegation identifying ties to California set forth in the foregoing paragraphs in Section III.B.2 as if fully alleged herein.

342.   Aylo Global Entertainment, Inc. was formerly Playboy Plus Entertainment and owned and operated by California-based Playboy before being acquired by Aylo.

**5.      Additionally, The Court Can Impute General Jurisdiction to The Foreign Defendants from The Alter-Ego Domestic Subsidiaries That They Control.**

343.   While the foreign Defendants are technically not "at home" in the U.S., they are *alter egos* with each other and with Aylo's California subsidiaries. The substantial business contacts from the subsidiaries that *are* at home in California can be *imputed* to the foreign parent corporations.

344.   The foreign parent companies, Aylo Holdings S.à.r.l. and ECP exercise *complete control* over the domestic subsidiaries:  Aylo USA Incorporated, Aylo Billing US Corp, and Aylo Global Entertainment, Inc. and each of those entities have general jurisdiction and are home in California.

345.   No part of the Aylo business enterprise, including the foreign parent corporations, Aylo Holdings S.à.r.l. and ECP, can operate or monetize their business

56

FIRST AMENDED COMPLAINT

without the U.S. based servers and California domesticated subsidiaries (*e.g.* billing).

346. Aylo Holdings S.à.r.l. in its corporate formation and all of its subsequent corporate amendment documents describes its *purpose as **"to coordinate and control all** of the businesses of any related 'connected' corporate entities."*

347. Under its corporate terms, Aylo Holdings S.à.r.l. has broad and unlimited corporate power and may dispose of any real or personal property for the whole or any part at the direction or discretion of the owners or directors. The company can and does operate as director and manager of all connected companies, typically through common local appointees controlled by the owners.

a. Andreou is the common point person for the foreign defendants as Class A Manager of Aylo Holdings S.à.r.l., director of Aylo Premium Ltd. and Aylo Freesites Ltd., and the president of 9219-1658 Quebec Inc. (among many other foreign entities in the Aylo Control Group) and from 2013 to 2023 was under the direction and Control of Bergmair, Antoon and Tassillo.

b. Andrew Link is the common point person for the domestic defendants as the CEO of Aylo USA Incorporated, Aylo Billing US Corp, and Aylo Global Entertainment (as well as many other domestic entities in the Aylo Control Group) and from 2013 to 2023 was under the direction and Control of Bergmair, Antoon and Tassillo.

348. Plaintiff incorporates by reference and realleges each and every allegation identifying the ties to California from its domestic alter ego subsidiaries as set forth in the foregoing paragraphs as if fully alleged herein.

349. Each foreign Defendant named herein additionally transacts significant and continuous business in State of California through Aylo's interactive tube sites and paysites.

350. Each of the foreign Defendants—Aylo Holdings S.à.r.l., Aylo Freesites, Ltd., Aylo Premium, Ltd., 9219-1568 Quebec, Inc.—conducts significant business activities within the State of California and have purposefully availed themselves of

FIRST AMENDED COMPLAINT

jurisdiction by: (a) directing their activities at California residents; (b) deriving benefit from their activities in California; (c) creating a substantial connection with California; (d) engaging in significant activities within California; (e) creating business relationships and continuing obligations between themselves and residents of California; (f) engaging in tortious acts and foreseeable consequences in California; (g) maintaining offices in California; and (h) employing California residents.

351.    Aylo Holdings S.à.r.l. through its directors, Andreou and Baba, signed the DPA *consenting* to jurisdiction in the U.S. and acknowledging regular satellite offices in Los Angeles, San Diego and California for the *same* conduct at issue in this complaint.

352.    The failure to disregard the fiction of their separate entities would result in fraud or injustice.

### 6.    The Court Has Personal Jurisdiction Over ECP.

#### i.  The Court has specific personal jurisdiction over ECP under successor liability theory.

353.    ECP has successor liability and is subject to personal jurisdiction of this Court because they consented to jurisdiction, are a mere continuation of the seller, and were formed for the purpose of fraudulently transferring the assets of Aylo Holdings S.à.r.l. and its subsidiaries to evade liability.

354.    The Court also has specific jurisdiction over ECP based on the substantial number of known and continuing targeted ties to California and the U.S.

#### (1)    The Creation of ECP and Its Control of Aylo's Enterprise.

355.    Ethical Capital Partners, Ltd. owns and controls Aylo Holdings S.à.r.l. and its consolidated, single business enterprise.  Through the continuation of the Aylo business after its acquisition and continuing to target California with its pornography websites, including Plaintiff's name and images, ECP is subject to jurisdiction.

356.    While ECP has tried to create distance between it and Aylo Holdings S.à.r.l. for purposes of evading this Court's jurisdiction, ECP, along with Aylo's

Control Group pervasively controls the *entire* business enterprise, directing the corporate policies and practices, and managing the daily operations to ensure their lawfulness. It is required to.

357. Aylo Holdings S.à.r.l. and its consolidated, single business enterprise endured a years-long criminal investigation from 2020-2023 by the U.S. Attorney for the Eastern District of New York directly related to its business partnership and conduct with San Diego-based GDP's sex trafficking venture and financially benefitting from sex trafficking and the commercialization of nonconsensual content.

358. ECP only evaded criminal prosecution by entering into the DPA, negotiated by the owners and directors of ECP and Aylo Holdings S.à.r.l.

359. ECP was created as an entity to receive Aylo Holdings S.à.r.l. stock to shield its owners from jurisdiction and liability and to protect their assets, including assets derived from illegal content and revenue sources.

360. ECP filed Articles of Incorporation in Ontario on December 12, 2021, after the U.S. Attorney commenced its criminal investigation in December 2020, but then also incorporated in the British Virgin Islands on May 12, 2022, during the investigation.

361. In March 2023, ECP acquired the stock of Aylo Holdings S.à.r.l., giving it complete and direct control of the company, its subsidiaries, and its vast network of global pornographic websites.

362. The criminal investigation was completed under ECP's ownership.

363. Despite ECP's representations to the public that it is a private equity firm, ECP is not actually a private equity firm and had no private equity with which to purchase Aylo Holdings S.à.r.l. and its consolidated business enterprise.

364. The choice to create layers of entities and incorporate in the British Virgin Islands serves the dual purpose of hiding ownership and information about the corporate entities, and evading liability for illegal conduct.

365. Officials in the British Virgin Islands acknowledged their unique

59

problem and need for assistance combatting human and sex trafficking and money laundering due to its proximity to the U.S. and lack of enforcement resources as far back as 2015.

366. Details about ECP and Aylo Holdings S.à.r.l.'s enterprise are intentionally shrouded in secrecy.

367. ECP has refused to disclose publicly the terms of the purchase.

368. ECP has refused to disclose any financial information.

369. ECP has refused to disclose the identities of owners, managing directors, or officers.

370. Plaintiff, a victim of trafficking and severe exploitation, should not be denied access to justice and penalized for the purposeful manipulation and secrecy by ECP and Aylo Holdings S.à.r.l.

371. ECP is now the ultimate owner of the exact same Aylo business enterprise that so heavily targeted the U.S, and California and has continued its business operations uninterrupted.

372. Solomon Friedman admitted in ECP's inaugural press release "Ethical Capital Partners will now have **_complete control_**" over its new assets." In this statement, ECP describes their new assets: "a technology and media company, owner of a large portfolio of adult entertainment properties, including Pornhub, YouPorn, Brazzers, Men.com, Sean Cody, Trans Angels, and Nutaku."

373. Solomon Friedman also stated in an interview that with the acquisition of Aylo, ECP not only gains _control_ of Pornhub, but several other sites, including RedTube, Brazzers, Nutaku, and YouPorn even though these websites and brands are allegedly operated by Aylo Freesites Ltd., Aylo Premium Ltd., Nutaku Ltd. and supported by other subsidiaries of Aylo Holdings S.à.r.l.

374. Although Fady Mansour submitted a Declaration in this action that claimed "ECP is distinct from the non-ECP defendants and does not participate in or exercise control over the non-ECP Defendants' day-to-day operations and affairs," by

FIRST AMENDED COMPLAINT

ECP's admissions to investors, the public, and U.S. Attorney this statement is not true. Fady Mansour is intricately involved with both ECP and Aylo Holdings S.à.r.l. He is the majority shareholder of both ECP and 9219-1658 Quebec, Inc. (a wholly owned subsidiary of Aylo Holdings S.à.r.l.), a director of ECP, and the Director, President, Secretary of an entity that together owns both ECP and Aylo Holdings S.à.r.l. called 1000498476 Ontario, Inc.

375.   ECP has the same address as Fady Mansour and Soloman Friedman's criminal defense law firm, Friedman Mansour LLP.

**(2)     ECP Consents to the Jurisdiction of the U.S.**

376.   Aylo Holdings S.à.r.l., its subsidiaries and successors, entered into the DPA with the U.S. Attorney on November 10, 2023.  The terms of the Agreement now apply to ECP, too, ***because the explicit terms of the DPA required it***.

377.   While ECP is not mentioned by name in the agreement, the U.S. Attorney references the "assurances" of the "new owner" in the agreement.  The agreement relied on the representations and consent of ECP representatives as the new owner and would not have been otherwise approved by the U.S. Attorney.

378.   ECP was aware that its targeted acquisition of Aylo Holdings S.à.r.l.'s business enterprise was under a DPA in the jurisdiction of the U.S., for knowingly profiting from the sex trafficking and exploitation of GDP victims, including Plaintiff.

379.   The terms of the agreement require that any new owner contractually agree in writing to be bound by the terms of the DPA.

380.   ECP explicitly consented to the jurisdiction of the U.S. surrounding under the DPA because:  "the Company agrees that in the event that during the Term, it undertakes any change in corporate form, including if it sells, merges or transfers business operations…it *shall include in any contract* for sale, merger, transfer or other change in corporate form *a provision binding the purchaser*, or any successor in interest thereto to the obligations described in this Agreement." **Ex. 1** (DPA) at 17 ¶ 24.

FIRST AMENDED COMPLAINT

381. Any proposed new change in corporate ownership structure required the prior approval of the U.S. Attorney's office so they could verify that the new owners would be subject to the agreement and the ongoing jurisdiction of the U.S.

382. "The Company *shall obtain approval* from the Office at least thirty (30) days prior to undertaking any such sale, merger, transfer or other change in corporate form, including dissolution, *in order to give the Office an opportunity to determine if such change in corporate form would impact the terms or obligations of the Agreement.* **Ex. 1** (DPA) at 18 ¶ 24.

383. In the DPA, Aylo *and its successors* agreed to the ongoing jurisdiction of the U.S. to monitor enforcement of the terms of the DPA for at least a three-year period following the November 10, 2023, signing of the agreement (at least until November 10, 2026).

### (3) ECP Explicitly Consents to Assume the Debts and Liabilities of Aylo Holdings S.à.r.l.

384. Based on the compliance with the terms of the DPA, ECP knowingly and explicitly accepted the legal liabilities of Aylo Holdings S.à.r.l., Aylo Freesites, Ltd., and Aylo USA Incorporated for their conduct with GDP.

385. "*Under its new ownership*, the Company has represented to the Office that it has taken additional steps to combat and prevent the dissemination of illegal content more broadly throughout the internet…" **Ex. 1** (DPA) at 4 ¶ 4(f).

386. ECP has *publicly held itself out* and *admitted* it is responsible for the future legal and ethical compliance of Aylo Holdings S.à.r.l.'s business enterprise and its guarantee that no further sex trafficking, rape, child pornography, or other nonconsensual content will appear on its websites.

387. "The Company represents that it has implemented *and will continue* to implement a compliance and ethics program throughout its operations, including those of its affiliates, agents and joint ventures, and those of its contractors and subcontractors." **Ex. 1** (DPA) at 11 ¶ 11.

FIRST AMENDED COMPLAINT

388.   Additionally, ECP has stated that it is interested in "just outcomes" and will "do right" by sex trafficking victims harmed by Aylo's conduct, which includes accepting rather than evading jurisdiction and liability.

389.   ECP cannot both be the compliant new owner who takes full responsibility and control for the enforcement of all the new terms for legal compliance *in the U.S.* and an "arm's length" buyer who has nothing to do with the day-to-day operations of Aylo Holdings S.à.r.l.'s global business enterprise, including predominantly in the U.S.

**(4)     ECP Impliedly Consents to Assume the Debts and Liabilities of Aylo Holdings S.à.r.l.**

390.   ECP was specifically created during the U.S. Attorney's criminal investigation of Aylo Holdings S.à.r.l. and its subsidiaries for unlawful conduct and for the purpose of bailing out and saving the company's business enterprise.

391.   ECP is controlled by criminal defense attorneys Fady Mansour and Solomon Friedman.

392.   ECP was aware of and participated in the U.S. Attorney's criminal investigation of the Aylo Holdings S.à.r.l. business enterprise.

393.   ECP admittedly performed due diligence on the pornography industry, Aylo Holdings S.à.r.l., its subsidiaries, including its assets and liabilities, before completing the acquisition of the stock.

394.   ECP was aware of the Aylo-GDP business partnership, and the fact that there were over 400 U.S. based victims, primarily out of California, whose nonconsensual content created profits included in the assets transferred to ECP.

395.   ECP, with that knowledge, *chose* to acquire control of the entire Aylo Holdings S.à.r.l. enterprise, and continue the entire business operation with the same directors and employees, same brands, same websites, and same GDP content.

396.   ECP has repeatedly acknowledged the problems created by trafficking and posting of nonconsensual content on the Aylo enterprise's platforms such as

FIRST AMENDED COMPLAINT

Pornhub, RedTube, and Brazzers, and has publicly committed to doing right by the victims and creating a gold standard for safety going forward, including for victims in the U.S.

397.   Several civil suits in the U.S. and the State of California, involving similar facts, were public and pending at the time of the stock acquisition.

398.   According to the U.S. Attorney's Office Press Release dated December 21, 2023, "Pornhub parent company admits to receiving proceeds of Sex Trafficking and Agrees to Three Year Monitor."  ECP was *already the parent company* at the time of the DPA and this press release that owned and pervasively controlled the Aylo enterprise.

399.   ECP made numerous public statements regarding its control of Pornhub and Aylo's portfolio of other pornography websites.

400.   While the *explicit* terms of the contract and stock acquisition have been kept secret, the terms of the DPA and surrounding facts demonstrate that, at a minimum, ECP *impliedly* accepted the debts and liabilities of Aylo Holdings S.à.r.l.'s consolidated business enterprise.

**(5)   ECP Is a Mere Continuation of the Seller.**

401.   ECP is a mere continuation of the business of the Aylo enterprise.

402.   Under ECP's ownership and direct control, ECP continued the operation of the Aylo consolidated business enterprise's websites and business, *without interruption*.

403.   Under ECP's ownership and direct control, the Aylo enterprise's business model of using free tube sites to attract viewers to convert to paying subscribers continued *without interruption*.

404.   Under ECP's ownership and direct control, the Trademarks and Patents for Aylo's brands continued, *without interruption*.

405.   Under ECP's ownership and direct control, the day-to-day operations regarding operations of Aylo's websites, creation of content, marketing, advertising,

64

FIRST AMENDED COMPLAINT

and distributing content continued *without interruption*.

406.   Under ECP's ownership and direct control, the employees of the Aylo enterprise continued their work supporting and advising content partners and users, without interruption.

407.   GDP's videos and content, including the nonconsensual content of Plaintiff, continued on the Aylo enterprise's websites after ECP acquired ownership and control.

408.   ECP was not a separate, pre-existing business, but rather one created expressly and solely for the purpose of continuing the consolidated Aylo enterprise.

**(6)     ECP Was Formed to Effectuate a Fraudulent Transfer of Assets.**

409.   Aylo Holdings S.à.r.l. admitted in the DPA to profiting from the GDP sex trafficking venture.

410.   Aylo Holdings S.à.r.l. then transferred the illegally acquired profits from that sex trafficking operation from Aylo Holdings S.à.r.l. and its consolidated business to ECP's ownership and control, where they could continue to invest, earn interest, and wrongfully shield those assets from the sex trafficking victims they harmed.

411.   Aylo Holdings S.à.r.l. had legal, financial and moral debts to the victims whose lives it ruined for profit.  Transferring assets to ECP perpetuates the fraudulent purpose of the Aylo enterprise evading jurisdiction and liability for the debts to sex trafficking victims, including Plaintiff.

412.   ECP had no pre-exiting business, assets, or equity.

413.   On information and belief, ECP had no assets or equity to acquire the stock of Aylo Holdings S.à.r.l.

414.   However, the extraordinary secrecy surrounding ECP and the acquisition of Aylo Holdings S.à.r.l. stock, especially in light of the Aylo enterprise's unlawful conduct, the DPA, and factual allegations herein, perpetuates fraud, injustice, and further harm to Plaintiff and other GDP sex trafficking victims.

FIRST AMENDED COMPLAINT

415. ECP's ownership and the involvement of or reversionary interest to any of Aylo Holdings S.à.r.l.'s prior owners and investors also remains secret to the detriment of Plaintiff and other GDP sex trafficking victims.

416. Rather, ECP chose, with the benefit of a lawyer as Director, to incorporate in a country that does not generally cooperate with law enforcement and is known as a tax haven, and a harbor for epic levels of sex and human trafficking, without meaningful laws or enforcement to prevent the type of illegal content procured, promoted, distributed and commercialized by the Aylo enterprise and ECP.

417. Designing this new structure to deny trafficking victims their rights and recovery under the laws of the U.S. *is* fraudulent and unjust.

418. Under the facts alleged in their entirety herein, and due to its involvement in and pervasive control of Aylo Holdings S.à.r.l.'s consolidated business enterprise, and responsibilities under the DPA for Aylo's unlawful conduct, ECP is a successor in interest, has liability to Plaintiff, and is subject to the jurisdiction of this Court under the theory of successor liability.

## ii. The Court has Direct Specific Jurisdiction over ECP.

419. ECP, directly, has sufficient minimum contacts with the U.S. and California to comport with traditional notions of fair play and substantial justice and to subject it to this Court's specific jurisdiction.

420. ECP purposefully and intentionally acquired Aylo Holdings S.à.r.l.'s entire business enterprise and library of websites and pornographic content, including unlawful content of Plaintiff and other victims, which is stored on servers in the United States, and promoted through Content Distribution Networks to prioritize the U.S. as a market for users, customers, and sales revenue.

421. All Aylo Holdings S.à.r.l.'s websites are now owned and controlled by ECP, are available in California, are marketed to California users, and include targeted advertising from California and US companies to a California audience.

422. ECP's acquisition of Aylo Holdings S.à.r.l.'s stock included at least three

66
FIRST AMENDED COMPLAINT

Aylo subsidiaries located in and operating from California to support Aylo's consolidated business enterprise with, among others, content creation and development, technology support, search engine optimization, marketing support and advice, administrative support, billing, and payment processing for the vast collection of tube sites and member-subscriber paysites.

423.   The ties of the Aylo enterprise to California should be imputed to ECP as the new owner of the continuing business enterprise.

424.   Under ECP's ownership and pervasive control, the business enterprise continues to purposefully direct and target activities at the forum state.

425.   ECP purposefully and intentionally continued to host, distributed, publicize, advertise, and monetize Plaintiff's GDP videos, content, and likeness in 2023 and 2024.

426.   ECP purposefully and intentionally targeted and acquired Aylo's consolidated business enterprise with full knowledge that Aylo's business model uniquely targeted and profited from the U.S.

427.   ECP purposefully and intentionally targeted and acquired Aylo's consolidated business enterprise with full knowledge that Aylo and the pornography industry targeted and still targets California as "The Porn Capital of the World".

428.   ECP purposefully and intentionally targeted and acquired Aylo's consolidated business enterprise with full knowledge that a disproportionate amount of its content was created in California, using either American actors and models, or sex trafficking victims lured into California for the purpose of creating profitable nonconsensual content.

429.   ECP purposefully and intentionally targeted and acquired Aylo's consolidated business enterprise with full knowledge they have offices in the U.S. and in California for over a decade.

430.   ECP chose to relocate the California-based Aylo companies to Texas to help defeat jurisdiction in California, where several cases were already pending.

FIRST AMENDED COMPLAINT

431. ECP - Aylo has chosen Courts of the U.S, including the Central District of California to enforce its Trademarks, even against foreign defendants, and filed multiple suits across the United States to pursue piracy of its intellectual property and content.

432. ECP in fact won a judgment in the Central District of California on July 8, 2024, for $2.1 million dollars for copyright infringement against a foreign pornography website and its owners, and thus has availed itself of the benefits of the Courts of the United States in this District.

433. Plaintiff's claims arise out of and are related to ECP and Aylo Holdings S.à.r.l.'s ongoing and continuing business and activities in the forum state.

434. ECP was a mere continuation of the Aylo business enterprise and as recently as June 2023, they were still advertising, publishing, reframing and constantly promoting Plaintiff's sex trafficking videos to the public.

435. Plaintiff's name and nonconsensual content was still being displayed, promoted and tweaked for different audiences on ECP's sites for at least six (6) months after ECP owned and controlled Aylo's enterprise.

436. After ECP acquired Aylo's business enterprise, the search engine optimization terms, including misspelled versions of Plaintiff's name were still directed to bring up Plaintiff and direct back to sites they owned to drive users and subscribers.

437. Exercising specific jurisdiction over ECP in the forum State of California is reasonable because:

    a. ECP targeted the acquisition of the Aylo Holdings S.a.r.l.'s vast consolidated business enterprise uniquely targeted to California and has substantial ongoing and continuing business ties to California through its daily business operations, daily marketing, procuring, creating, and disseminating, and commercializing content through its U.S. based network and local California offices.

FIRST AMENDED COMPLAINT

b. ECP's burden of defending in the State of California is minimal as the Aylo business enterprise has over a decade of business and legal experience in California.

c. ECP has a longstanding relationship with an experienced California legal team.

d. There is no meaningful conflict with the sovereignty of the British Virgin Islands as they do not enforce these underlying laws and defendant does not actually operate out of the British Virgin Islands.

e. The forum of California is the most efficient judicial resolution of the controversy because the conduct and tortious acts occurred in California, a significant number of witnesses are in California, and there is judicial experience in California on the laws in question which will be most efficient in adjudicating the claims at issue.

f. The forum is critical to the interests of Plaintiff, a sex trafficking victim, who has done nothing wrong and should not be hailed into the court of a foreign country when she was victimized in the United States and the resource differential between the parties is so vast that denying access to ECP in this forum would amount to rendering her rights under the TVPRA being empty and unenforceable.

g. There is no other alternative forum with greater targeted and relevant ties, which in practice would mean Plaintiff's rights would be illusory and on paper only and would leave "Ethical Capital Partners" beyond the reach of U.S. laws despite knowingly purchasing and profiting from sex trafficking.

C. **VENUE**

438. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action occurred in this District.

69

FIRST AMENDED COMPLAINT

439. Venue is proper in this District pursuant to 28 U.S.C. § 1391(c)(2) because an entity with the capacity to sue and be sued shall be deemed to resident, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action because the domestic Defendants maintained a principal place of business in the District.

440. Venue is proper in this District pursuant to 28 U.S.C. §1391(c)(3) because a defendant not resident of the United States may be sued in any judicial district, and the joinder of such defendant shall be disregarded in determining where the action may be brought with respect to other defendants.

441. Based on the convenience of the parties, the convenience of the witnesses, and in the interests of justice there is no other better venue. 28 U.S.C. § 1404.

442. Further, at least three of Aylo domestic subsidiary Defendants, that operated under the control of the foreign defendants, had offices in California in this District for the relevant time period up December of 2023.

## IV.  FACTUAL ALLEGATIONS

**A.  AYLO INTENTIONALLY IMPLEMENTED A BUSINESS MODEL WHEREBY IT SOLICITED, PROMOTED, & MONETIZED SEX TRAFFICKING CONTENT FOR PROFIT.**

**1.  Aylo's Choice to Allow Unrestricted Pornographic Content in its Business Resulted in the Worldwide Distribution, Advertisement, & Use of Nonconsensual Content for its Profit.[2]**

443. For more than a decade, Aylo (formerly known as MindGeek) has held the dominant monopoly amongst online pornography companies in the world.

---

[2] For all relevant facts alleged herein, Aylo operated as one enterprise through its alter egos and sister companies. *See* Section II.C: Defendants Operate as a Single Enterprise. While each Defendant's specific role and culpable conduct is enumerated as distinctly as possible in Section V: Causes of Action, Defendants' organizational complexity and lack of transparency make the further inner-workings of Aylo's pornography business network opaque to the public and to Plaintiff.

FIRST AMENDED COMPLAINT

444. From 2013 to 2023, Aylo was directly controlled and operated by its majority owner, Bergmair, and minority owners, Antoon and Tassillo, who also served as Aylo's CEO and COO, respectively, and their carefully selected directors (collectively, "Aylo's Control Group").

445. Bergmair, Antoon, and Tassillo built the Aylo empire by knowingly and intentionally adopting and implementing an ***unrestricted content business model*** under which they solicited, promoted, and monetized nonconsensual content, including sex trafficking, child pornography, and rape.

446. Aylo's owners did not merely provide a platform for others to post pornographic content. Rather, they actively assisted content providers, whether lawful or unlawful, in order to maximize the amount and variety of content on their numerous online sites in order to maximize views, paid subscriptions, and revenue.

447. In doing so, Aylo's owners intentionally disregarded the horrendous exploitation and abuse of multiple thousands of human beings, including children, teenagers,  and other vulnerable populations, facilitated the generation of content procured by criminal conduct, and then globally distributed and promoted such content on their websites to the horror and detriment of the victims.

448. Additionally, Aylo's business model assisted content partners in how to maximize views for every post and make as much money as possible.

449. Bergmair, Antoon, and Tassillo operated Aylo as a single, unitary business enterprise. *See* Section II.C.

450. These individuals created a fictitious highly complex, secretive multi-national corporate structure to attempt to evade sex trafficking, taxes, or pornography laws in the jurisdictions in which they operated and earned the majority of their revenues. *See* Section IV.E.

451. Such corporate fiction also obscured the true ownership and relationships of these businesses as well as the flow of monies and/or dividends funneled through any one entity at any given time. *See* Section IV. E.

FIRST AMENDED COMPLAINT

452. As experienced owners and executives in the pornography industry, Bergmair, Antoon, and Tassillo knew and understood that welcoming *all* content would necessarily result in the ubiquitous presence of nonconsensual content.

453. Bergmair previously owned and individually ran Pornhub competitor, Redtube, for years, and used the same unrestricted content model and ubiquitous presence of nonconsensual content at Redtube.

454. Similarly, before Antoon and Tassillo became owners of Aylo, they had been employed by and then became owners of Aylo predecessor Manwin for years with the same unrestricted content model and intentional monetization of child pornography and other nonconsensual content.

455. Bergmair, Antoon, and Tassillo continued this unrestricted content business model when they partnered to acquire Aylo, and Antoon and Tassillo did so as the CEO and COO until the alleged sale of their interests in 2023.

456. Aylo made the decision to avoid any real technological and human moderation and to instead devote all of Aylo's technological and human resources to monetizing unlawful content just like all other content.

457. Bergmair, Antoon, and Tassillo implemented and maintained these policies and practices for a decade until the alleged sale of their interests in Aylo in 2023.

458. Bergmair, Antoon, and Tassillo had knowledge and understood they were permitting, distributing, and promoting nonconsensual content because of the way they controlled the company and utilized its Search Engine Optimization ("SEO") technology to maximize its business and assist content partners and advertisers in preparing and editing their content.

459. Bergmair, Antoon, and Tassillo had knowledge due to regular reports they received and meetings they attended where issues regarding the performance and SEO of content were discussed.

460. Antoon, as CEO, had regular daily contact with Bergmair to discuss the

FIRST AMENDED COMPLAINT

Aylo business and took direction from him as the majority owner and ultimate decision maker on all material matters, including Aylo policies and practices with respect to sex trafficking, child pornography, and other nonconsensual content.

461. Bergmair, Antoon, and Tassillo received regular complaints, concerns, and questions from employees about how to treat suspected and disturbing illegal content.

462. Bergmair, Antoon, and Tassillo received hundreds of reports from law enforcement, advocacy groups, government agencies, victims, the press, website users, and their own employees that illegal and nonconsensual content was ubiquitous on Aylo's websites.

463. Nevertheless, these owners knowingly and intentionally decided to continue not only hosting illegal content, but capturing it, optimizing it, and using it as part of their product offering for profit.

464. For example, Aylo routinely hosted videos titled to indicate the content was unlawful and had previously been removed by federal authorities such as "deleted 3x so I'm tempting the FBI to do it 4x."

465. Aylo screens all video titles on its websites and allowed unlawful, previously removed content to be reposted because many viewers seek out illegal content.

466. GirlsDoPorn content was no exception. For years, Aylo facilitated GDP and the success of GDP's illegal videos on Aylo's websites for profit.

467. GDP was one of Aylo's most popular and successful content partners, becoming the 13th most popular channel out of thousands on Pornhub.

468. GDP's channel on Aylo's websites had nearly 800,000 subscribers, over 600 million views, and was aggressively promoted and controlled by Aylo.

469. Based on Aylo's unrestricted content business model and business partnership with GDP, Aylo distributed and promoted trafficked, nonconsensual pornographic content for profit, including that of Plaintiff.

73

470. GDP first trafficked Plaintiff for sex in 2013 and posted her content on Aylo's websites.

471. Aylo thereafter made Plaintiff its "poster child" for GDP videos. Plaintiff was aggressively exploited, distributed, and advertised throughout Aylo's websites.

472. Aylo created a highlighted "Porn Star" page for Plaintiff on Pornhub. This page listed Plaintiff as a featured "Porn Star," included Plaintiff's personal information, and falsely described Plaintiff as choosing a career in pornography.

473. Plaintiff's page had over 33,000 subscribers and 49,000,000 views.

474. Aylo continued to host, distribute, and advertise Plaintiff's nonconsensual sex trafficking videos and images for profit through 2023 because of the popularity of her videos.

475. Even after Plaintiff's videos were mostly removed in 2023, Aylo and ECP continued to use the popularity of Plaintiff's name as "click bait" via Aylo's algorithms and SEO technology to generate website traffic and revenue until 2024. By leaving her tags active and optimized, users searching for Plaintiff's nonconsensual content on Google, Yahoo, and other search engines would still be directed to Pornhub or another of Aylo's websites.

> **2.** **AYLO Used Sophisticated SEO Technology to Actively Commercialize Nonconsensual Content and Impede the Moderation and Removal of Unlawful Content**

476. To implement and promote its ***reckless and unrestricted content business model***, Aylo used its sophisticated SEO technology to optimize all its content, including child pornography and other nonconsensual content, for the purpose of maximizing the variety of pornographic content available to customers, website traffic, views, subscriptions and revenues throughout its numerous pornographic sites.

477. Utilizing SEO in this manner was an intentional, deliberate, and detailed business strategy and decision made by Bergmair, Antoon, and Tassillo as the

74

FIRST AMENDED COMPLAINT

company's owners and executive management.

478. The knowledge and intent of Bergmair, Antoon, and Tassillo to proactively adopt and monetize nonconsensual conduct existed from the inception of Aylo's business.

479. Aylo incorporated all unlawful content into its SEO process to maximize views and profits just as it did for all other legal content.

480. Nonconsensual content that was performing well was analyzed, refined, and tested to amplify that performance, and the results were used to optimize similar content and proactively provide content partners preferred titles, tags, and descriptions based on its SEO analysis.

481. Aylo's employees were directly involved in content creation and editing. Content creation and editing was directed at maximizing revenue.

482. Aylo's employees would add to and edit the content for maximum effect when they reviewed it and customize content for user preferences.

483. Aylo's formatters create buttons for some videos that describe certain types of sexual activity occurring within the video, thereby allowing viewers to jump ahead to desired sections of the video depicting the activity identified in the button. These efforts are another way to optimize profit sharing, ad placement, and otherwise capitalize on the data of user preferences.

484. Aylo's formatters create thumbnails for the videos on Aylo's tube sites and store these thumbnails on a separate server. Aylo explained to its content partners that thumbnails are a key component to attracting viewers to a video and the number of views by making the videos more appealing for users.

485. Aylo, through TrafficJunky, sells banner and sidebar advertisements as well as advertisements that appear before and after videos.

486. Aylo's employees are involved in advertisement placement, content, and editing to maximize views and revenue.

487. Aylo's SEO technology was so sophisticated that it could tell advertisers

what kind of content categories were most likely to engage with their ads, and allowed advertisers to geo-target specific audiences, such as U.S. or California viewers.

488.  Aylo placed these advertisements on pages viewed by users, including pages featuring nonconsensual content.

489.  Aylo's unrestricted content business model and use of sophisticated SEO technology to maximize content, traffic, and revenue regardless of the content's lawfulness directly conflicted with laws, regulations, and policies in place to prevent procuring, distributing, and viewing child pornography and other nonconsensual content.

490.  Aylo deliberately failed to develop and implement a meaningful moderation practice for identifying and excluding illegal content.  While videos were viewed for maximizing views and profits, they, were not viewed for the purpose of identifying and excluding illegal, violent or nonconsensual content.

491.  Aylo deliberately failed to use its sophisticated technology for flagging, reviewing, and removing illegal pornographic content from its sites.

492.  Aylo deliberately failed to effectively employ enough human moderators dedicated to reviewing all uploads to its sites and removing illegal pornographic content.

493.  Having a meaningful moderation practice for identifying and excluding illegal content directly contradicted the purpose and implementation of Aylo's unrestricted content business model.

494.  Aylo, its Control Group and employees, repeatedly ignored takedown requests from victims as well as law enforcement and government authorities.

495.  In 2020, in response to the *New York Times* article _The Children of Pornhub_ about a criminal investigation commenced by the U.S. Attorney, Aylo's Control Group scrambled to save its business by promising to implement moderation.

496.  Instead of actually delivering on its promises, Aylo's Control Group continued to proactively work to frustrate the effect of practices that would limit

76

content so they could continue to monetize as much unrestricted, illegal, content as possible for as long as possible.

497. When forced, Aylo's Control Group implemented a limited moderation process for its paysites only where payments were processed by Visa and Mastercard.

498. The moderation process was not implemented for Aylo's free tube sites where there was the greatest risk of nonconsensual content.

499. This decision and effort were directed by Antoon and Tassillo in consultation with Bergmair.

500. Aylo's limited policy of reviewing flagged content included only reviewing content that had been flagged at least fifteen times, and the review process was often slow due to backlog created by a lack of moderators.

501. An investigation by the Canadian Parliament and the Canadian Privacy Committee found in February 2024 that, among other issues: (a) Aylo's moderation practices remained "inadequate" and had "many deficiencies" that "are wholly inconsistent with an organization taking responsibility" for ensuring all content is consensual; (b) Aylo either had no knowledge whether all individuals depicted in the content in question consented or knew they did not; and (c) Aylo refused to take the necessary responsible corrective measures. **Ex**. 2 at ¶ 171.

502. Aylo's commercialization of child pornography and other nonconsensual content was not an innocent deficiency but the result of deliberate and knowing choices and business practices by its owners, management, and employees.

503. Most other companies with user generated content, like Facebook and Reddit manage to moderate and avoid illegal and nonconsensual content from being ubiquitous on their platforms. Aylo had the same resources but chose not to implement them. The fact that Aylo proactively avoided using its technology to identify, exclude, and/or remove unlawful content, and instead used it to optimize it, demonstrates its knowing intent.

/ / /

FIRST AMENDED COMPLAINT

**B.** **AYLO UTILIZED CONTENT DISTRIBUTION NETWORKS, SEO TECHNOLOGY & SERVERS IN THE UNITED STATES TO ASSIST CONTENT PARTNERS WITH MAXIMIZING ILLEGAL CONTENT, WEB TRAFFIC, & REVENUE.**

**1.** **Aylo's Global Platform and Distribution Channels for Content, Including Unlawful Content, is Vast and Worldwide.**

504. Aylo owns and operates hundreds of pornographic websites, including both paysites and freesites (tube sites).

505. Aylo controls the majority of pornography on the Internet through its various entities and sites.

506. Online pornography mainly consists of two types of websites: paysites and freesites.

507. Paysites are websites where content, services, and merchandise are sold, and customers are required to pay a monthly subscription to view the pornographic content.

508. Freesites, also known as tube sites, have no fee and contain content such as shorter five to ten-minute clips of longer pornographic videos. Aylo Defendants use freesites to attract significant web traffic with the goal of having potential customers purchase monthly subscriptions on the paysites.

509. Aylo's tube sites are interactive, robust, and multi-faceted e-commerce websites designed to attract and sell various sex-related products and services, primarily pornographic videos, to a high volume of sex industry customers, production companies, and performers. These websites are free to access and generate revenue through internal advertising for Aylo's other websites and sales to third party advertisers through TrafficJunky. These tube sites are free to access, and offer free user generated content as well as short clips of Aylo created content.

510. Aylo's tube sites do extensive business over the Internet, whereby Aylo

78

knowingly and repeatedly receives and transfers funds for various purchases and services, transfers computer files and other information, and enters into contracts with residents of all countries and states, including California.

511. The most popular feature on Aylo's tube sites is a searchable video library. Pornhub.com alone has more than 10 million pornographic videos in its free video library.

512. The videos in the public libraries on Aylo's tube sites come from numerous sources, including members of the public, third-party pornographic production companies and also Aylo itself, which publishes trailer versions of videos produced by its content partners and its own production companies and brands.

513. Until recently, Aylo did not implement or require an age or identification verification process for the uploading pornographic videos by members of the public or third-party pornographic production companies.

514. As part of the interactive experience offered on Aylo's tube sites, customers and viewers can create accounts, post comments regarding content, create online communities, and interact with one another.

515. Customers and viewers can subscribe to follow certain content providers or performers and send them compensation through the websites.

516. Aylo's tube sites also allow its customers and users to download videos from the public library for free as a free sharing platform.

517. This free downloading and sharing platform contributed to wide-spread distribution and use of nonconsensual content on the Internet.

518. In addition to the commercial and entertainment services offered to consumers, Aylo's tube sites offer business-to business opportunities and services.

519. Aylo offers pornography production companies the opportunity to partner with Aylo through several programs that allow Aylo to market, sell, and promote the content partner's videos in exchange for splitting the profits therefrom.

520. These programs include Aylo Content Partner Program and the Premium

Viewshare Program.

521. Aylo's tube sites also earn money through advertisement sales, whereby the advertiser pays Aylo for every 1,000 impressions their ad receives on Aylo's websites. Due to the high view counts on Plaintiff's nonconsensual videos, Aylo generated considerable ad revenue from her trafficked content.

522. Aylo's most visited tube site is www.Pornhub.com (Pornhub).

523. In 2019, Pornhub had approximately 42 billion visits with 39 billion searches. Averaging 115 million visits per day, Pornhub accommodated uploads for 6.83 million new videos that same year.[3]

524. In addition, Aylo owns and/or operates numerous other popular tube sites, including www.YouPorn.com, www.RedTube.com, www.XTube.com, www.Tube8.com, and Thumbzilla.com. Aylo deliberately cross-posts and re-formats successful content throughout their network in order to appeal to the largest audience possible.

525. Aylo also owns paysites such PornhubPremium.com, YouPornPremium.com, RedTubePremium.com, You8VIP.com as well as Brazzers, Babes.com, Digital Playground, Reality Kings, and Twistys and works to promote views, subscriptions, and revenue to each of the sites.

526. Aylo's *reckless and unrestricted content business model* is predicated on maximizing a variety of content, views, and traffic to its numerous websites, even if the content is illegal.

**2. Aylo Utilized SEO Technology to Assist Content Partners in Maximizing Website Traffic, Views, and Revenue.**

527. In furtherance of its business model, Aylo promotes its robust content development program for content providers and user associates to widely disseminate videos and/or share in revenue.

---

[3] *See The 2019 Year in Review*, PORNHUB INSIGHTS (Dec. 11, 2019), https://www.Pornhub.com/insights/2019-year-in-review.

FIRST AMENDED COMPLAINT

528. Aylo's business model significantly profits from sex videos featuring teens, child pornography, sex trafficking, depictions of incest and rape.

529. Aylo's Content Partner Program is described as follows:

> "The Content Partner Program is designed for studios with a paysite to expose their content to millions of visitors. Once partnered, you receive a personalized channel that includes free ad space both on your channel and on your videos. Through the use of video features on your homepage, your content is promoted to our users which will direct traffic back to your paysite with the intention of converting them into paying members. In turn, we would receive a share of this revenue through your affiliate program. There is no compensation based on views in this program."[4]

530. While Aylo's tube sites are predominately freesites which earn revenue through advertising and affiliate fees, portions of Aylo's tube sites also act as paysites through Aylo's Viewshare Program for premium members.

531. Aylo's Viewshare Program is described as:

> "The Viewshare program is designed to earn you revenue based on the number of views your content receives.  In this program you will upload full-length, HD videos which are locked behind our paywall, and you are compensated every time a Premium member watches your video. While Premium is an ad-free environment, partners receive a prominent "Join" button on their channel and below their videos to drive traffic back to their paysite."[5]

532. Aylo and its content partners enter into an explicit agreements whereby content partners agree, among other terms, that Aylo can use the content in exchange for the services Aylo will provide.

533. Aylo does not simply provide a neutral platform or means to post content

---

[4] *See What is the Content Partner Program?* PORNHUB, https://help.pornhub.com/hc/en-us/articles/4419878848019-What-is-the-Content-Partner-Program (last visited Sep. 8, 2023).

[5] *See What is the Viewshare Program?* PORNHUB, https://help.pornhub.com/hc/en-us/articles/4419891330195-What-is-the-Viewshare-Program (last visited Sep. 8, 2023).

FIRST AMENDED COMPLAINT

online. Rather, it actively engages with content partners and assists them with maximizing views to their content.

534. The Content Partners Guide states: "Our knowledgeable and friendly team will walk you through every step of the way. Contact us and start promoting your brand."[6]

535. Aylo offers content partners "The Pornhub Playbook: How to make money with Pornhub" Content Partners Guide to help content partners maximize profits with Pornhub and exposure to the content partner's content and brand.

536. In its explanation of "How to Succeed" on Pornhub's website, Aylo directed content partners to use up to 16 tags that describe the video and performers, select up to 8 relevant categories, use niche specific categories to ensure content is visible to the "right" fans, write a creative title that described the scene, and add a stage name to the title of the video.

537. Aylo's categories show how they specifically target viewers who are interested in certain types of content. For example, on the page explaining video categories, Aylo stated that "Teen" is one of its most popular categories.

538. Aylo provided assistance to content partners including detailed instructions on maximizing customer attention with suggested titles, descriptions, and categories.

539. Suggestions and assistance to content partners are created in part through Aylo's SEO analysis which determines what content will most effectively draw attention to that particular type of conduct.

540. SEO is the science of optimizing a website's ability to garner top search rankings and depends on many factors, including content volume, how well that content is described in detail, the website's ability to capture and analyze user interactions and preferences, and traffic.

---

[6] PORNHUB, THE PORNHUB PLAYBOOK: HOW TO MAKE MONEY WITH PORNHUB (Content Partners Guide), v.2.6 (Sep. 6, 2019, 3:45 PM).

FIRST AMENDED COMPLAINT

541. Aylo has a "Search Engine Marketing" team dedicating to "develop[ing] successful strategies to ensure top-ranking in search engine traffic."[7]

542. Keywords and tags are essential for customers' search engine optimization on Aylo's sites.

543. Aylo's own formatters review and modify the content as they deem appropriate for developing it for posting and advertising, including modifying the titles, themes, descriptions, text, keywords, tags, categories, images, and videos themselves.

544. Aylo then proactively draws attention to the content by combining it with other, similarly described content and promoting it to others who Aylo identifies as likely to be interested in the form of proposed searches or playlists.

545. Such an unrestricted content business model provides Aylo a continuous stream of new and different content to generate more traffic to its numerous websites and increase revenue.

546. Aylo uses this traffic and content to: (a) advertise and drive traffic to Aylo and third-party "premium" pornographic sites or services; (b) sell advertising for non-pornographic third-party products and services; and (c) collect and maintain data to identify user interests and preferences.

547. Additionally, Aylo's unrestricted content business model served its ability to secure the most traffic and content and, thereby, dominate search engine results in any porn related search on search engines such as Google and Yahoo.

      **3.**      **<u>Aylo Utilized Content Distribution Networks, in the United States, Servers in the United States, Earned Substantial Revenue in the United States, and Processed Payments through Financial and Banking Institutions in the United States to Support Its Unlawful Conduct.</u>**

548. For years, the U.S. was Aylo's largest market for online pornography.

---

[7] *Services at MindGeek: Search Engine Marketing*, MINDGEEK, https://www.mindgeek.com/services/#search-engine-marketing (last visited Aug. 2023);

83

549. Aylo utilized servers, subsidiaries, and numerous payment processing agents in the U.S. to service that market.

550. Aylo's servers are located in Waltham, Massachusetts and elsewhere in the U.S.

551. The servers in the United States contained virtually all of Aylo's content and were used for the uploading, transferring, and using nonconsensual sexual content, including Plaintiff.

552. The vast majority of Aylo's revenues were earned in the U.S. and the payments processed through financial and banking institutions located in the U.S.

553. Furthermore, Aylo engaged the California-based GDP sex trafficking venture as a content partner, entered into agreements in California, conducted business in California, utilized servers located in Massachusetts and elsewhere in the United States, and received significant revenue from California, New York, and elsewhere in the U.S.

**4.    Aylo Knowingly Participated in The California-Based GDP Sex Trafficking Venture, Assisted GDP, Financially Benefited Therefrom, And Continued the Unauthorized Use of Plaintiff's Name, Videos, Images And / Or Identity for Its Own Financial Gain.**

554. California-based GDP created accounts on Aylo's tube sites and began posting its videos in or about 2009.

555. GDP's business was premised on the construct that the women in the videos were not professional porn stars but were amateur college-aged women filming pornography for the first and only time. Subscribers were meant to be left with the impression that the women in GDP's videos were everyday women that they could encounter in their communities, campuses, and daily lives.[8]

556. In accordance with this one-time-only amateur paradigm, GDP's

---

[8] See **Exhibit. 3** Second Amended Complaint, *Jane Does Nos. 1 – 14 v. GirlsDoPorn.com et al*, Case No. 37-2016-00019027-CU-FR-CTL at 2-3.

FIRST AMENDED COMPLAINT

business was dependent on recruiting a constant stream of new models in order to generate fresh website content.[9]

557. The recruited models did not intend to pursue a career in adult entertainment. Rather, the women were mostly students with careers ahead of them who never even considered solicitations to film a pornographic video.

558. GDP's "girl-next-door" theme, content, and promotion became very popular and successful.

559. In 2011, GDP applied, and Aylo accepted GDP into its Aylo's Content Partner Program.

560. At a later date, Aylo engaged and accepted GDP into its Premium Viewshare Program.

561. By accepting GDP into its Content Partner and Premium Viewshare Programs, Aylo agreed to conduct business with GDP's sex trafficking venture.

562. GDP's business model and "girl-next-door" content provided Aylo a content category that was popular as well as a continuous stream of new content it needed to maximize its SEO, website traffic, and revenues.

563. Through its partnership with GDP, Aylo knowingly participated in, facilitated, promoted, supported, and assisted the GDP sex trafficking venture.

564. As one of the largest, if not the largest, online pornography companies in the world, Aylo's partnership provided GDP's criminal venture with a global platform and distribution channel for its unlawful videos.

565. When GDP became a partner in Aylo's Content Partner Program, Aylo and its representatives created a "channel" on Aylo's tube sites centralizing GDP's videos in a single location where Aylo's viewers and potential customers were able to search the channel and subscribe to it for a fee.

566. GDP operated two channels with connected pay sites, GDP.com and

---

[9] *Id.*

FIRST AMENDED COMPLAINT

GirlsDoToys.com, where it sold content by offering its customers access to libraries of full-length videos featuring Plaintiff and other victims for $30 to $60 per month.

567.  As a Content Partner, Aylo's representatives actively worked with GDP and began advertising, promoting, marketing, selling, and exploiting videos featuring GDP's sex trafficking victims, including Plaintiff, on its websites to keep paying customers and gain new customers.

568.  Aylo took many concrete steps to aid and participate in the GDP sex trafficking venture, generally, and the sex trafficking of Plaintiff by, *inter alia*:

    a.  Providing GDP access to Aylo's world-wide distribution channels so that both Aylo and GDP could profit through the dissemination of videos depicting Plaintiff's sexual assaults;

    b.  Partnering with GDP through its Content Partner Program and Viewshare Program;

    c.  Providing GDP with Aylo's global exposure, and the financial lifeline to sustain its criminal venture;

    d.  Uploading, or permitting the uploading of, Plaintiff's sex trafficking videos to the GDP and GDT channels on Aylo's sites;

    e.  Uploading Plaintiff's sex trafficking videos to the vast collection of Aylo's pornography websites including, among other sites, Pornhub.com, YouPorn.com, RedTube.com, Tube8.com, PornhubPremium.com, RedTubePremium.com, YouPornPremium.com, Tube8VIP.com, XTube.com, and Brazzers.com;

    f.  Providing Aylo's formatters and employee representatives to assist GDP in maximizing exposure, views, subscriptions, and revenue from videos featuring Plaintiff and other GDP victims;

    g.  Assisting GDP in monetizing the sex trafficking videos by acting as an affiliate for GDP.com, GirlsDoToys.com, and other paysites;

86

FIRST AMENDED COMPLAINT

h.  Actively marketing and/or suggesting GDP videos and content to users of Aylo's tube sites and/or paysites;

i.  Hyperlinking, marketing, advertising, promoting, selling, and/or exploiting videos featuring victims of GDP's sex trafficking venture;

j.  Creating, developing, and designing trailers, advertisements, titles, tags, descriptions, images, and/or other content for GDP videos and channels, including Plaintiff's videos and content;

k.  Providing SEO services to GDP and its customers, including utilizing the popular term "Teen" or "Miss Teen Colorado" and suggesting Plaintiff's videos to users;

l.  Conducting and/or facilitating financial transactions and distributing funds to GDP for the illegal videos and content;

m.  Sharing revenue and profits with GDP;

n.  Permitting users to download GDP sex trafficking videos which could then be uploaded to any other website or otherwise exploited;

o.  Refusing to remove GDP's sex trafficking videos when Plaintiff and numerous other victims complained to Aylo;

p.  Willfully ignoring the complaints of Plaintiff and numerous other victims that the sex trafficking videos were uploaded and used without their authorization and consent;

q.  Refusing to remove GDP's sex trafficking videos even after it was informed about the State Court Action, the MindGeek Federal Action, and the U.S. Attorney's indictments of GDP's principals and employees

r.  Re-posting and/or republishing GDP's sex trafficking videos after previous temporary removal;

87

FIRST AMENDED COMPLAINT

s. Continuing to use Plaintiff's videos, name, images, and/or identity through 2023, without authorization or consent, for its own financial gain; and

t. Failing to report GDP to law enforcement.

569. Having accepted GDP into its Content Partner Program and Viewshare Program, Aylo directly participated in GDP's sex trafficking venture by willfully and actively assisting GDP, using its SEO technology to best promote GDP videos, marketing the GDP brand, hosting and distributing GDP content throughout its vast network of pornography websites, and maximizing website traffic, subscription sales, and profits.

570. Aylo willfully and actively promoted Plaintiff's videos, images, identity, and likeness on Pornhub and other sites through 2023, including a full feature advertisement of Plaintiff with a biography, Pornstar Rank, and other advertisements such as:

- Super Sexy Busty Miss Teen Colorado in First Porn Ever
- Miss Colorado Teen in her debut porno
  Kristy Althaus Miss Teen Colorado USA Sex Tape
- The Beauty Queen PMV (enjoy your 337 if you delete this again FBI)
- Kristy Althaus sucks and f*cks
- Hot busty Miss Teen Colorado in her first solo porn video
- FBI deleted 138 of my videos due2the Beauty Queen PMVs
- Perms 4Beauty queens2have sex, if the heartless FBI will stop deleting it
- Deleted 3x so I'm tempting the FBI to do it 4x &commit suicide
- Kristy Althaus GDT Promo

571. Aylo and GDP purposefully exploited Plaintiff as Miss Teen Colorado which increased traffic, views, and revenue for them. They sought to leverage Plaintiff's status as a beauty queen to further drive internet traffic in their marketing

88

FIRST AMENDED COMPLAINT

and advertisements.

572.  Six months after the release of the first video, Aylo and GDP released additional videos of Plaintiff, without her authorization and consent, again implementing an aggressive marketing strategy and exploiting Plaintiff's name, videos, images, identity, and former association with the Miss Teen Colorado pageant for their own financial gain and profit.

573.  Plaintiff's video was the second most popular video on all of Aylo's Pornhub website for the year 2014:



574.  Plaintiff's videos had hundreds of millions of views and generated millions of dollars for Aylo and GDP.

575.  Sex trafficker Michael Pratt told Plaintiff that one of her videos had 300 million views.  He also showed her on his computer screen the number of views for her video on Aylo's website.

89

576.   Due to the popularity of Plaintiff's videos, Aylo and GDP advertised and promoted her as a new "Porn Star."

577.   Aylo received millions of dollars in revenue through its partnership with GDP by, among other things, collecting affiliate referral fees, advertisement sales, revenue from Aylo's own subscription websites, and the control and use of Plaintiff's name and content after the Department of Justice shut down GDP in October 2019.

578.   Aylo's business benefitted substantially from the increased traffic to its tube sites driven by GDP fans and following.

579.   Aylo wrongly profited from the sex trafficking and exploitation of Plaintiff and other GDP victims.

580.   Even after Plaintiff's videos were allegedly removed from Aylo's Pornhub website in 2023, Aylo continued to profit from Plaintiff's popular name by using it as "click bait" via its algorithms and SEO technology until at least 2024.

581.   Aylo understood that because of Plaintiff's popularity, fans would still be searching for her nonconsensual videos using search engines such as Google. Aylo did not want to lose the revenue that those fans generated, so Aylo continued to use Plaintiff to drive traffic to Aylo's websites. Even after all GDP content had been removed from Pornhub, a Google search for Plaintiff's name would pull up multiple hits for Pornhub in the top results.

**5.   Aylo Had Knowledge of and Was Indifferent to Its Widespread Distribution, Advertisement, and Use of Plaintiff's Nonconsensual Content Throughout its Numerous Websites for Profit.**

582.   Aylo had knowledge of its business model and the resulting widespread distribution of nonconsensual content throughout its numerous websites for profit. Aylo was indifferent and did not care. Its priority was maximizing a variety of content and revenue and becoming the top result in pornographic related internet searches through SEO technology.

583.   Aylo continued to promote and use Plaintiff's name and nonconsensual

FIRST AMENDED COMPLAINT

videos and images even after twenty-two trafficked women and minors sued GDP in June 2016 in a San Diego, California state court civil action alleging GDP's content was nonconsensual and procured by coercion, force, intimidation, deception, and/or fraud ("State Court Action).[10]

584. The GDP channel on Aylo's websites were so lucrative, and Aylo so indifferent to monetizing nonconsensual content, that Aylo kept the channel on its sites and collected revenue from it even after learning of the initial State Court Action and did nothing to investigate the allegations.

585. Moreover, during the State Court Action, Aylo was served with a subpoena for records, yet again explicitly informing Aylo of GDP's unlawful business practices. Nevertheless, Aylo continued to host and promote the videos of Plaintiff and other victims on its sites.

586. Aylo attempted to acquire the GDP business during the State Court Action.

587. Throughout the State Court Action, Aylo continued to use Plaintiff's name and promote her as a "Miss Teen Colorado" to maximize customer views, subscriptions, and revenue throughout its sites.

588. Despite Aylo's knowledge of the State Court Action filed against GDP, it continued to partner with GDP until October 2019 when the Department of Justice seized and shut down GDP's business and indicted its principals and employees, at which point, a company to partner with no longer existed.

589. Aylo continued to promote and use Plaintiff's name and nonconsensual videos and images after the Department of Justice shut down GDP and began criminal

---

[10] Plaintiff incorporates by reference as though fully set forth herein all pleadings in the cases below and specifically attaches as an exhibit: **Exhibit 3:** (*Jane Does Nos. 1-14 v. GDP.com*, Second Amended Complaint, No. 37-2016-00019027-CU-FR-CTL (Cal. Super. Ct. Mar. 13, 2017); **Exhibit 4:** *Jane Doe Nos. 17-22 v. GDP.com*, Complaint, No. 37-2017-00043712-CU-FR-CTL (Cal. Super. Ct. Nov. 8, 2017) (collectively, "GDP State Action")), and **Exhibit 5:** *Jane Doe Nos. 1-22 v. GDP.com*, Statement of Decision, Nos. 37-2016-00019027-CU-FR-CTL, 37-2017-00033321-CU-FR-CTL, 37-2017-00043712-CU-FR-CTL (Cal. Super. Ct. Apr. 27, 2020).

FIRST AMENDED COMPLAINT

prosecutions of GDP's principals and employees.

590. On October 9, 2019, the United States Attorney for the Southern District of California charged GDP's three principals—Michael Pratt ("Pratt"), Matthew Wolfe ("Wolfe"), and Ruben Andre Garcia ("Garcia")—and three other staff, with sex trafficking and conspiracy to commit sex trafficking pursuant to 18 U.S.C. § 1591.

591. A grand jury indictment formally charged Pratt, Wolfe, and Garcia with these crimes.

592. Pratt fled the country but was arrested in Spain and has been extradited to the United States.

593. Wolfe and Garcia were arrested on or about October 9, 2019.

594. Garcia, one of the traffickers, pled guilty to conspiracy to commit sex trafficking, in violation of 18 U.S.C. § 1594(c), and sex trafficking by force, fraud, or coercion, in violation of 18 U.S.C. §§ 1591(a)(1) and (2). He received a sentence of twenty (20) years and was ordered to pay restitution.

595. In Garcia's criminal case, the Honorable Janis Sammartino found: Beginning in approximately 2013 and continuing up to October 2019, Garcia participated in a conspiracy with Michael James Pratt, Matthew Isaac Wolfe, Theodore Wilfred Gyi, Valerie Moser, and others, to film commercial sex acts using force, fraud and coercion.

596. Judge Sammartino ordered that the coercive GDP contracts are void and unenforceable, and additionally, ordered that all transfers, licenses, or leases to any third parties are void, that Plaintiff and other GDP victims hold superior right, title, and interest in their images, likeness, and videos, and Plaintiff and other victims shall have and recover all property GDP took from them, including images, likeness, videos, and copyrights.

597. Another trafficker, Wolfe, received a sentence of fourteen (14) years.

598. From October 2019 and afterward, Aylo solely controlled and used trafficked GDP content on its websites, including the names and nonconsensual

92

FIRST AMENDED COMPLAINT

content of Plaintiff and other GDP victims.

599.   Even though the formal GDP channels were disabled, GDP content was ubiquitous on Aylo's numerous websites, and its internal search engine would regularly direct users to those videos.

600.   As of October 2020, a simple search of "GDP" would result in over 300 videos and images of GDP victims.

601.   On April 27, 2020, the Honorable Kevin A. Enright issued his Final Statement of Decision in the State Court Action. Despite the detailed findings by Judge Enright, Aylo continued to distribute, advertise, promote, and use the trafficked, nonconsensual content of GDP victims, including Plaintiff.

602.   Aylo continued to promote and use Plaintiff's name and nonconsensual videos and images even after fifty (50) trafficked women sued its company (then MindGeek) on December 15, 2020, for Aylo's participation in and promotion of the GDP sex trafficking venture ("the MindGeek Federal Action").[11]

603.   The prior MindGeek Federal Action was resolved through a settlement between the parties in October 2021.

604.   Aylo continued to promote and use Plaintiff's name and nonconsensual videos and images even after the U.S. Attorney began a three-year criminal investigation of Aylo directly related to its conduct with GDP. **Ex. 1** (DPA) ¶ 4(d).

605.   Despite the GDP State Court Action, the prior MindGeek Federal Action, and the criminal investigation by the U.S. Attorney, Aylo only temporarily removed the GDP videos, including Plaintiff's videos, from the Pornhub website.

606.   Due to the substantial amount of revenue GDP content generated for Aylo, Aylo modified, reposted and republished the popular videos.

---

[11] Plaintiff incorporates by reference as though fully set forth herein: all pleadings from the related MindGeek federal court action (*Jane Doe Nos. 1-40 v. MG Freesites, Ltd*, Complaint, No. 3:20-CV-02440-W-RBB (S.D. Cal. Dec. 15, 2020), attached hereto as **Exhibit 6**; *Jane Doe Nos. 1-50 v. MG Freesites, Ltd.*, First Amended Complaint, No. 3:20-CV-02440-WQH-KSC (S.D. Cal. Apr. 1, 2021), attached hereto as **Exhibit 7** (collectively "MindGeek Federal Action").

FIRST AMENDED COMPLAINT

607.    Plaintiff's name, videos, images, likeness and identity were likewise reposted and republished across Aylo's sites, without Plaintiff's consent, due to significant website traffic, customer views, subscriptions, and revenue the videos of Plaintiff generated for Aylo.

608.    Aylo even mocked federal authorities when re-posting videos of Plaintiff with new titles such as "The Beauty Queen PMV (enjoy your 337 if you delete this again FBI)". Another video with Plaintiff as the thumbnail is titled: "Deleted 3x so I'm tempting the FBI to do it 4x & commit suicide". Aylo was fully aware that the GDP content was illegally obtained, and it simply did not care.

609.    Aylo knew they was partnering with, distributing revenue to, and profiting from a sex trafficking venture for years.

610.    Aylo repeated decisions to not only ignore, but participate and profit from, GDP's unlawful sex trafficking and treatment of victims easily establishes both the criminal "reckless disregard" standard and the lesser negligence standard for civil liability damages and attorneys' fees under 18 U.S.C. § 1595.

611.    Aylo's actions, however, were willful, malicious, oppressive, and taken in reckless disregard of Plaintiff's rights. Aylo knew and was informed that the illegal and unconsented publication of sex videos of Plaintiff and other young women would destroy their lives. Once published, GDP victims were ostracized by family and friends and relentlessly harassed by strangers. Victims suffered extreme distress, and some became suicidal. Plaintiff's anguish resulted in deep struggles with despair and worthlessness. She also lost employment, career opportunities, and special relationships.

612.    Aylo also knew about the significant harassment and trauma that Plaintiff and other GDP victims suffered by the continued publication of their names and nonconsensual pornographic content. They were told by numerous victims and informed by the prior lawsuits but did not care.

613.    Aylo chose to continue its unrestricted content business model and the

94

FIRST AMENDED COMPLAINT

profits it generated over the lives and well-being of innocent people.

## C.   AYLO ADMITTED LIABILITY FOR PARTICIPATING IN AND ASSISTING GDP'S SEX TRAFFICKING VENTURE.

614.   In December 2020, the U.S. Attorney also began a three-year criminal investigation of Aylo directly related to its conduct with GDP. **Ex. 1** ¶ 4(d).

615.   Aylo cooperated with the U.S. Attorney's investigation. *Id.*

616.   From December 2020 through November 10, 2023, Aylo, along with ECP as new owner and controller of Aylo, actively avoided criminal prosecution related to its partnership with the GDP sex trafficking venture so it could continue its lucrative business.

617.   On November 10, 2023, Aylo entered into a DPA with the U.S. Attorney's Office for unlawful monetary transactions involving proceeds from sex trafficking. **Ex. 1**.

618.   In doing so, Aylo "admit[ted], accept[ed], and acknowledge[d] that it [was] responsible under United States law for the acts of its officers, directors, employees and agents with respect to the conduct described in the Information and Statement of Facts [relating to GDP]" and "the facts described in the Statement of Facts are true and accurate." *Id.* ¶ 2.

619.   Under the DPA, Aylo and its new owner must accept responsibility and admit to facts regarding its partnership with GDP. The DPA prohibits Aylo from contradicting the acceptance of responsibility for its conduct or in the Statement of Facts in any public statement, litigation, or otherwise. *Id.* ¶¶ 1-4, 25.

620.   Aylo Holdings S.à.r.l., Aylo's parent company, is subject to the DPA, requiring the parent company, all of its subsidiaries (operating numerous pornography sites) and its owner, ECP, to ensure the pornography business operates lawfully and in compliance with the DPA and Independent Compliance Monitor. *Id.*

621.   The U.S. Attorney identifies Aylo Holdings S.A.R.L., Aylo USA, Inc., and Aylo Freesites Ltd. as a "consolidated" business, collectively "the Company," and

FIRST AMENDED COMPLAINT

a group of entities in business to maintain and operate "websites that enabled third parties to post and distribute adult videos." *Id*. ¶ 1-4, 24, Attachment C ¶¶ 1-3, Attachment D; **Ex. 1**, ¶ 1.

622.   The DPA is binding on Aylo and its owners. *Id*. ¶¶ 3-6,-28.

623.   Andreou, a "Class A Manager" of Aylo Holdings S.á.r.l. reviewed the terms of the DPA with the Company's Board of Directors and signed the DPA on behalf of Aylo Holdings S.á.r.l.

624.   The Board of Directors of Aylo Holdings S.á.r.l. approved corporate resolutions concerning its company, subsidiaries, and the DPA.

625.   These entities are defendants in both the criminal action and Plaintiff's action.

626.   The DPA specifically states Aylo had offices and employees in California: "From January 2009 through December 2020, Aylo was a global privately held group of entities (including Aylo USA, Inc., Aylo Freesites Ltd., Aylo Premium, Ltd. and Aylo S.à.r.l. Aylo S.à.r.l. was a foreign entity organized and existing under the laws of Luxembourg. Although its corporate headquarters was in Luxembourg, MindGeek also had offices with employees in Montreal, Canada, and among other places, **Los Angeles, California." Ex. 1,** ¶ 1 (emphasis added).

627.   Aylo targeted California with their numerous tube sites, paysites, as well as the California-based GDP content-partnership through at least October 2019. **Ex. 1**.

628.   GDP had two offices in San Diego, California.

629.   Aylo signed agreements with GDP located in California. **Ex. 1**.

630.   Even after GDP was shut down by the Department of Justice, Aylo subsequently continued to host, distribute, advertise, promote, and use GDP trafficked nonconsensual content, including Plaintiff's name, videos, images, and/or identity to maximize and generate revenues. **Ex. 1**.

631.   As a result of its conduct with GDP, Aylo agreed in the DPA to pay GDP victims restitution if requested and if they have not otherwise received compensation

FIRST AMENDED COMPLAINT

from the Company. **Ex. 1** ¶ 9.

632.   To achieve the DPA, ECP specifically engaged with the U.S. Attorney, representing: "***Under its new ownership, the Company has represented to the Office*** that it has taken additional steps to combat and prevent the dissemination of illegal content more broadly throughout the internet, including on platforms it does not own or control, including but not limited to, collaborating with law enforcement agencies on innovative approaches to eradicate non-consensual content and Child Sexual Abuse Material[.]" **Ex. 1** ¶ 4(f) (emphasis added).

633.   Aylo is required under the DPA to notify the U.S. Attorney and obtain approval for any change in corporate form, whether by a sale, asset sale, merger, transfer or other change in corporate form, and the DPA is binding on any purchaser or successor in interest thereto. *Id*. ¶ 24.

### D.     AYLO & GDP EXPLOITED PLAINTIFF.

634.   Aylo's reckless and unrestricted content business model and use of sophisticated SEO technology to maximize pornographic content, website traffic, views, and revenue permitted and perpetuated criminal conduct such as the GDP sex trafficking venture.

635.   Aylo intentionally provided GDP with the global platform, world-wide distribution, and revenue for the implementation and continuation of its sex trafficking venture for nearly a decade.

636.   GDP's unlawful venture required it to recruit and convince a high volume of high school and college-aged women to fly to San Diego under false pretenses and then perform for pornographic videos. To accomplish this, GDP engaged in numerous methods of deceit, fraud, manipulation, and coercion to obtain the pornographic content they needed.

637.   Thus, GDP used fraudulent practices to facilitate its recruitment. GDP took considerable, calculated steps to falsely assure prospective models that their videos would never be posted online, come to light in the United States, or be seen by

anyone who might know them. *Id.*

638.   GDP went so far as to hire actresses to pose as previous models and assure new recruits of their privacy and security.  These paid "references" provided prospective models with false comfort that the experience was safe and enjoyable, and that the fake references' videos had never appeared online or been discovered by anyone in the references' lives.[12]

639.   Once a newly recruited woman flew to San Diego, Plaintiff found herself alone in a hotel room with two or more men about to shoot a pornographic video.  At this point, GDP had her sign documents containing dense and ambiguous legalese, which they falsely described as being the written version of what she had already agreed to.[13]

640.   GDP acted to pressure the woman to sign the documents quickly without reading them and engaged in other deceptive, coercive, and threatening behavior to secure their signatures, including plying the woman with drugs and alcohol.[14]

641.   After illegally filming the woman engage in forced sex acts, GDP posted the videos on MindGeek's websites and advertised for its own online subscription platforms.[15]

642.   Hundreds of women from various cities throughout the U.S. and Canada, including Plaintiff, were recruited to appear in GDP videos based upon this system of force, fraud, and coercion.[16]

643.   As a teenager, Plaintiff was successful in professionally modeling clothes for agencies and companies such as Champion and Kohl's.

644.   Plaintiff had prior experience as a runway model and also modeled for a

---

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.*

FIRST AMENDED COMPLAINT

sunglasses company.

645. Plaintiff was also a contestant in the Miss Teen Colorado pageant in 2012 and was successful as the first runner up.

646. Plaintiff's experience as a model for Champion and Kohl's as well as her first runner up status in the state beauty pageant provided a promising foundation for a career in professional modeling.

647. Typically, Miss Teen beauty pageant winners and runners up have professional clothing, accessory, and cosmetic modeling opportunities -- and Plaintiff was no exception.

648. Plaintiff's modeling and pageant opportunities were destroyed due to Defendants' unlawful conduct and the nonconsensual use of her name, image, and videos for the Aylo and GDP brands.

649. Similar to other GDP victims, Plaintiff saw a Craigslist ad for paid modeling jobs and inquired via email correspondence. The ad Plaintiff responded to was for Bubblegum Casting, which had a website designed to make it appear to be a legitimate California modeling company. There was no mention of pornography, GDP, its partnership with Aylo, or their intention to traffic victims, post and monetize nonconsensual videos.

650. Plaintiff relayed her interest in the modeling opportunity and agreed to partake in one photoshoot. GDP then paid for Plaintiff's airline tickets and hotel to travel to San Diego for the modeling photoshoot.

651. Plaintiff, at the tender age of eighteen (18) years old, arrived in San Diego for a headshots and clothes modeling photoshoot she believed would help her career.[17]

652. GDP had taken a particular interest in Plaintiff because of her physical

---

[17] "Headshot" refers to a photograph that is taken of a person's head and face, and sometimes features the person's shoulders and chest. A headshot is often taken for submission to professional modeling and acting jobs.

FIRST AMENDED COMPLAINT

appearance and Plaintiff's success in the Miss Teen Colorado pageant. They stated Plaintiff had the "right looks."

653.    Plaintiff learned of GDPs true intention only after traveling from her home state. Pratt and his conspirators, including Garcia, picked Plaintiff up from the airport and began to coerce Plaintiff into allowing live action filming of adult content.

654.    Rather than the mere headshots and clothing photoshoot that she had agreed to fly to San Diego to do, Pratt began demanding that Plaintiff film nude and sexually explicit videos. When Plaintiff refused, Pratt and his conspirators immediately pressured her and plied her with booze and pills.

655.    Plaintiff told Pratt that she did not want to participate in amateur pornography. To convince her otherwise, Pratt and Garcia told Plaintiff that the video would only be on DVD and would only be used in Australia.  Pratt and Garcia falsely represented to Plaintiff that the video would _not_ be used in any other manner, would _not_ be released in the United States, and would _not_ be posted on the Internet.

656.    Pratt and Garcia continued to pressure Plaintiff to consume alcohol and marijuana in order to "relax".

657.    Pratt and Garcia said they would take Plaintiff to a hotel to film the video. On the way, they picked up a third conspirator, Wolfe.

658.    During the drive, Pratt gave Plaintiff what appeared to be a contract and told her to sign it.  Plaintiff was not able to read the document in the car or in her intoxicated condition, although she saw the words "DVD" and "Australia" in larger font than the rest of the words in the document. Plaintiff was not provided a copy of the document.

659.    Plaintiff then found herself in a hotel room with four strange men: Pratt, Wolfe, Garcia, and one other conspirator who worked on lighting for the production.

660.    Pratt took Plaintiff's cell phone and refused to give Plaintiff back her cell phone until they were finished "filming the video".

661.    Plaintiff was restricted to the bed area in the hotel room.

100

FIRST AMENDED COMPLAINT

662. The hotel room was filled with equipment. The bathroom and hotel door were both blocked with lights, equipment, and cases for equipment.

663. Garcia was the male performer for the video.

664. While Plaintiff was trapped in the hotel room and in an intoxicated state, Pratt and his conspirators deceived, coerced, and forced Plaintiff to perform sexual acts on film.

665. Production of the video took approximately 9-10 hours and included protracted filming of Plaintiff's nonconsensual sex.

666. Plaintiff started bleeding due to the repeated and violent nature of the acts to which she was subjected.

667. When the bed sheets became covered with blood, Pratt just covered the stained sheets with other blankets or flipped blankets to the clean side and relentless continued directing and filming the nonconsensual sexual acts.

668. Pratt had a demanding, aggravated, and aggressive demeanor during the video production process.

669. Plaintiff became upset, started crying, and repeatedly asked to stop.

670. Plaintiff told Pratt, Wolfe, and Garcia she wanted to leave. The three men reiterated that she was not permitted to stop the production or to leave the hotel room until they got the footage they wanted for the video.

671. Plaintiff then tried to move the equipment blocking the exit door.

672. Furious, Pratt grabbed Plaintiff and threw her on the bed.

673. Pratt yelled and cursed at Plaintiff calling her a "stupid b*tch" and "f*cking slut."

674. Plaintiff felt afraid for her life trapped in the hotel room.

675. To get Plaintiff through the production, Pratt and Garcia continued to force Plaintiff to drink more alcohol. They also gave her Xanax.

676. Production of the video continued without Plaintiff's consent as they filmed her in an intoxicated state.

FIRST AMENDED COMPLAINT

677.    Prior to that evening, Plaintiff had no knowledge of the GDP business or GDP.com and GirlsDoToys.com websites.

678.    In August 2013, Plaintiff began her freshman year of college.  Pratt pursued Plaintiff and demanded she make additional videos. When Plaintiff told Pratt no and refused to comply, Pratt resorted to blackmail, fear, intimidation, and threats of force against Plaintiff and her family.

679.    Pratt threatened Plaintiff that he would release her video to the Internet if Plaintiff did not comply with his demands.

680.    Pratt also made threatening statements to Plaintiff about knowing her personal information, such as where she lived and her social security number.

681.    Pratt threatened Plaintiff's life if she did not agree and texted her:



682.    Plaintiff told Pratt that she did not want or consent to the release of the video of her and asked him to "have a heart."  Pratt did not care.

683.    Plaintiff contacted Garcia about Pratt's blackmail and threats to her life.  Garcia told Plaintiff that she should agree to do a second video because Pratt would follow through with releasing the video if Plaintiff did not comply.

684.    Plaintiff was afraid of Pratt, felt threatened by him, and feared for her life and the lives of her family and friends.

685.    Out of fear and under duress, Plaintiff participated in additional videos

102
FIRST AMENDED COMPLAINT

with the understanding that this was the only way to keep her family safe and her prior video off of the internet.

686.   During filming, the men again took Plaintiff's cell phone.

687.   In addition to the filmed acts, Plaintiff was subjected to further sexual harassment and assault from the GDP conspirators.

688.   Without consent, Wolfe touched and tried to kiss Plaintiff telling her she was beautiful.

689.   Plaintiff rejected Wolfe's advances.

690.   Wolfe then told Plaintiff she could have her cell phone back if she would kiss him and "touch his d*ck."

691.   Plaintiff struggled throughout filming the next video with Garcia. Plaintiff repeatedly asked to stop filming.

692.   Halfway through the video, Pratt erupted in anger, yelling and cursing at Garcia about Plaintiff.  Pratt broke a hotel lamp in his fit of rage.

693.   Terrified, Plaintiff made it into the hotel bathroom to try to find refuge. However, Pratt followed her and would not leave her alone.

694.   In the hotel bathroom, Pratt showed Plaintiff that he had a gun in a holster on his hip. The gun had been previously hidden and covered by his shirt.

695.   Plaintiff was again told that she was not allowed to stop the production or leave the hotel room before they got the footage they wanted for the video.

696.   Plaintiff was again forced to consume alcohol, marijuana, and Xanax to keep her in a vulnerable state while they completed filming.

697.   When Plaintiff denied additionally taking oxycodone, Pratt and Garcia put the drug in her drink, which she refused.

698.   When the video was finally completed, Pratt still refused to let Plaintiff leave.

699.   Pratt took Plaintiff's belongings and forced Plaintiff to go back to his home.

103

FIRST AMENDED COMPLAINT

700.   In the car on the way to his home, Pratt forced Plaintiff to perform oral sex on him.

701.   While Plaintiff was performing oral sex, Pratt took out his gun, put the gun in Plaintiff's mouth, and forced her to suck on the gun.

702.   Once in Pratt's home, Pratt repeatedly sexually assaulted Plaintiff.

703.   Plaintiff saw that Pratt had many different guns out in the home and was proud of them.

704.   Plaintiff cried while Pratt demeaned and cursed at her.

705.   Pratt, again, forced Plaintiff to perform oral sex on him. During the act, Pratt grabbed his gun, forced the gun in Plaintiff's mouth, and made her suck on the gun a second time.

706.   Plaintiff felt trapped and afraid. She felt she had no choice but to submit to Pratt's every demand or risk her life.

707.   In January 2014, while Plaintiff was in class at college, she received a text message from an unknown number stating: "Told you bitch."  Pratt followed through on his threat.

708.   Around that same time, Plaintiff received a text message from a friend saying that her pornographic video was on Twitter, the Pornhub website, and multiple other pornography websites.

709.   Greedy for more, Pratt, Wolfe, and Garcia continued to pursue Plaintiff with further threats, coercion, and force. Plaintiff was deeply fearful of them and what they would do to her.

710.   GDP produced additional short solo videos of Plaintiff that were uploaded and distributed to Aylo's network of sites.

711.   Once published to the sites, GDP and Aylo, through the policies and practices of Aylo's Control Group and employees, implemented their aggressive marketing strategy to obtain views, customers, and paid subscriptions.  This marketing strategy included contacting Plaintiff's and other victims' communities,

104

FIRST AMENDED COMPLAINT

social circles, family, friends, teachers, classmates, employers, and/or co-workers.

712. Fox News, and other media sources released stories about Plaintiff suggesting that she had become a porn star (not realizing she was a victim of sex trafficking).[18]

713. Plaintiff was devastated. She has suffered, and continues to suffer, extreme emotional distress from Pratt's threats and Aylo's global release of her videos.

714. Plaintiff was harassed by other students while she attended class, walked to her dorm, and on the bus. Plaintiff had to be escorted by campus security due to the harassment and threats. Plaintiff often remained in her dorm room out of fear of going outside.

715. Plaintiff was prescribed medication for severe distress and anxiety.

716. Due to GDP's and Aylo's publication, distribution, and advertising of Plaintiff's videos throughout Aylo's global network, Plaintiff was forced to leave her university, return to her mother's home, and begin online classes at a community college.

717. Nevertheless, Plaintiff was still recognized by teachers, students, and many others in the general public and suffered extreme emotional distress.

718. Plaintiff was stripped of her title as First Runner Up in the Miss Teen Colorado pageant. Aylo and GDP used the loss of Plaintiff's title as a way to market Plaintiff's name and videos.

---

[18] *See, e.g.*, Nadine DeNinno, *Kristy Althaus Porn Video Resurfaces, Miss Teen USA Erases 2012 Colorado Runner-Up From Page [VIDEO]*, INTERNATIONAL BUSINESS TIMES (Feb. 4, 2014, 9:55 AM), https://www.ibtimes.com/kristy-althaus-porn-video-resurfaces-miss-teen-usa-erases-2012-colorado-runner-page-video-1553151; *Disgraced former Miss Colorado Teen contestant reportedly making porn*, DAILY NEWS (Jun. 17, 2014, 3:50 PM, updated Jan. 9, 2919, 9:11 PM), https://www.nydailynews.com/news/national/colorado-teen-contestant-reportedly-making-porn article-1.1833231; *Miss Teen Colorado runner up Kristy Althaus turns porn star*, NEWS.COM.AU (Jun. 19, 2014, 4:57 PM), https://www.news.com.au/lifestyle/beauty/ miss-teen-colorado-runner-up-kristy-althaus-turns-porn-star/newsstory/1ff3e9f28bb 3adb87b96e80de7ac2c8d; *Former Miss Teen Colorado in second porn video, report says*, FOX NEWS (Jun. 18, 2014, updated Apr. 5, 2016), https://www.foxnews.com/entertainment/former-miss-teen-colorado-in-second-porn-video-report-says; *Beauty queen turns to life of porn*, YAHOO NEWS AUSTRALIA (Updated Mar. 31, 2018),https://au.news.yahoo.com/beauty-queen-turns-to-life-of-porn-24279669.html

105

719. Plaintiff lost jobs in humiliating ways when customers and co-workers recognized her and her association with GDP and Aylo.

720. Plaintiff lost employment and employment opportunities because employers did not want her stigma associated with their businesses and/or brands.

721. Due to the association with Aylo and GDP's pornographic websites and brand, Plaintiff was no longer able to obtain modeling jobs.

722. Plaintiff's life, dreams, and well-being were shattered as a result of Aylo and GDP's unlawful conduct.

723. In November 2022, Plaintiff received notice from the United States Department of Justice, Federal Bureau of Investigation ("FBI"), that she was one of more than four hundred (400) victims of the GDP-Aylo sex trafficking venture.

724. This case seeks justice for a survivor of immeasurable pain and suffering caused by Aylo, the entity that commercialized nonconsensual content, and despite knowledge of GDP's criminal enterprise, chose time and again to prioritize profits over people.

**E.   AYLO DEFENDANTS OPERATE AS A SINGLE, UNITARY BUSINESS & CREATED A FICTITIOUS CORPORATE STRUCTURE TO PURPOSEFULLY EVADE LAWS & HIDE THE FLOW OF MONIES. BETWEEN ENTITIES.**

**1.   Aylo Defendants' Fictitious and Secretive Corporate Structure Used for Illegal Purposes Should Be Disregarded and Treated as a Single, Unitary Business Enterprise.**

725. Aylo's Control Group controlled, set, and implemented Aylo's policies and practices in their capacity as the three owners and were fully aware of and directed its unrestricted creation, distribution, and use of child pornography and other nonconsensual content.

726. Furthermore, Aylo's Control Group made the decision to implement a sham corporate structure to evade pornography laws in the jurisdictions in which they

FIRST AMENDED COMPLAINT

operated and earned the majority of their revenues.

727.   However, Aylo was treated and operated as a single, unitary business enterprise.

728.   Aylo's owners and directors created a highly-complex, secretive multi-national corporate structure consisting of numerous subsidiaries in various international jurisdictions which had no economic substance and served no legitimate or commercial business purpose.

729.   Aylo used their corporate fiction to ignore sex trafficking and child pornography laws in the U.S, in particular, where it generated most of its revenues, even though its operations and content were covered under criminal and civil laws in the U.S.

730.   Such complex structure also allowed the true ownership and relationships of these businesses as well as the flow of monies between and out of them to remain hidden and secret.

731.   It also obscured the magnitude of the monies and/or dividends being funneled through any one entity at any given time.

732.   Aylo and its owners improperly paid dividends because the owners transferred and paid themselves from any entity as they saw fit.

733.   Aylo and its owners circumvented the corporate form and operated the business without distinction between entities.

734.   Aylo and its owners engaged in tax fraud.

735.   Aylo's owners— Bergmair, Antoon, and Tassillo—engaged in self-dealing.

736.   The number of entities created in various jurisdictions also made it extremely difficult for law enforcement, government officials, regulators, and potential creditors to effectively investigate or take action against the business.

737.   Aylo manufactured the fiction that it was a company headquartered in Luxembourg and operating out of Cyprus, where laws and enforcement concerning

FIRST AMENDED COMPLAINT

pornography are minimal.

738.   Journalists and neighbors who visited the alleged Luxembourg headquarters described the office as empty.

739.   Offices in Cyprus were staffed with very junior employees who purportedly engaged in editing content for some websites and loading content on those sites with no other operations or communications conducted from that office. Reporters and visitors are informed that the alleged headquarters and Cyprus office have nothing to do with the websites that use their address.

740.   Aylo's owners selected these jurisdictions because of they were havens for tax evasion, money laundering, and circumventing the much stricter criminal and civil laws and enforcement of sex trafficking and child pornography in the United States, Germany, and Canada where Aylo actually operated.

**2.    Aylo Intentionally Took Further Action to Avoid Liability for Unlawful Conduct by Creating Layers of New Sham ECP Entities.**

741.   During the U.S. Attorney's criminal investigation of Aylo from 2020-2023, Aylo's owners acted to: (1) establish new entities to transfer Aylo's stock offshore in the British Virgin Islands ("BVI"), (2) conceal the identity of Aylo's true owners and management, (3) involve criminal defense attorneys Solomon Friedman and Fady Mansour, [19] as founding partners, directors, and/or beneficial owners of both Aylo and ECP; and rebrand its business with the new name "Aylo," formerly MindGeek.

742.   MindGeek changed its name to Aylo on August 17, 2023, due to the need "for a fresh start," and for rebranding purposes as it revamps and continues its business. **Ex. 6.**

_____

[19] Fady Mansour and Solomon Friedman are both criminal defense attorneys with Friedman Mansour LLP and Founding Partners and Directors of ECP.  The law firm and ECP operate from the same business address 200 Elgin Street, Suite 403, Ottawa, ON K2P 1L5. *See,* www.friedmanlaw.ca; www.ethicalcapitalpartners.com.

743. ECP states: "Launched in 2004, the company has grown considerably, becoming an industry leader and tech pioneer. This growth, and the company's newest chapter under the ownership of [ECP], meant that it was time for a new brand that aligns with the employees' values and aspirations." *Id*.

744. ECP's statement, however, is not true. For more than a decade, Aylo itself participated in criminal activity as a result of its *reckless and unrestricted content business model* and use of its business and SEO technology to distribute advertise, promote, and use of child pornography and/or trafficked, nonconsensual pornographic content. *See also Serena Fleites v. MindGeek S.á.r.l., et al*., Case No. 2:21-cv-04920-CJC-ADS (C.D. Cal. 2022).

## V. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Benefitting from Participation in a Sex Trafficking Venture in Violation of the TVPRA 18 U.S.C. §§1591(a)(2), 1595

745. Plaintiff incorporates by reference and realleges each and every allegation set forth in the foregoing paragraphs as if fully alleged herein.

746. The Defendant entities are all inter-related in one business and operate as a whole. Plaintiff incorporates by reference and realleges the role and culpability of each Defendant as if fully alleged herein.

747. Defendants Aylo Holdings S.à.r.l., Aylo Freesites, Ltd, Aylo Premium, Ltd., 9129-1568 Quebec, Inc., Aylo Billing U.S. Corp., Aylo Global Entertainment, Inc., Aylo USA Incorporated, and Ethical Capital Partners, Ltd. jointly and severally, benefitted from participation in GDP's sex trafficking venture within the meaning of 18 U.S.C. §§ 1591 and 1595.

748. Plaintiff was and is a victim of sex trafficking within the meaning of 22 U.S.C. § 7102(11) and in violation of 18 U.S.C. §§ 1591 and 1595.

749. Aylo, jointly and severally, solicited and promoted content partners to upload pornographic videos to its websites and utilized its SEO technology and

FIRST AMENDED COMPLAINT

employees to maximize web traffic, views, and revenue for its content and that of its content partners, including illegal content.

750. Aylo, jointly and severally, knew, should have known, or acted in reckless disregard of the fact that GDP operated a sex trafficking venture that wholly relied on the use of force, threats of force, coercion, and/or fraud to film Plaintiff and other regular high school and college-aged women engaging in commercial sex acts.

751. Aylo, jointly and severally, took many concrete steps to aid, participate, and benefit from the GDP sex trafficking venture, generally, and the sex trafficking of Plaintiff by, *inter alia*:

    a. Providing GDP access to Aylo's world-wide distribution channels so that both AYLO and GDP could profit through the dissemination of videos depicting Plaintiff's sexual assault/rape;

    b. Partnering with GDP through its Content Partner Program and Premium Viewshare Program;

    c. Providing GDP with Aylo's global exposure, and the financial lifeline to sustain its criminal venture;

    d. Uploading, or permitting the uploading of, Plaintiff's sex trafficking videos to the GDP and GirlsDoToys ("GDT") channels on Aylo's sites;

    e. Uploading Plaintiff's sex trafficking videos to Aylo's library of videos and vast collection of Aylo's tube sites and paysites;

    f. Providing Aylo employee representatives and/or formatters to create and/or edit content and assist GDP in maximizing exposure, views, subscriptions, and revenue from videos featuring Plaintiff and other GDP victims;

    g. Assisting GDP in monetizing the sex trafficking videos by acting as an affiliate for GDP.com, GirlsDoToys.com, and other paysites;

    h. Actively marketing and/or suggesting GDP videos and content to users of Aylo's tube sites and/or paysites;

110

FIRST AMENDED COMPLAINT

i. Hyperlinking, marketing, advertising, promoting, selling, and/or exploiting videos featuring victims of GDP's sex trafficking venture, including Plaintiff;

j. Creating, developing, and designing trailers, advertisements, titles, tags, descriptions, images, and/or other content for GDP videos and channels, including Plaintiff's videos and content;

k. Providing search engine optimization services to GDP and its customers suggesting Plaintiff's videos to users;

l. Conducting and/or facilitating financial transactions and distributing funds to GDP for the illegal videos and content;

m. Sharing revenue and profits with GDP;

n. Permitting users to download GDP sex trafficking videos which could then be uploaded to any other website or otherwise widely distributed exploited over the Internet;

o. Refusing to remove GDP's sex trafficking videos when Plaintiff and numerous other victims complained to Aylo;

p. Willfully ignoring the complaints of Plaintiff and numerous other victims that the sex trafficking videos were uploaded and used without their authorization and consent;

q. Re-posting and/or republishing GDP's sex trafficking videos after previous removal;

r. Continuing to use Plaintiff's videos, name, images, and/or identity through 2023, without authorization or consent, for its own financial gain and profit;

s. Continuing to use Plaintiff's name through 2024, without authorization or consent, as "click bait" via its SEO technology and algorithms for its own financial gain and profit;

t. Failing to develop and implement a meaningful content monitor process

111

to identify and remove illegal content; and

u. Failing to report the GDP sex trafficking venture to law enforcement.

v. The sex trafficking venture engaged in acts that recruited, enticed harbored, transported, provided, obtained, advertised, maintained, patronized and/or solicited Plaintiff.

752. Through Aylo's world-wide distribution channels, Aylo provided GDP the network and financial lifeline for its unlawful business. GDP could not have achieved the distribution, sales, and profit it had—and that Aylo jointly and independently benefitted from—without Aylo's crucial support and participation.

753. The concrete steps described above constituted taking part in the sex trafficking venture and were necessary for GDP's success. The concrete steps described above constituted active engagement by Aylo in the GDPs sex trafficking venture.

754. Aylo, jointly and severally, knowingly benefited, financially or by receiving value, among others, by:

a. Earning millions of dollars in affiliate fees through the Content Partner Program with GDP by exploiting Plaintiff's videos, name, images, and/or identity and sending user traffic from Aylo's tube sites to GDP's paysites;

b. Through the use of Plaintiff's videos, and those of other GDP victims, benefitting from increased traffic to its tube sites which resulted in increased advertisement revenue and increased sales of Aylo's own products and content;

c. Earning millions of dollars by selling "Premium" subscriptions through the Premium Viewshare Program and using videos featuring Plaintiff and other GDP victims;

d. Hosting the videos of Plaintiff and other GDP victims in the general free library of its tube sites, which resulted in increased traffic to

FIRST AMENDED COMPLAINT

Aylo's tube sites and generated subscriptions and affiliate revenue from third-party paysites and Aylo's own paysites;

e. Continuing the unauthorized use and exploitation of Plaintiff's videos, name, images, likeness, and/or identity, even after the Department of Justice seized and shut down GDP, up to and through 2023, for its own financial gain; and

f. Continuing to use Plaintiff's name through 2024, without authorization or consent, as "click bait" via its SEO technology and algorithms for its own financial gain and profit.

755. Such means above were used to cause Plaintiff to engage in a commercial sex act, as defined by 18 U.S.C. §§ 1591(e)(3).

756. By virtue of Aylo and ECP's unlawful benefitting with a high degree of moral turpitude, Plaintiff is entitled to, among other remedies, compensatory and punitive damages, restitution of all amounts to which Defendants have been unjustly enriched as a result of Defendants' unlawful conduct.

757. By virtue of Aylo and ECP's unlawful benefitting, Defendants are liable to Plaintiff for damages in amount to be determined at trial.

## SECOND CAUSE OF ACTION

## Advertising a Sex Trafficking Victim in Violation of the TVPRA

## 18 U.S.C. §§ 1591(a)(1), 1595

758. Plaintiff incorporates by reference and realleges each and every allegation set forth in the foregoing paragraphs as if fully alleged herein.

759. The Defendant entities are all inter-related in one business and operate as a whole. Plaintiff incorporates by reference and realleges the role and culpability of each Defendant as if fully alleged herein.

760. Defendants Aylo Holdings S.à.r.l., Aylo Freesites, Ltd, Aylo Premium, Ltd., 9129-1568 Quebec, Inc., Aylo Billing U.S. Corp., Aylo Global Entertainment, Inc., Aylo USA Incorporated, and Ethical Capital Partners, Ltd. jointly and severally,

113

FIRST AMENDED COMPLAINT

unlawfully advertised Plaintiff on its platforms in reckless disregard of the fact that GDP used force, threats of force, fraud, or coercion to make Plaintiff engage in the filmed commercial sex acts in violation of 18 U.S.C. §§ 1591(a)(1) and 1595.

761.  Plaintiff was and is a victim of sex trafficking within the meaning of 22 U.S.C. § 7102(11) and in violation of 18 U.S.C. §§ 1591 and 1595.

762.  Aylo, jointly and severally, unlawfully advertised Plaintiff on its platforms in reckless disregard of the fact that GDP used force, threats of force, fraud, or coercion to make Plaintiff engage in the filmed commercial sex acts in violation of 18 U.S.C. §§ 1591(a)(1) and 1595.

763.  Aylo, jointly and severally, further unlawfully provided, obtained, and maintained the sex trafficking videos of Plaintiff on numerous of its global platforms, distributing the videos to MindGeek's own tube sites and paysites, including through sites for Aylo's subsidiaries, affiliates, Content Partner Program, and Premium Viewshare Program.

764.  Aylo, jointly and severally, knew, had constructive knowledge of, should have known, or acted in reckless disregard of the fact that GDP operated a sex trafficking venture that wholly relied on the use of force, threats of force, coercion, and/or fraud to film Plaintiff and other regular high school and college-aged women engaging in commercial sex acts.

765.  Aylo, jointly and severally, ignored complaints by Plaintiff and other GDP victims, as well as the prior civil lawsuits and criminal, to prioritize its own financial benefit and value from advertising, providing, obtaining, and maintaining the illegally obtained videos of Plaintiff.

766.  Aylo, jointly and severally, knowingly and intentionally, through various means described herein, obtained, advertised, maintained, provided, distributed, and monetized Plaintiff's sex trafficking videos in and affecting interstate and foreign commerce, together and with others, in violation of 18 U.S.C. § 1591 (a)(1).

767.  By taking the concrete steps outlined above, Aylo, jointly and severally,

114

FIRST AMENDED COMPLAINT

knowingly partnered with GDP to advertise Plaintiff, and provide, obtain, and maintain Plaintiff's sex trafficking videos on its global platform.

768. Aylo's joint and several affirmative conduct to advertise, provide, obtain, and maintain Plaintiff's videos was committed knowing, or in reckless disregard of the fact, that GDP was dependent on enticing and recruiting a constant stream of young women, who did not intend to pursue a career in adult entertainment, to shoot pornographic videos, and that GDP used a combination of force, threats of force, coercion, blackmail, intimidation, fraud, and/or disparity of power as the means to obtain the content they advertised on Aylo's websites.

769. Aylo had a statutory obligation not to knowingly advertise, provide, obtain, or maintain Plaintiff's sex trafficking videos on its websites when it knew, or should have known, or recklessly disregarded the fact, that GDP created the videos through force, threats of force, fraud, or coercion in violation of the TVPRA, 18 U.S.C. § 1591(a)(1).

770. Nevertheless, Aylo continued to advertise, allow, and distribute Plaintiff's videos for its own financial gain until at least 2023.

771. As a proximate result of Aylo's advertising and associated conduct, Plaintiff has suffered serious harm and damages. Further, Aylo has received ill-gotten gains from the unlawful advertisement and exploitation of Plaintiff's videos, name, images, likeness, and/or identity for its own business purposes and profit.

772. Aylo's employees, officers, directors, and/or managing agents had actual or constructive knowledge of GDP's unlawful conduct or recklessly disregarded such.

773. Aylo's conduct in perpetrating TVPRA violations evinced a high degree of moral turpitude, fraud, and dishonesty. Its deliberate actions were malicious, fraudulent, oppressive, outrageous, and taken in reckless disregard of Plaintiff's rights. Plaintiff is entitled to punitive damages to punish Aylo for its actions and to deter others from acting similarly in the future.

774. By virtue of these knowing and intentional violations of 18 U.S.C. §§

1591(a)(1) and 1595, Defendants are liable to Plaintiff for damages and reasonable attorneys' fees.

775.   By virtue of these knowing and intentional violations of 18 U.S.C. §§ 1591(a)(1) and 1595, Defendants are jointly and severally liable to Plaintiff for punitive damages.

### THIRD CAUSE OF ACTION

### Conspiracy to Commit Violations of the TVPRA

### 18 U.S.C. §§ 1594(c), 1591, 1595

776.   Plaintiff incorporates by reference and realleges each and every allegation set forth in the foregoing paragraphs as if fully alleged herein.

777.   The Defendant entities are all inter-related in one business and operate as a whole. Plaintiff incorporates by reference and realleges the role and culpability of each Defendant as if fully alleged herein.

778.   Defendants Aylo Holdings S.à.r.l., Aylo Freesites, Ltd, Aylo Premium, Ltd., 9129-1568 Quebec, Inc., Aylo Billing U.S. Corp., Aylo Global Entertainment, Inc., Aylo USA Incorporated, and Ethical Capital Partners, Ltd., jointly and severally, intentionally conspired with others, including Pratt and his other co-conspirators, by agreement and understanding, to violate 18 U.S.C. §§ 1591(a)(1) and (a)(2), and to further GDP's sex trafficking venture to coerce commercial sex acts from Plaintiff and other victims, all in violation of 18 U.S.C. § 1594(c).  Aylo's employees, agents, officers, and/or directors conspired with Pratt to further the GDP sex trafficking venture.

779.   Aylo's joint and several conspiracies to violate 18 U.S.C. §§ 1591(a)(1) and (a)(2) was forbidden by 18 U.S.C. § 1594(c) and Aylo thereby violated the Trafficking Victims Protection Reauthorization Act.

780.   Aylo's joint and several conspiracies directly, proximately, and foreseeably harmed Plaintiff by directly leading to her forcibly engaging in commercial sex acts and in other ways, including by continuously advertising videos

116

of her trafficking. Aylo's conspiracy exploited Plaintiff and victimized her.

781. Aylo, jointly and severally, conspired with Pratt and his co-conspirators to facilitate Pratt's GDP sex trafficking venture for the purpose of profiting therefrom. Aylo had knowledge of Pratt's sex trafficking venture and acted with the specific intent to further the venture, including by advertising Plaintiff. Pratt could not and did not act alone. Rather, Aylo's employees, agents, officers, and/or directors approved and accepted Pratt's GDP sex trafficking venture into its Content Partner Program and Premium Viewshare Program and directly conspired with Pratt to further the profits reaped by both GDP and Aylo.

782. Aylo and Pratt had a meeting of the minds as to the essential nature of the plan to promote GDP and obtain exposure, views, subscriptions, and revenue for both Aylo's and GDP's businesses.

783. Aylo's conspiracies with Pratt was part of its participation in the GDP sex trafficking venture. Without Aylo agreeing to promote and facilitate the venture— by providing its global platform, world-wide distribution channels, and financial lifeline—Pratt would not have been able to sustain GDP and continue to entice and recruit victims for years.

784. Aylo's joint and several overt acts in furtherance of the conspiracy, understanding, and agreement in violation of 18 U.S.C. § 1591(a) are, among others, described in paragraphs 443-744 above.

785. Among the many overt acts intentionally committed by Aylo in furtherance of the sex trafficking venture was creating and implementing an unrestricted content business model which maximized the amount and variety of content on its numerous websites regardless of source or the nonconsensual nature of the content, maintaining a business partnership and financial relationship between Aylo and GDP's sex trafficking venture within this District, and utilizing its SEO technology and employees to maximize the promotion, views, and revenue for its content and that of its content partners which facilitated and continued the sex

117

FIRST AMENDED COMPLAINT

trafficking of Plaintiff and other victims.

786.   The financial accounts and transactions between Aylo and GDP were in and affecting interstate and foreign commerce, including within this District.

787.   Aylo's joint and several actions in furtherance of the conspiracy were intertwined with Pratt's GDP sex trafficking venture, as the global exposure, world-wide distribution, subscription sales, and funding for the sex trafficking venture were essential for Pratt to commit coercive commercial sex acts.

788.   It was part of the conspiracy that Aylo would financially benefit from providing the global exposure, world-wide distribution, subscription sales, and funding for the GDP sex trafficking venture. Aylo financially benefitted from its participation in and facilitation of the venture.

789.   Aylo, jointly and severally, knew, should have known, and/or acted in reckless disregard of the fact that the conspiracy would directly and proximately lead to unlawful commercial sex acts of Plaintiff with GDP co-conspirators.

790.   Plaintiff's videos had hundreds of millions of views, and generated millions of dollars for Aylo and GDP.  Pratt and his co-conspirators, including Aylo, knew Plaintiff's name and exploited her name, videos, images, identity and/or Miss Teen Colorado affiliation or first runner up title without authorization and consent.

791.   Further, due to the commercial and financial success of Plaintiff's videos, Pratt and his co-conspirators, including Aylo, continued to engage Plaintiff in commercial sex acts through means of force, threats of force, coercion, intimidation, fraud, and/or a combination of such means to obtain additional content for their websites.

792.   Aylo benefitted financially from and received value from conspiring to participate in Pratt's GDP sex trafficking venture.

793.   Aylo's conspiracy has caused Plaintiff serious harm and damages.  That harm was directly and proximately caused by the conspiracy and the harm resulting from the conspiracy was foreseeable.

118

FIRST AMENDED COMPLAINT

794.   Aylo's conduct in conspiring to violate the TVPRA was intentional and outrageous because it was deliberate in furtherance of a widespread, illegal, and dangerous sex trafficking venture.  It also evinced a high degree of moral turpitude, fraud, and dishonesty.

795.   By virtue of these violations of 18 U.S.C. § 1594(c), Defendants are liable to Plaintiff for damages and reasonable attorneys' fees under 18 U.S.C. § 1595.

796.   By virtue of its intentional and outrageous conspiracy to violate of 18 U.S.C. §§ 1591 and 1594, Defendants are liable to Plaintiff for punitive damages.

## FOURTH CAUSE OF ACTION

### Attempt to Commit Violations of the TVPRA

### 18 U.S.C. §§ 1594(a), 1591, 1595

797.  Plaintiff incorporates by reference and realleges each and every allegation set forth in the foregoing paragraphs as if fully alleged herein.

798.   The Defendant entities are all inter-related in one business and operate as a whole. Plaintiff incorporates by reference and realleges the role and culpability of each Defendant as if fully alleged herein.

799.   Defendants Aylo Holdings S.à.r.l., Aylo Freesites, Ltd, Aylo Premium, Ltd., 9129-1568 Quebec, Inc., Aylo Billing U.S. Corp., Aylo Global Entertainment, Inc., Aylo USA Incorporated, and Ethical Capital Partners, Ltd., jointly and severally, knowingly attempted to violate 18 U.S.C. §§ 1591(a)(1) and (a)(2), and to further Pratt's GDP sex trafficking venture to coerce commercial sex acts from Plaintiff and other victims in violation of 18 U.S.C. § 1594(a).

800.  Aylo's employees, agents, officers, and/or directors, jointly and severally, deliberately took substantial steps described, among others, in paragraphs 226 above to attempt to violate 18 U.S.C. §§ 1591(a)(1) and (a)(2) within this District.

801.   Among the many substantial steps taken by Aylo to deliberately attempt to violate 18 U.S.C. §§ 1591(a)(1) and (a)(2) was creating and implementing an unrestricted content business model which maximized the amount and variety of

119

content on its numerous websites regardless of source or the nonconsensual nature of the content, maintaining a business partnership and financial relationship between Aylo and Pratt/GDP's sex trafficking venture within this District, and utilizing its SEO technology and employees to maximize the promotion, views, and revenue for its content and that of its content partners which facilitated and continued the sex trafficking of Plaintiff and other victims.

802.  The financial accounts and transactions between Aylo and GDP, jointly and severally, were in and affecting interstate and foreign commerce, including within this District.

803.  In attempting to further sex trafficking Plaintiff and other GDP victims, Aylo provided GDP with support, assistance, global exposure, and world-wide distribution of its videos, images, and content to maximize views, subscription sales, and revenue for the financial benefit of both Aylo and GDP.

804.  It was part of the attempt to violate 18 U.S.C. § 1591(a)(1) that Aylo would obtain, advertise, maintain, provide, promote, and distribute sex trafficking videos of Plaintiff and other GDP victims. Aylo profited from these unlawful advertisements.

805.  It was part of the attempt to violate 18 U.S.C. § 1591(a)(2) that Aylo would financially benefit from participating in, facilitating, and supporting Pratt's GDP sex trafficking venture. Aylo financially benefitted from its participation in, facilitation, and support of the venture.

806.  Aylo knew, should have known, and/or acted in reckless disregard of the fact that the attempt to violate 18 U.S.C. §§ 1591(a)(1) and (a)(2) would directly and proximately lead to unlawful commercial sex acts of Plaintiff by Pratt and his GDP co-conspirators.

807.  Plaintiff's videos had hundreds of millions of views, and generated millions of dollars for Aylo and GDP.  Pratt and his co-conspirators, including Aylo, knew Plaintiff's name and exploited her name, videos, images, and/or identity,

without authorization and consent, in an attempt to violate 18 U.S.C. §§ 1591(a)(1) and (a)(2).

808. Further, due to the commercial and financial success of Plaintiff's videos, Pratt and his co-conspirators, including Aylo, continued to engage Plaintiff in commercial sex acts through means of force, threats of force, coercion, intimidation, fraud, and/or a combination of such means in an attempt to violate 18 U.S.C. § 1591(a).

809. Aylo's attempt to violate 18 U.S.C. §§ 1591(a)(1) and (a)(2) was a deliberate attempt to further a widespread, illegal, and dangerous sex trafficking venture directed specifically at Plaintiff and other victims of GDP. It also evinced a high degree of moral turpitude, fraud, and dishonesty.

810. Aylo's conduct has caused Plaintiff serious harm and damages. That harm was directly and proximately caused by the conspiracy and the harm resulting from the conspiracy was foreseeable.

811. By virtue of these violations of 18 U.S.C. § 1594(a), Defendants are liable to Plaintiff for damages and reasonable attorneys' fees under 18 U.S.C. § 1595.

812. By virtue of its intentional and outrageous attempt to violate 18 U.S.C. §§ 1591 and 1594, Defendants are liable to Plaintiff for punitive damages.

## FIFTH CAUSE OF ACTION

### Violation of the Lanham Act – False Advertising

### 15 U.S.C. § 1125(a)

813. Plaintiff incorporates by reference and realleges each and every allegation set forth in the foregoing paragraphs as if fully alleged herein.

814. The Defendant entities are all inter-related in one business and operate as a whole. Plaintiff incorporates by reference and realleges the role and culpability of each Defendant as if fully alleged herein.

815. Defendants Aylo Holdings S.à.r.l., Aylo Freesites, Ltd, Aylo Premium, Ltd., 9129-1568 Quebec, Inc., Aylo Billing U.S. Corp., Aylo Global Entertainment,

121
FIRST AMENDED COMPLAINT

Inc., Aylo USA Incorporated, and Ethical Capital Partners, Ltd., jointly and severally, use and used the Internet to advertise, promote, market, and maximize traffic to their sites and business, affecting interstate and foreign commerce, for the purpose of obtaining paying customers and generating profits.

816. Aylo, jointly and severally, used, promoted, and exploited Plaintiff's name, videos, images, likeness, and/or identity as described herein without authority in order to, inter alia, increase and maximize views, subscriptions, and revenue on or to their sites and businesses, create the false perception that Plaintiff was affiliated with their businesses, endorsed the business activities Aylo and GDP, and/or consented to or authorized the usage of her videos, images, likeness, and/or identity in order to advertise, promote, and market the business activities of Aylo and GDP.

817. Plaintiff's first video was first published around January 2014. However, between 2014 and even as late as February of 2024, Aylo was still, jointly and severally advertising, publishing, re-framing, and otherwise constantly promoting Plaintiff's videos to the public.

818. Aylo, jointly and severally, constantly and proactively took steps to draw attention to Plaintiff's content even years after it was first put on Aylo's websites. Specifically, Aylo, jointly and severally, took Plaintiff's videos and pictures and added them to playlists, suggested searches, and category libraries with other like-described content offered to users with similar interests. To drive various audiences, Aylo, jointly and severally, would constantly and continuously amend the descriptive content and messaging to add a user's particular type of image content to enhance its viewership.

819. Throughout January 2014 and February of 2024, Aylo modified the tags associated with Plaintiffs videos in order to target new audiences. Aylo also applied misspellings of Plaintiff's name phonetically to further attract audiences who were looking for Plaintiff's popular videos.

820. At all times relevant to this Complaint, Aylo, jointly and severally had

122

FIRST AMENDED COMPLAINT

actual and exclusive control over the contents contained within and/or displayed on its sites and on the GDP channels on its sites for the purpose of actually deceiving or having the tendency to deceive a substantial segment of audience.

821. Aylo, jointly and severally, had actual or constructive knowledge of the wrongfulness of its conduct and acted with intent to deprive Plaintiff of her rights and interest. Aylo, jointly and severally, further acted with actual or constructive knowledge of the high probability that their actions would cause harm and damage to Plaintiff.

822. Aylo's joint and several unauthorized use of Plaintiff's name, videos, images, likeness, and/or identity as described herein constitutes false advertising by falsely suggesting or implying, inter alia, that Plaintiff was affiliated with, associated with, or connected to Aylo, endorsed Aylo's brand, business or activities, or consented to or authorized Aylo's usage of her name, videos, images, likeness, and/or identity in order to maximize views, subscriptions, and revenue for sites operated and controlled, jointly and severally, by Aylo and GDP.

823. Aylo's false and deceptive use of Plaintiff's name, videos, images, likeness, and/or identity as described herein deceived and/or caused actual customer confusion as to:

    a. Whether Plaintiff was affiliated or associated with Aylo and GDP;

    b. Whether Plaintiff endorsed, sponsored, or approved of Aylo's brand, business and activities;

    c. Whether Plaintiff consented to or authorized Aylo's usage of her name, videos, images, likeness, and/or identity in order to advertise and promote their business and maximize views, subscriptions, and revenue.

824. Such unauthorized use of Plaintiff's name, videos, images, likeness, and/or identity as described herein misled and deceived customers and enticed potential customers to visit Aylo or GDP sites and pay for subscriptions on the

123

paysites.

825. Such deception is material and likely influenced the purchasing decisions of consumers, in that consumers were under the impression that Plaintiff was associated with Aylo when, in fact, she was not.

826. Aylo knew or should have known that their joint and several unauthorized uses of Plaintiff's name, videos, images, likeness, and/or identity as described herein would cause consumer confusion.

827. Aylo's joint and several unauthorized uses of Plaintiff's name, videos, images, likeness, and/or identity as described herein violates 15 U.S.C. § 1125(a), constitutes false advertising.

828. Aylo's wrongful conduct and false advertisement entered interstate commerce, as large audiences purchased and viewed, and advertisers paid to advertise on Plaintiff's image and likeness.

829. Aylo, jointly and severally, have caused significant damage to Plaintiff as a direct, foreseeable and proximate result of their unauthorized use of Plaintiff's name, videos, images, likeness, and/or identity as described herein.

830. Plaintiff has standing and was within the zone of interests of the Act. She had her own mainstream modeling career with major brands such as Champion and Kohl's and was first runner up Miss Teen Colorado.

831. Aylo's content partnership with GDP sex traffickers to procure and disseminate nonconsensual sexual content, abruptly cost Plaintiff her title, and the modeling offers dried up because the press presented it as scandalous and a choice. Plaintiff's young brand was tarnished and no longer valuable for the modeling contracts she was well-suited for.

832. Aylo's joint and several conduct usurped her modeling opportunities, ending her own and made profits off Plaintiff's looks that should have been reserved for Plaintiff's chosen, consensual modeling career.

833. As a further direct and proximate result of Aylo's joint and several

FIRST AMENDED COMPLAINT

conduct as alleged herein, Aylo has wrongly obtained and withheld profits attributed directly or indirectly to the unlawful use of Plaintiff's name, videos, images, likeness, and/or identity, entitling Plaintiff to disgorgement of those ill-gotten gains in an amount to be determined at trial.

### 1.    Single Publication Rule

834.    Plaintiff's first video was first published online around January 2014 on GDP and its content partner, Pornhub.  The distribution soon exploded to hundreds of sites and millions of viewers around the world.

835.    However, content depicting Plaintiff was actively revised and newly republished on dozens of websites and deliberately changed to attract new audiences of its various sites over the course of a decade and at least through February 8, 2024.

836.    Plaintiff appeared on Brazzers on February 8, 2024, this time with a Russian prompt of Поисквидео and still branded with "GDP" on the front.  A Russian-speaking audience is a *different* audience, and a different publication, than the first release in 2014, and it is published on a *different* website owned by Aylo. Brazzers is also a *different* audience because it is subscription and membership-based.

837.    Despite assurances to the U.S. Attorney that all GDP content would be pulled down, a Google search reveals that a basic search is still pointing to Pornhub as a result of search engine programming.  This means that even if her video didn't appear on the link, one would *think* that the person in the photo or video was Plaintiff, and they are still using Plaintiff's name despite being a sex trafficking victim to make money.  In this instance they are branding as "gay porn", which is a different audience, and would direct users to a different channel or landing page, than one for "miss teen".

838.    Across hundreds of websites, each site is "segmented" to curate for a *different* audience or customer preference. For example, "teen" attracts one audience, where "beauty queen" attracts a different audience.  By reposting Plaintiff's videos with a variety of titles and tags, Aylo ensured that they were delivering Plaintiff's profitable content to a wide range of audiences.

FIRST AMENDED COMPLAINT

839. The audiences changed with each posting or publication in the following ways:

     a. Which region

     b. Which demographics

     c. Which customer "preferences"

     d. Which website

     e. What time-period

     f. Those publications were changed for different audiences using a few different techniques:

     g. Changing the headline

     h. Changing the still or video lead

     i. Using different hash tags or meta tags

     j. Changing the language

     k. Using different search engine optimization terms and techniques to target a different audience

     l. Viewers are not taken back to the same page or website. The targeting routes viewers to different landing pages with different content, and thus a different audience.

840. The very business model of Aylo requires that content be rebranded, reposted, retargeted, readvertised and redirected in order to maximize views.

841. Aylo owns and controls hundreds of websites, and even Pornhub itself is not simply "one website" but rather a nearly infinite number of virtual locations to curate for varied audiences and viewers.

842. The content was actively and deliberately modified, re-branded, and retargeted to different audiences choosing to create and modify search terms to bring in different audiences, including different variations in spelling of Plaintiff's name.

843. Aylo, jointly and severally, constantly and proactively took steps to draw attention to Plaintiff's content up through at least February of 2024.

126

FIRST AMENDED COMPLAINT

844. Specifically, Aylo, jointly and severally, took Plaintiff's videos and pictures and added them to playlists, suggested searches, and category libraries with other like-described content offered to users with similar interests.

845. To drive various audiences, Aylo, jointly and severally, would constantly and continuously amend the descriptive content and messaging to add a user's particular type of image content to change and enhance its viewership.

846. Throughout January 2014 and February 2024, Aylo, jointly and severally, routinely modified the tags associated with Plaintiffs videos in order to target new audiences.

847. Aylo also applied misspellings of Plaintiff's name phonetically to further attract audiences who were looking for Plaintiff's popular videos.

848. The most recent republication that Plaintiff is aware of is February 8, 2024. It is in a different language, on a different site owned by Aylo and appears long after the DPA required that all content of sex trafficking victims of GDP be removed from all sites owned by Defendants.

849. By virtue of Aylo and ECP's false advertising with a high degree of moral turpitude, Plaintiff is entitled to, among other remedies, compensatory and punitive damages, restitution of all amounts to which Defendants have been unjustly enriched as a result of Defendants' unlawful conduct.

850. By virtue of Aylo and ECP's false advertising of Plaintiff's name, likeness, and identity, Defendants are liable to Plaintiff for damages in amount to be determined at trial.

## SIXTH CAUSE OF ACTION

### Violation of the Lanham Act – False Endorsement

### 15 U.S.C. § 1125(a)

851. Plaintiff incorporates by reference and realleges each and every allegation set forth in the foregoing paragraphs as if fully alleged herein.

852. The Defendant entities are all inter-related in one business and operate

127

FIRST AMENDED COMPLAINT

as a whole. Plaintiff incorporates by reference and realleges the role and culpability of each Defendant as if fully alleged herein.

853. Defendants Aylo Holdings S.à.r.l., Aylo Freesites, Ltd, Aylo Premium, Ltd., 9129-1568 Quebec, Inc., Aylo Billing U.S. Corp., Aylo Global Entertainment, Inc., Aylo USA Incorporated, and Ethical Capital Partners, Ltd., jointly and severally, use and used the Internet to advertise, promote, market, and maximize traffic to their sites and business, affecting interstate and foreign commerce, for the purpose of obtaining paying customers and generating profits.

854. Aylo, jointly and severally used, promoted, and exploited Plaintiff's name, videos, images, likeness, and/or identity as described herein without authority in order to, inter alia, increase and maximize views, subscriptions, and revenue on or to their sites and businesses, create the false perception that Plaintiff was affiliated with their businesses, endorsed the business activities Aylo and GDP, and/or consented to or authorized the usage of her videos, images, likeness, and/or identity in order to advertise, promote, and market the business activities of Aylo and GDP.

855. Plaintiff's first video was first published around January 2014. However, between 2014 and even as late as June 2023, Aylo was still advertising, publishing, re-framing, and otherwise constantly promoting Plaintiff's videos to the public.

856. Aylo, jointly and severally, constantly and proactively took steps to draw attention to Plaintiff's content even years after it was first put on Aylo's websites. Specifically, Aylo took Plaintiff's videos and pictures and added them to playlists, suggested searches, and category libraries with other like-described content offered to users with similar interests. To drive various audiences, Aylo would constantly and continuously amend the descriptive content and messaging to add a user's particular type of image content to enhance its viewership.

857. From January 2014 to June 2023, Aylo, jointly and severally, modified the tags associated with Plaintiffs videos in order to target new audiences. Aylo also applied misspellings of Plaintiff's name phonetically to further attract audiences who

were looking for Plaintiff's popular videos. At all times relevant to this Complaint, Aylo, jointly and severally, had actual and exclusive control over the contents contained within and/or displayed on its sites and on the GDP paysite channels on its sites for the purpose of actually deceiving or having the tendency to deceive a substantial segment of audience.

858.    Aylo had actual or constructive knowledge of the wrongfulness of its conduct and acted with intent to deprive Plaintiff of her rights and interest. Aylo, jointly and severally, further acted with actual or constructive knowledge of the high probability that their actions would cause harm and damage to Plaintiff.

859.    Aylo's  joint and several unauthorized use of Plaintiff's name, videos, images, likeness, and/or identity as described herein constitutes false endorsement by falsely suggesting or implying, inter alia, that Plaintiff was affiliated with, associated with, or connected to Aylo,  endorsed Aylo's brand,  business or activities, or consented to or authorized Aylo's usage of her name, videos, images, likeness, and/or identity in order to maximize views, subscriptions, and revenue for sites operated and controlled by Aylo and GDP.

860.    Defendant's joint and several false and deceptive use of Plaintiff's name, videos, images, likeness, and/or identity as described herein likely caused consumer confusion as to the origin, sponsorship, or approval of goods or services as to:

        a.    Whether Plaintiff was affiliated or associated with Aylo and GDP;

        b.    Whether Plaintiff endorsed, sponsored, or approved of Aylo's brand, business and activities;

        c.    Whether Plaintiff consented to or authorized Aylo's usage of her name, videos, images, likeness, and/or identity in order to advertise and promote their business and maximize views, subscriptions, and revenue.

861.    Such unauthorized use of Plaintiff's name, videos, images, likeness, and/or identity as described herein misled and deceived customers and enticed

129

FIRST AMENDED COMPLAINT

potential customers to visit Aylo or GDP sites and pay for subscriptions on the paysites.

862. Such false or misleading representations of fact is material and likely influenced the purchasing decisions of consumers, in that consumers were under the impression that Plaintiff was associated with Aylo when, in fact, she was not.

863. Aylo, jointly and severally, knew or should have known that their unauthorized use of Plaintiff's name, videos, images, likeness, and/or identity as described herein would cause consumer confusion.

864. Aylo's joint and several wrongful conduct and false advertisement entered interstate commerce, as large audiences purchased and viewed, and advertisers paid to advertise on Plaintiff's image and likeness.

865. Aylo has jointly and severally caused significant damage to Plaintiff as a direct, foreseeable and proximate result of their unauthorized use of Plaintiff's name, videos, images, likeness, and/or identity as described herein.

866. Plaintiff has standing and was within the zone of interests of the Act. She had her own mainstream modeling career with major brands such as Kohl's and Champion and was first runner up Miss Teen Colorado.

867. Aylo's content partnership with GDP sex traffickers to procure and disseminate nonconsensual sexual content, abruptly cost Plaintiff her title, and the modeling offers dried up because the press presented it as scandalous and a choice. Plaintiff's young brand was tarnished and no longer valuable for the modeling contracts she was well-suited for.

868. Aylo's joint and several conduct usurped her modeling opportunities, ending her own and made profits off Plaintiff's looks that should have been reserved for Plaintiff's chosen, consensual modeling career.

869. As a further direct and proximate result of Aylo's joint and several conduct as alleged herein, Aylo has wrongly obtained and withheld profits attributed directly or indirectly to the unlawful use of Plaintiff's name, videos, images, likeness,

130

and/or identity, entitling Plaintiff to disgorgement of those ill-gotten gains in an amount to be determined at trial.

870. Due to Aylo and ECP's continued false endorsement of Plaintiff's name, likeness, identity, and/or videos through at least 2023, Plaintiff overcomes the Single Publication Rule and incorporates by reference and realleges the foregoing Section V.1. paragraphs 834 – 850 as if fully alleged herein.

871. By virtue of Aylo and ECP's joint and several misappropriation with a high degree of moral turpitude, Plaintiff is entitled to, among other remedies, compensatory and punitive damages, restitution of all amounts to which Defendants have been unjustly enriched as a result of the misappropriation, disgorgement of Defendants' profits from the misappropriation and injunctive relief.

872. By virtue of Aylo and ECP's misappropriation of Plaintiff's name, likeness, identity, and/or videos Defendants are jointly and severally liable to Plaintiff for damages in amount to be determined at trial.

### SEVENTH CAUSE OF ACTION

### Distribution of Private Sexually Explicit Materials in Violation of Cal. Civ. Code § 1708.85

873. Plaintiff incorporates by reference and realleges each and every allegation set forth in the foregoing paragraphs as if fully alleged herein.

874. The Defendant entities are all inter-related in one business and operate as a whole. Plaintiff incorporates by reference and realleges the role and culpability of each Defendant as if fully alleged herein.

875. Defendants Aylo Holdings S.à.r.l., Aylo Freesites, Ltd, Aylo Premium, Ltd., 9129-1568 Quebec, Inc., Aylo Billing U.S. Corp., Aylo Global Entertainment, Inc., Aylo USA Incorporated, and Ethical Capital Partners, Ltd., jointly and severally, intentionally, willfully, maliciously, and fraudulently distributed Plaintiff's sex trafficking videos on its vast global platforms.

876. Plaintiff did not consent to Aylo's distribution of her sex trafficking

videos.

877. The GDP sex trafficking videos of Plaintiff depicted Plaintiff's intimate body parts and Plaintiff engaging in sexual acts.

878. Aylo, jointly and severally, constantly and proactively took steps to draw attention to Plaintiff's content even years after it was first put on Aylo's websites. Specifically, Aylo took Plaintiff's videos and pictures and added them to playlists, suggested searches, and category libraries with other like-described content offered to users with similar interests. To drive various audiences, Aylo would constantly and continuously amend the descriptive content and messaging to add a user's particular type of interest to enhance its viewership.

879. Throughout January 2014 and June 2023, Aylo, jointly and severally, modified the tags associated with Plaintiffs videos in order to target new audiences. Aylo also applied misspellings of Plaintiff's name phonetically to further attract audiences who were looking for Plaintiff's popular videos.

880. Aylo, jointly and severally, knew or should have known, that Plaintiff had a reasonable expectation of privacy in her sex trafficking videos because Plaintiff and other GDP victims directly reported their unauthorized use to Aylo.

881. Aylo, jointly and severally, ignored complaints by Plaintiff and other victims, as well as the prior civil lawsuits and criminal proceedings against GDP, to prioritize its own financial benefit and value from advertising, providing, obtaining, and maintaining the illegally obtained videos of Plaintiff.

882. As a proximate result of Aylo's joint and several distribution of Plaintiff's private, sexually explicit materials in violation of California Civil Code § 1708.85, Plaintiff has suffered serious harm and damages, including but not limited to general and special damages within the meaning of Civil Code § 48a for loss of reputation, shame, mortification, and hurt feelings.

883. Aylo's joint and several distribution of Plaintiff's private, sexually explicit materials is a substantial factor in causing Plaintiff's harm.

FIRST AMENDED COMPLAINT

884. Aylo, jointly and severally, has received ill-gotten gains from the unlawful distribution of private sexually explicit material of Plaintiff for its own business purposes and profit.

885. Due to Aylo and ECP's continued unlawful distribution of Plaintiff's name, likeness, identity, and/or videos through at least 2023, Plaintiff overcomes the Single Publication Rule and incorporates by reference and realleges the foregoing paragraphs 834 – 850 as if fully alleged herein.

886. By virtue of Aylo and ECP's misappropriation with a high degree of moral turpitude, Plaintiff is entitled to, among other remedies, compensatory and punitive damages, restitution of all amounts to which Defendants have been unjustly enriched as a result of the misappropriation, disgorgement of Defendants' profits from the misappropriation and injunctive relief.

887. By virtue of Aylo and ECP's misappropriation of Plaintiff's name, likeness, and identity, Defendants are liable to Plaintiff for damages in amount to be determined at trial.

## EIGHTH CAUSE OF ACTION

### Commercial Misappropriation of Likeness in Violation of

### Cal. Civ. Code § 3344(a)

888. Plaintiff incorporates by reference and realleges each and every allegation set forth in the foregoing paragraphs as if fully alleged herein.

889. The Defendant entities are all inter-related in one business and operate as a whole. Plaintiff incorporates by reference and realleges the role and culpability of each Defendant as if fully alleged herein.

890. Under California law, Plaintiff holds the exclusive right to control the public dissemination of her name, voice, photograph, and likeness for commercial use.  From the date of Judge Sammartino's order through at least February 2024, Aylo and ECP illegally continued using Plaintiff's name and image without her permission.

891. In violation of Civil Code § 3344(a), Defendants Aylo Holdings S.à.r.l.,

133

Aylo Freesites, Ltd, Aylo Premium, Ltd., 9129-1568 Quebec, Inc., Aylo Billing U.S. Corp., Aylo Global Entertainment, Inc., Aylo USA Incorporated, and Ethical Capital Partners, Ltd., jointly and severally, knowingly used Plaintiff's, name, voice, photograph, and/or likeness without her consent, and for its own commercial gain.

892.   Aylo's use of Plaintiff's name, voice, photograph, and/or likeness did not occur in connection with a news, public affairs, or sports broadcast or account, or with a political campaign.

893.   Aylo, jointly and severally, knowingly used pictures and videos of Plaintiff's face and body on its website platforms for its own purposes or benefit, commercially or otherwise Aylo financially benefitted from these videos.

894.   Plaintiff never consented to the use or distribution of her name, likeness, and/or identity on the internet or Aylo's joint and several global platforms.

895.   Aylo's joint and several conduct was a substantial factor in causing Plaintiff's harm.

896.   Aylo's joint and several, use of Plaintiff's name, voice, photograph, and/or likeness was directly connected to Aylo's commercial purpose.

897.   Aylo's joint and several conduct was a substantial factor in causing Plaintiff harm.

898.   Due to Aylo and ECP's continued misappropriation of Plaintiff's name, likeness, identity, and/or videos through at least 2023, Plaintiff overcomes the Single Publication Rule and incorporates by reference and realleges the foregoing paragraphs 834 – 850 as if fully alleged herein.

899.   By virtue of Aylo and ECP's misappropriation with a high degree of moral turpitude, Plaintiff is entitled to, among other remedies, compensatory and punitive damages, restitution of all amounts to which Defendants have been unjustly enriched as a result of the misappropriation, disgorgement of Defendants' profits from the misappropriation and injunctive relief.

900.   By virtue of Aylo and ECP's misappropriation of Plaintiff's name,

likeness, and identity, Defendants are liable to Plaintiff for damages in amount to be determined at trial.

## <u>NINTH CAUSE OF ACTION</u>

### **Violation of California's Right of Publicity Misappropriation of Likeness**

901. Plaintiff incorporates by reference and realleges each and every allegation set forth in the foregoing paragraphs as if fully alleged herein.

902. The Defendant entities are all inter-related in one business and operate as a whole. Plaintiff incorporates by reference and realleges the role and culpability of each Defendant as if fully alleged herein.

903. Under California law, Plaintiff holds the exclusive right to control the public dissemination of her name, likeness, and identity for commercial use.

904. By maintaining, streaming, distributing, reuploading, and monetizing videos and images of sexual acts of Plaintiff on its websites, Defendants Aylo Holdings S.à.r.l., Aylo Freesites, Ltd, Aylo Premium, Ltd., 9129-1568 Quebec, Inc., Aylo Billing U.S. Corp., Aylo Global Entertainment, Inc., Aylo USA Incorporated, and Ethical Capital Partners, Ltd., jointly and severally, appropriated Plaintiff's identity, image, and likeness for commercial use.

905. Aylo, jointly and severally, unlawfully used pictures and videos of Plaintiff's face and body on its website platforms for advertising and its own business and financial advantage.

906. The appropriation of Plaintiff's identity, image, and likeness was for Aylo, jointly and severally, own purposes or benefit, commercially or otherwise. Aylo financially benefitted from these videos and images of Plaintiff.

907. Plaintiff never consented to the use or distribution of her name, likeness, and/or identity on the internet or Aylo's global website platforms.

908. Aylo's conduct, jointly and severally, was a substantial factor in causing Plaintiff's harm.

909. Due to Aylo and ECP's continued misappropriation of Plaintiff's name,

FIRST AMENDED COMPLAINT

likeness, identity, and/or videos through at least 2023, Plaintiff overcomes the Single Publication Rule and incorporates by reference and realleges the foregoing paragraphs 834 – 850 as if fully alleged herein.

910.   Aylo and ECP's joint and several misappropriation of Plaintiff's name, likeness, and/or identity constitutes a violation of her right of publicity and has caused significant harm and damages to Plaintiff, including, but not limited to, psychological damages including mental suffering, anguish, humiliation, shame, embarrassment, mortification, and other emotional distress, and financial harm as a direct, foreseeable, and proximate result of its unauthorized conduct.

911.   Aylo and ECP's joint and several violation of Plaintiff's right of publicity has caused, and will continue to cause, irreparable harm to Plaintiff, her reputation, and brand by attributing to Plaintiff a desired career in the adult entertainment industry of which she never wanted and did not consent.

912.   By virtue of Aylo and ECP's misappropriation with a high degree of moral turpitude, Plaintiff is entitled to, among other remedies, compensatory and punitive damages, restitution of all amounts to which Defendants have been unjustly enriched as a result of the misappropriation, disgorgement of Defendants' profits from the misappropriation and injunctive relief.

913.   By virtue of Aylo and ECP's misappropriation of Plaintiff's name, likeness, and identity, Defendants are liable to Plaintiff for damages in amount to be determined at trial.

## TENTH CAUSE OF ACTION
### Violation of Right to Privacy
### Cal. Const., Art. 1, § 1

914.   Plaintiff incorporates by reference and realleges each and every allegation set forth in the foregoing paragraphs as if fully alleged herein.

915.   The Defendant entities are all inter-related in one business and operate as a whole. Plaintiff incorporates by reference and realleges the role and culpability

136

FIRST AMENDED COMPLAINT

of each Defendant as if fully alleged herein.

916. In violation of California's constitutional right to privacy, Cal. Const., Art. 1, § 1, Aylo, jointly and severally, obtained, used, and advertised sexually explicit pictures and videos of Plaintiff.

917. By maintaining, streaming, distributing, reuploading, and monetizing videos and images of sexual acts of Plaintiff on its websites, Defendants Aylo Holdings S.à.r.l., Aylo Freesites, Ltd, Aylo Premium, Ltd., 9129-1568 Quebec, Inc., Aylo Billing U.S. Corp., Aylo Global Entertainment, Inc., Aylo USA Incorporated, and Ethical Capital Partners, Ltd., jointly and severally, made a public disclosures of nonconsensual sexual content of Plaintiff arising from a sex trafficking operation that violated Plaintiff's right to privacy.

918. Plaintiff had a reasonable expectation of privacy in images and videos that depicted Plaintiff's face and body in a sexually explicit manner which readily identified and distinguished Plaintiff.

919. Aylo, jointly and severally, deceived and lied to Plaintiff that the sexually explicit images and videos would not be widely posted, distributed, and advertised across the internet and therefore intentionally intruded into Plaintiff's reasonable expectation of privacy by using these pictures and videos of Plaintiff for advertising.

920. Plaintiff's videos had hundreds of millions of views, and generated millions of dollars for Aylo.

921. Because of Aylo's status as one of the largest porn companies in the world, millions of other people across the globe had access to Plaintiffs videos and pictures.

922. Within those videos and pictures, Plaintiff could be easily identified, seen, and/or heard.

923. Due to this commercial and financial success, Aylo, jointly and severally, continued its unlawful invasion of Plaintiff's privacy despite Plaintiff's explicit request for the content to be removed.

137

FIRST AMENDED COMPLAINT

924. Aylo, jointly and severally, widespread advertising and distribution of such sexually explicit material across the internet and Aylo's global website platforms was a severe intrusion into Plaintiff's privacy and would be highly offensive to a reasonable person.

925. As a result of Aylo's actions, Plaintiff was harmed and Aylo's conduct was a substantial factor in causing Plaintiff harm.

926. Due to Aylo and ECP's continued violations of Plaintiff's right to privacy through at least 2023, Plaintiff overcomes the Single Publication Rule and incorporates by reference and realleges the foregoing paragraphs 834 – 850 as if fully alleged herein.

927. By virtue of Aylo and ECP's violation of Plaintiff's right to privacy with a high degree of moral turpitude, Plaintiff is entitled to, among other remedies, compensatory and punitive damages, restitution of all amounts to which Defendants have been unjustly enriched as a result of the Defendants' unlawful conduct.

928. By virtue of Aylo and ECP's violation of Plaintiff's right to privacy, Defendants are liable to Plaintiff for damages in amount to be determined at trial.

## ELEVENTH CAUSE OF ACTION

### False Light Invasion of Privacy

929. Plaintiff incorporates by reference and realleges each and every allegation set forth in the foregoing paragraphs as if fully alleged herein.

930. The Defendant entities are all inter-related in one business and operate as a whole. Plaintiff incorporates by reference and realleges the role and culpability of each Defendant as if fully alleged herein.

931. Plaintiff had a reasonable expectation of privacy in not having sexually explicit videos taken as a result of a sex trafficking posted on the worldwide web.

932. Plaintiff had a reasonable expectation of privacy to live her life, go to school, work a job and live in her home without stalkers, harassment, doxing and death threats that have been constant since Aylo advertised and disseminated her sex

138

trafficking videos.

933. By maintaining, streaming, distributing, reuploading, and monetizing videos and images of sexual acts of Plaintiff on its websites, Defendants Aylo Holdings S.à.r.l., Aylo Freesites, Ltd, Aylo Premium, Ltd., 9129-1568 Quebec, Inc., Aylo Billing U.S. Corp., Aylo Global Entertainment, Inc., Aylo USA Incorporated, and Ethical Capital Partners, Ltd., jointly and severally, made a public disclosures of nonconsensual sexual content Plaintiff arising from a sex trafficking operation that presented Plaintiff in a false light.

934. The information or material that was disclosed, jointly and severally, by Aylo was false and portrayed Plaintiff in a false light. Viewers and other users of Aylo's websites, may have (and likely did) believe that Plaintiff voluntarily appeared in the videos and images, willingly engaged in pornography, and made money as an "actress" off the posting of the video and images.

935. The false light created by Aylo's joint and several public disclosure of Plaintiff's videos and pictures would be highly offensive to a reasonable person in Plaintiff's position.

936. The misappropriated images and videos depicted Plaintiff's face and body in a sexually explicit manner which readily identified and distinguished Plaintiff.

937. Aylo, jointly and severally, knew, acted with reckless disregard for the truth, or was negligent in determining the truth that the disclosure would create a false impression about Plaintiff.

938. Aylo's conduct, jointly and severally, was a substantial factor in causing Plaintiff harm and Plaintiff was harmed as a result of Aylo's disclosures.

939. Plaintiff sustained harm to her physical safety, property, education, profession, reputation and has both lost money and spent money attempting to remediate the same.

940. Due to Aylo and ECP's continued misappropriation and violation of

139
FIRST AMENDED COMPLAINT

Plaintiff's privacy and name, likeness, identity, and/or videos through at least 2023, Plaintiff overcomes the Single Publication Rule and incorporates by reference and realleges the foregoing paragraphs 834 – 850 as if fully alleged herein.

941.   By virtue of Aylo and ECP's misappropriation with a high degree of moral turpitude, Plaintiff is entitled to, among other remedies, compensatory and punitive damages, restitution of all amounts to which Defendants have been unjustly enriched as a result of the misappropriation, disgorgement of Defendants' profits from the misappropriation and injunctive relief.

942.   By virtue of Aylo and ECP's misappropriation of Plaintiff's name, likeness, and identity, Defendants are liable to Plaintiff for damages in amount to be determined at trial.

## TWELFTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

943.   Plaintiff incorporates by reference and realleges each and every allegation set forth in the foregoing paragraphs as if fully alleged herein.

944.   The Defendant entities are all inter-related in one business and operate as a whole. Plaintiff incorporates by reference and realleges the role and culpability of each Defendant as if fully alleged herein.

945.   By maintaining, streaming, distributing, reuploading, and monetizing videos and images of sexual acts of Plaintiff on its websites, Defendants Aylo Holdings S.à.r.l., Aylo Freesites, Ltd, Aylo Premium, Ltd., 9129-1568 Quebec, Inc., Aylo Billing U.S. Corp., Aylo Global Entertainment, Inc., Aylo USA Incorporated, and Ethical Capital Partners, Ltd., jointly and severally, made a public disclosures of nonconsensual sexual content Plaintiff arising from a sex trafficking operation.

946.  As a direct and proximate result of knowingly benefiting from participating, facilitating, distributing and advertising Plaintiff's content on Aylo's global platform and sites, Aylo jointly and severally, intended to cause plaintiff emotional distress or acted with reckless disregard for the probability that Plaintiff

140

would suffer emotional distress, knowing that Plaintiff was present when the conduct occurred.

947. As a direct and proximate result of knowingly hosting, and continuing to host, Plaintiff's content, without consent, Aylo, jointly and severally, intended to cause plaintiff emotional distress or acted with reckless disregard for the probability that Plaintiff would suffer emotional distress, knowing that Plaintiff was present when the conduct occurred, seeing the content go viral online and knowing millions of viewers were watching her nonconsensual sexual content for their entertainment.

948. As a direct and proximate result of knowingly using and misappropriating Plaintiff's name, images, videos, likeness, and/or identity, without consent, on its pornographic sites to maximize views, subscriptions, and revenue, Aylo jointly and severally, intended to cause plaintiff emotional distress or acted with reckless disregard for the probability that Plaintiff would suffer emotional distress, knowing that Plaintiff was present when the conduct occurred.

949. Aylo's actions jointly and severally constitute extreme and outrageous conduct that shocks the conscience.

950. As a result of Aylo's joint and several actions, Plaintiff has suffered and continues to suffer severe emotional distress.

951. Aylo's conduct jointly and severally was a substantial factor in causing Plaintiff's severe emotional distress.

952. Due to Aylo and ECP's continued misappropriation of Plaintiff's name, likeness, identity, and/or videos through at least 2023, Plaintiff overcomes the Single Publication Rule and incorporates by reference and realleges the foregoing paragraphs 834 – 850 as if fully alleged herein.

953. By virtue of Aylo and ECP's joint and several misappropriation with a high degree of moral turpitude, Plaintiff is entitled to, among other remedies, compensatory and punitive damages, restitution of all amounts to which Defendants have been unjustly enriched as a result of the misappropriation, disgorgement of

141

FIRST AMENDED COMPLAINT

Defendants' profits from the misappropriation and injunctive relief.

954. By virtue of Aylo and ECP's misappropriation of Plaintiff's name, likeness, and identity, Defendants are liable, jointly and severally, to Plaintiff for damages in amount to be determined at trial.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in her favor and against Defendants, jointly and severally, in amounts to be determined at trial, as follows:

(a)    Awarding Plaintiff all compensatory, general, special, and consequential damages, including economic and noneconomic damages and reputational harm;

(b)    Awarding Plaintiff restitution for all monies Defendants earned marketing, selling, and exploiting Plaintiff's name, images, and videos;

(c)    Awarding Plaintiff punitive and exemplary damages against Defendants;

(d)    Awarding Plaintiff all damages allowed by 15 U.S.C. §§ 1125, 1116, and 1117, including all actual and consequential damages sustained by Plaintiff, including all economic damages and losses, disgorgement of profits attributable to Defendants' misappropriation of the Plaintiff's images, likenesses, and/or identity as well as treble damages and reasonable attorneys' fees;

(e)    Awarding Plaintiff attorney fees as may otherwise be permitted by law;

(f)    Awarding Plaintiff costs and expenses, including expert fees and costs;

(g)    Awarding Plaintiff pre and post judgment interest at the maximum legal rate;

(h)    Permanently enjoining Defendants from using Plaintiff's videos as well as her name, images, likeness and/or identity in any manner and/or profiting therefrom;

(i)    Declaring the Defendants as alter egos; and

(j)    Granting such further and other relief as this Court deems just and equitable.

142

FIRST AMENDED COMPLAINT

DATED:  September 3, 2024

By:  /s/ Amanda J.G. Walbrun

Raymond P. Boucher (SBN 115364)
Amanda J.G. Walbrun (SBN 317408)
BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California  91367
Telephone: (818) 340-5400 Facsimile: (818) 340-5401
Email:ray@boucher.la
   walbrun@boucher.la


BURG SIMPSON
ELDREDGE HERSH & JARDINE, P.C.

By:  /s/ David K. TeSelle

David K. TeSelle, Pro Hac Vice
Lisa R. Marks, Pro Hac Vice
Morgan L. Carroll, Pro Hac Vice
Alyssa Hill, Pro Hac Vice Pending
40 Inverness Drive East
Englewood, Colorado 80112
Telephone: (303) 792-5595
Facsimile: (303) 708-0527
Email:dteselle@burgsimpson.com
   lmarks@burgsimpson.com
   mcarroll@burgsimpson.com

143

FIRST AMENDED COMPLAINT

## VII.   DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all triable issues of fact.

DATED:  September 3, 2024

By:        */s/ Amanda J.G. Walbrun*

Raymond P. Boucher (SBN 115364)
Amanda J.G. Walbrun (SBN 317408)
BOUCHER LLP
21600 Oxnard Street, Suite 600
Woodland Hills, California  91367
Telephone: (818) 340-5400 Facsimile:
(818) 340-5401
Email:ray@boucher.la
        walbrun@boucher.la

BURG SIMPSON
ELDREDGE HERSH & JARDINE, P.C.

By:        */s/ David K. TeSelle*

David K. TeSelle, Pro Hac Vice
Lisa R. Marks, Pro Hac Vice
Morgan L. Carroll, Pro Hac Vice
Alyssa Hill, Pro Hac Vice Pending
40 Inverness Drive East
Englewood, Colorado 80112
Telephone: (303) 792-5595
Facsimile: (303) 708-0527
Email:dteselle@burgsimpson.com
        lmarks@burgsimpson.com
        mcarroll@burgsimpson.com

144

FIRST AMENDED COMPLAINT