# EXHIBIT 1

*Deferred Prosecution Agreement*
*United States of America v. Aylo Holdings S.à.r.l. f/k/a*
*MindGeek S.à.r.l., et al*
*December 21, 2023,*

Exh. 1-001

Case 2:23-cv-04863-MWF-AGR Document 81 Filed 12/09/24 Page 2 of 77 Page ID #:1950

DocuSign Envelope ID: 0D71BB7D-5A23-4BD1-A595-96939E3DF476

COURT'S
EXHIBIT NO. 1
IDENTIFICATION/EVIDENCE
DKT.# 23cr463
DATE: 12/21/2023
PENGAD 800-631-6989

HDM:GN/GK/TBM
F. #2020R01135

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

AYLO HOLDINGS S.À.R.L, formerly
known as "MindGeek S.à.r.l.,"

          Defendant.

- - - - - - - - - - - - - - - - - - X

DEFERRED PROSECUTION
AGREEMENT

The defendant AYLO HOLDINGS S.À.R.L, formerly known as "MindGeek

S.à.r.l.," and its subsidiaries Aylo USA Inc., formerly known as "MindGeek USA, Inc.," and

AYLO Freesites Ltd., formerly known as "MG Freesites Ltd." (collectively, "MindGeek" or the

"Company"), pursuant to a duly authorized Board of Directors Resolution (a copy of which is

attached hereto as Attachment A), and the United States Attorney's Office for the Eastern

District of New York (the "Office") hereby enter into this Deferred Prosecution Agreement (the

"Agreement").

<u>Criminal Information and Acceptance of Responsibility</u>

1.    MindGeek acknowledges and agrees that the Office will file an

Information (the "Information"), a copy of which is attached hereto as Attachment B and

incorporated herein by reference, in the United States District Court for the Eastern District of

New York, charging MindGeek with one count of engaging in an unlawful monetary transaction,

in violation of Title 18, United States Code, Section 1957. By executing the Agreement,

MindGeek knowingly (a) waives any and all rights it has to have the crime charged in the

1

Exh. 1-002

DocuSign Envelope ID: 0D71BB7D-5A23-4BD1-A505-96039E3DF476

Information presented to a grand jury and prosecuted by indictment, as well as all rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); (b) waives any and all objections with respect to venue and applicable statutes of limitations for any charges by the United States arising out of the conduct described in the Statement of Facts, a copy of which is attached hereto as Attachment C and incorporated herein by reference; and (c) consents to the filing of the Information, as provided by the terms of this Agreement, in the United States District Court for the Eastern District of New York. The Office agrees to defer prosecution of the Company pursuant to the terms and conditions described below.

2. The Company admits, accepts and acknowledges that (a) it is responsible under United States law for the acts of its officers, directors, employees and agents with respect to the conduct described in the Information and the Statement of Facts, and (b) the facts described in the Statement of Facts are true and accurate. Should the Office pursue the prosecution that is deferred by this Agreement, the Company stipulates to the admissibility of the Statement of Facts in any proceeding, including any trial, guilty plea or sentencing proceeding, and will not contradict any facts in the Statement of Facts at any such proceeding.

<u>Term of the Agreement</u>

3. The Agreement shall be in effect for a period beginning on the date on which the Information is filed and ending three (3) years from the later of the date on which the Information is filed or the date on which the independent compliance monitor (the "Monitor") is retained by MindGeek, as described in paragraphs 13 through 16 below ("the Term"). MindGeek agrees that, in the event that the Office determines, in its sole discretion, that MindGeek has knowingly violated any provision of the Agreement or has knowingly failed to

Exh. 1-003

DocuSign Envelope ID: 0D71BB7D-5A23-4BD1-A505-96039E3DF476

completely perform or fulfill each of MindGeek's obligations under the Agreement, an extension or extensions of the Term may be imposed by the Office, in its sole discretion, for up to a total additional time period of twelve (12) months, without prejudice to the Office's right to proceed with the prosecution as provided in paragraphs 19 through 23 below. Any extension of the Agreement extends all terms of the Agreement, including the terms of the reporting requirement, as set forth in Attachment D, for an equivalent period. Conversely, in the event the Office finds, in its sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the reporting requirement in Attachment D, and the other provisions of the Agreement have been satisfied, the Office may elect to terminate the Agreement early. If the Court rejects the Agreement, all provisions of the Agreement shall be deemed null and void, and the Term shall be deemed not to have begun.

Relevant Considerations

4. The Office enters into this Agreement based on the individual facts and circumstances presented by this case, including:

(a) The Company did not voluntarily self-disclose the offense conduct to the Office, and as a result, the Company was not eligible for a more significant discount on the fine amount or the form of resolution;

(b) The seriousness of the offense conduct;

(c) The Company received credit, in addition to the two-point downward adjustment to the Sentencing Guidelines, of 20 percent off of the bottom of the Sentencing Guidelines range for its cooperation with the Office's investigation;

(d) The Company cooperated with the Office's investigation, which began in December 2020;

3

Exh. 1-004

(e)     The Company has established and implemented a compliance program and internal controls to prevent the uploading and dissemination of illegal content across all of its online platforms, including:

> (i)     preventing unverified users from uploading any content to its platforms;
>
> (ii)     removing all download functions on its free platforms;
>
> (iii)     employing both human moderation and technological review before any uploaded content is able to be seen on its platforms;
>
> (iv)     employing sophisticated proprietary and third-party software developed and designed to detect minors' images and non-consensual content on its platforms; and
>
> (v)     employing sophisticated proprietary and third-party software to fingerprint illegal content, including non-consensual content, in order to prevent its dissemination on its platforms;

(f)     Under its new ownership, the Company has represented to the Office that it has taken additional steps to combat and prevent the dissemination of illegal content more broadly throughout the internet, including on platforms it does not own or control, including, but not limited to, collaborating with law enforcement agencies on innovative approaches to eradicate non-consensual content and Child Sexual Abuse Material;

(g)     The Company has removed all GirlsDoPorn.com ("Girls Do Porn") and GirlsDoToys.com ("Girls Do Toys") content from its platforms, has taken significant

4

Exh. 1-005

measures to prevent the uploading and distribution of Girls Do Porn and Girls Do Toys content on its platforms, and ceased any and all compensation to entities and individuals promoting Girls Do Porn and Girls Do Toys;

(h)     The Company has agreed to make monetary payments to any individuals who were defrauded by the operators of Girls Do Porn and Girls Do Toys whose images were posted on the Company's platforms in accordance with the terms set forth in Paragraph 9;

(i)     The Company did not commit, conspire to commit, or aid and abet the commission of sex trafficking by the operators of Girls Do Porn and Girls Do Toys;

(j)     In addition to the Company's remedial efforts, the Company has agreed to the imposition of the Monitor;

(k)     The Company has no prior criminal history; and

(l)     The Company has committed to continuing to cooperate with the Office as described in paragraph 5 below.

<u>Future Cooperation and Disclosure Requirements</u>

5.     The Company shall cooperate fully with the Office in any and all matters relating to the conduct described in this Agreement and the Statement of Facts, or any individual or entity referred to therein, as well as any other conduct that may violate federal criminal law, subject to applicable law and regulations, until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the Term. At the request of the Office, the Company shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies, in any investigation of the Company, its parent company or its affiliates, or any of its present or former officers, directors, employees,

5

Exh. 1-006

agents and consultants, or any other party, in any and all matters relating to the conduct described in the Agreement and the Statement of Facts and other conduct investigated by the Office or any other component of the Department of Justice. The Company agrees that its cooperation pursuant to this paragraph shall include, but not be limited to, the following:

(a) Upon inquiry of the Office, the Company shall truthfully disclose all factual information not protected by a valid claim of attorney-client privilege or work product doctrine with respect to its activities, those of its parent company and affiliates, and those of its present and former directors, officers, employees, agents and consultants, including any evidence or allegations and internal or external investigations, about which the Company has any knowledge. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Company to provide to the Office, upon request, any document, record or other tangible evidence about which the Office may inquire of the Company;

(b) Upon request of the Office, the Company shall designate knowledgeable employees, agents or attorneys to provide to the Office the information and materials described in Paragraph 5(a) above on behalf of the Company. It is further understood that the Company must at all times provide complete, truthful and accurate information;

(c) The Company shall use its best efforts to make available for interviews or testimony, as requested by the Office, present or former officers, directors, employees, agents and consultants of the Company. This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities. Cooperation under this paragraph shall include identification of witnesses who, to the knowledge of the Company, may have material information regarding the matters under investigation; and

Exh. 1-007

DocuSign Envelope ID: 0D71BB7D-5A23-4BD1-A505-96039E3DF476

(d)     With respect to any information, testimony, documents, records or other tangible evidence provided to the Office pursuant to this Agreement, the Company consents to any and all disclosures, subject to applicable law and regulations, to other governmental authorities, including United States authorities and those of a foreign government of such materials as the Office, in its sole discretion, shall deem appropriate.

6.     In addition to the obligations in Paragraph 5 above, during the Term of the Agreement, should the Company learn of any evidence of conduct that may constitute a violation of federal criminal law by the Company, the Company shall promptly report such evidence to the Office.

<u>Payment of Monetary Penalties and Restitution</u>

7.     The Office and the Company agree that application of the United States Sentencing Guidelines ("USSG" or "Sentencing Guidelines") to determine the applicable fine range yields the following analysis:

(a)     The 2021 USSG are applicable to this matter.

(b)     <u>Offense Level</u>.  Based upon USSG §§ 2S1.1(a)(2) and 2B1.1, the total offense level is 17, calculated as follows:

| | | |
|---|---|---|
| § 2S1.1(a)(2) | Base Offense Level | 8 |
| § 2B1.1(b)(1)(E) | Value of Unlawful Transactions (More Than $95,000 and Less Than $150,000) | +8 |
| § 2S1.1(b)(2)(A) | Conviction Under 18 U.S.C. § 1957 | <u>+1</u> |
| **Total Offense Level** | | <u>**17**</u> |

(c)     <u>Base Fine</u>.  Based upon USSG § 8C2.4(a)(2), the base fine is $870,260.77 (the amount of pecuniary gain).

Exh. 1-008

(d)    Culpability Score.  Based upon USSG § 8C2.5, the culpability score is 7, calculated as follows:

| | | |
|---|---|---|
| § 8C2.5(a) | Base Culpability Score | 5 |
| § 8C2.5(b)(2)(A) | Organization Had 1000 or More Employees | +4 |
| § 8C2.5(g)(2) | Full Cooperation and Acceptance of Responsibility | -2 |
| **Total** | | **7** |

Calculation of Fine Range:

| | |
|---|---|
| Base Fine | $870,260.77 |
| Multipliers | 1.4(min)/2.8(max) |
| Fine Range | $1,218,365.08/$2,436,730.16 |

8.    The Company agrees, based on the application of the Sentencing Guidelines, to pay a total monetary penalty of $974,692.06 ("Criminal Fine").  The Criminal Fine reflects a multiplier of 1.4 to the Base Fine identified above, and a 20 percent discount from this computed fine.  The Office and the Company further agree that the Company will pay criminal forfeiture to the United States Treasury, in the amount of $870,260.77, in connection with this Agreement ("Forfeiture").  The Company, directly or through an affiliate, therefore, agrees to pay the combined Criminal Fine and Forfeiture amount of $1,844,952.83 ("Total Monetary Penalty") no later than ten (10) business days after the approval by the United States District Court for the Eastern District of New York of this Agreement, to the benefit of the United States Treasury.  The Total Monetary Penalty is final and shall not be refunded. Furthermore, nothing in this Agreement shall be deemed an agreement by the Office that the Total Monetary Penalty is the maximum penalty that may be imposed in any future prosecution, and the Office is not precluded from arguing in any future prosecution that the Court should impose a higher fine, although the Office agrees that under those circumstances, it will

Exh. 1-009

recommend to the Court that any amount paid under this Agreement should be offset against any fine the Court imposes as part of a future judgment.  The Company acknowledges that no tax deduction may be sought in connection with the payment of any part of this Total Monetary Penalty.  The Company shall not seek or accept, directly or indirectly, reimbursement or indemnification from any source with regard to the penalty or disgorgement amounts that the Company pays pursuant to this Agreement or any other agreement concerning the conduct set forth in the Statement of Facts entered into with an enforcement authority or regulator.

9.      In addition to the monetary penalties stated in Paragraph 8, the Company has agreed to make monetary payments to any individuals who were defrauded by the operators of Girls Do Porn and Girls Do Toys, and whose images were posted on the Company's platforms (the "Individuals"), who request restitution within one (1) year from the date of this Agreement and who have not yet otherwise received compensation from the Company to compensate them for any losses recoverable as restitution, as such losses are defined in 18 U.S.C. § 1593(b)(3).  To obtain a monetary payment, the Individuals must submit an affidavit under the penalty of perjury that sets out facts establishing a *prima facie* showing: (a) that the Individual was defrauded by the operators of Girls Do Porn and Girls Do Toys or was otherwise a victim of a sex trafficking venture by Girls Do Porn and Girls Do Toys, as defined by 18 U.S.C. § 1591; (b) that the Individual's image(s) were posted on a website owned, operated or controlled by the Company or any of its subsidiaries; and (c) the full amount of the Individual's losses, as defined in 18 U.S.C. § 1593(b)(3), as well as any information regarding the extent to which payments by the Company or other entities have previously been made to the Individual for the same losses. Individuals who wish to submit claims for monetary payments will be informed (a) of the terms set forth in this paragraph; and (b) that, by submitting any such claims, they agree to be bound by

9

the terms set forth in this paragraph. The Company will make a monetary payment that reflects the full amount of the Individual's losses caused by publication of the Individual's images on a website owned, operated or controlled by the Company or any of its subsidiaries, and each Individual who establishes losses (for which they have not previously received compensation) in accordance with the terms set forth in this paragraph shall receive an amount which is not less than $3,000. See 18 U.S.C. §§ 1593(b)(3), 2259(b)(2)(B). The "full amount of the [Individual]'s losses" does not include any losses for emotional distress or pain and suffering, but does include payments to compensate the Individual for losses including but not limited to lost wages, medical bills, therapy bills and the costs undertaken to engage takedown services to remove videos. Id. Any dispute as to the facts asserted in an Individual's affidavit or the amount of the monetary payment will be determined by the Monitor using a preponderance of the evidence standard. If for any reason an affidavit submitted by an Individual in a timely manner is deemed insufficient, the Individual shall have a period of three (3) months to resubmit the affidavit. Nothing in this paragraph is intended to constitute or otherwise require a waiver of any alternative rights or remedies available to the Individuals, including potential civil remedies.

Conditional Release From Liability

10.     Subject to Paragraphs 19 through 23 below, the Office agrees, except as provided in this Agreement, that it will not bring any criminal or civil case against the Company or any of its current or former wholly-owned subsidiaries relating to any of the conduct described in either the Statement of Facts or the Information filed pursuant to this Agreement, or for conduct that the Company disclosed to the Office prior to the signing of this Agreement. This Agreement does not provide any protection against prosecution for any future conduct by the Company. In addition, this Agreement does not provide any protection against prosecution

10

DocuSign Envelope ID: 0D71BB7D-5A23-4BD1-A605-96939E3DF476

of any individuals, regardless of their affiliation with the Company.  The Office, however, may use any information related to the conduct described in the Statement of Facts against the Company:

>    (a)    in a prosecution for perjury or obstruction of justice;

>    (b)    in a prosecution for making a false statement;

>    (c)    in a prosecution or other proceeding relating to any crime of violence; or

>    (d)    in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.

### Corporate Compliance Program

11.    The Company represents that it has implemented and will continue to implement a compliance and ethics program throughout its operations, including those of its affiliates, agents and joint ventures, and those of its contractors and subcontractors.

12.    In order to address any deficiencies in its policies and procedures, the Company represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, a review of its existing policies and procedures regarding its compliance with federal criminal law relating to unlawful monetary transactions and other federal criminal offenses relating to content posted online.  If necessary and appropriate, the Company will adopt new, or modify existing, internal controls, policies and procedures in order to ensure that the Company maintains a system of internal

11

Exh. 1-012

DocuSign Envelope ID: 0D71BB7D-5A23-4BD1-A505-96939F53DF476

controls and compliance codes, standards and procedures designed to detect and deter violations of such laws.

Independent Compliance Monitor

13.     Promptly after the Office's selection pursuant to this paragraph and paragraphs 14 through 15 below, the Company agrees to retain a Monitor for the term specified in Paragraph 16 below. The Monitor's duties and authority, and the obligations of the Company with respect to the Monitor and the Office, are set forth in Attachment D, which is incorporated by reference into this Agreement. Upon the execution of this Agreement, and after consultation with the Office, the parties must follow the monitor selection process set forth in the memorandum issued by the Department of Justice, titled "United States Attorneys' Offices Monitor Selection for Corporate Criminal Enforcement," effective on March 1, 2023 (the "DOJ Monitor Selection Memorandum"). Within at least twenty (20) business days after the execution of this Agreement, the Company must submit a written proposal to the Office identifying a pool of three (3) qualified candidates to serve as the Monitor and providing the information required by Section V(A) of the DOJ Monitor Selection Memorandum. The Monitor candidates or their team members shall have, at a minimum, the following qualifications:

(a)     demonstrated expertise with communication service providers and/or online platforms where content is provided by third-parties;

(b)     demonstrated expertise with respect to the screening and monitoring of illegal content for communication service providers and/or online platforms;

(c)     experience designing and/or reviewing corporate compliance policies, procedures and internal controls for communication service providers and/or online platforms;

12

Exh. 1-013

(d)     the ability to access and deploy resources as necessary to discharge the Monitor's duties as described in the Agreement; and

(e)     sufficient independence from the Company to ensure effective and impartial performance of the Monitor's duties as described in the Agreement.

14.     The parties will follow the monitor selection process set forth in Section V of the DOJ Monitor Selection Memorandum.  All candidates must be approved by the Office and the Office of the Deputy Attorney General at the Department of Justice ("ODAG") pursuant to Section V(E) and V(F) of the DOJ Monitor Selection Memorandum.  The Office retains the right, in its sole discretion, to recommend the Monitor from among the candidates proposed by the Company to ODAG, though the Company may express its preference(s) among the candidates.   If either the Office or ODAG does not approve of the proposed Monitor, the Company must propose a new candidate or slate of candidates in accordance with Sections V(C) and V(D) of the DOJ Monitor Selection Memorandum.   This process shall continue until a Monitor is approved by ODAG.  The parties will use their best efforts to complete the selection process within sixty (60) calendar days of the filing of the Agreement and the accompanying Information.

15.     If the Monitor resigns or is otherwise unable to fulfill his or her obligations as set out herein and in Attachment D, the Company shall within thirty (30) calendar days recommend a pool of three (3) qualified candidates from which the Office will choose a replacement.

16.     MindGeek shall retain the Monitor for a period of three (3) years from the date on which the Monitor is retained by the Company (the "Term of Monitorship"), subject to extension or early termination as described in Paragraph 3 above.  The Monitor's powers, duties

13

and responsibilities, as well as additional circumstances that may support an extension of the Term of Monitorship, are set forth in Attachment D.  The Company agrees that it will not employ or be affiliated with the Monitor or the Monitor's firm for a period of at least two (2) years from the date on which the Term of Monitorship expires.  Nor will the Company discuss with the Monitor or the Monitor's firm the possibility of further employment or affiliation during the Term of Monitorship.

### Deferred Prosecution

17.     In consideration of the undertakings agreed to by the Company herein, the Office agrees that any prosecution of the Company for the conduct set forth in the Statement of Facts, and for the conduct that the Company disclosed to the Office prior to the signing of this Agreement, be and hereby is deferred for the Term.  To the extent there is conduct disclosed by the Company that the parties have specifically discussed and agreed is not covered by this Agreement, such conduct will not be exempt from further prosecution and is not within the scope of or relevant to this Agreement.

18.     The Office further agrees that if the Company fully complies with all of its obligations under this Agreement, the Office will not continue the criminal prosecution against the Company described in Paragraph 1 above and, at the conclusion of the Term, this Agreement shall expire.  Within ninety (90) days of the Agreement's expiration, the Office shall seek dismissal with prejudice of the Information filed against the Company described in Paragraph 1 above, and agree not to file charges in the future against the Company based on the conduct described in this Agreement and the Statement of Facts.

### Breach of the Agreement

19.     If, during the Term, the Company: (a) commits any felony under U.S.

14

Exh. 1-015

DocuSign Envelope ID: 9D71BB7D-5A23-4BD1-A505-96939E3DF476

federal law; (b) provides in connection with this Agreement deliberately false, incomplete or misleading information, including in connection with its disclosure of information about individual culpability; (c) fails to cooperate as set forth in Paragraph 5 of this Agreement; (d) fails to continue to implement the compliance program as set forth in Paragraphs 11 and 12 of this Agreement; or (e) otherwise fails specifically to perform or to fulfill completely each of the Company's obligations under the Agreement, regardless of whether the Office becomes aware of such a breach after the Term is complete, the Company shall thereafter be subject to prosecution for any federal criminal violation of which the Office has knowledge, including, but not limited to, the charge in the Information described in Paragraph 1 above and charges that arise from the conduct set forth in the Statement of Facts, which may be pursued by the Office in the United States District Court for the Eastern District of New York or any other appropriate venue. Determination of whether the Company has breached the Agreement and whether to pursue prosecution of the Company shall be in the Office's sole discretion. Any such prosecution may be premised on information provided by the Company or its personnel. Any such prosecution relating to the conduct described in the Statement of Facts or relating to conduct known to the Office prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Company, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term plus one year. Thus, by signing this Agreement, the Company agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year. In addition, the Company agrees that the statute of limitations as to any violation of federal law that occurs during the Term will be tolled from the date upon which the

15

violation occurs until the earlier of the date upon which the Office is made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

20.     In the event the Office determines that the Company has breached this Agreement, the Office agrees to provide the Company with written notice prior to instituting any prosecution resulting from such breach.  Within thirty (30) days of receipt of such notice, the Company shall have the opportunity to respond to the Office in writing to explain the nature and circumstances of the breach, as well as the actions the Company has taken to address and remediate the situation, which the Office shall consider in determining whether to pursue prosecution of the Company.

21.     In the event that the Office determines that the Company has breached this Agreement: (a) all statements made by or on behalf of the Company to the Office or to the Court, including the facts in the Statement of Facts, and any testimony given by the Company before a grand jury, a court or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Office against the Company; and (b) the Company shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Company prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible.  The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Company, will

16

Exh. 1-017

DocuSign Envelope ID: 9D71BB7D-5A23-4BD1-A605-96939F53DF476

be imputed to the Company for the purpose of determining whether the Company has violated any provision of this Agreement shall be in the sole discretion of the Office.

22.     The Company acknowledges that the Office has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Company breaches this Agreement and this matter proceeds to judgment.  The Company further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

23.     Thirty (30) days after the expiration of the period of deferred prosecution specified in this Agreement, the Company, by the Chief Executive Officer of the Company and the Chief Financial Officer of the Company, will certify to the U.S. Department of Justice that the Company has met its disclosure obligations pursuant to Paragraph 5 of this Agreement.  Each certification will be deemed a material statement and representation by the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

<u>Sale, Merger or Other Change in Corporate Form of Company</u>

24.     Except as may otherwise be agreed by the parties in connection with a particular transaction, the Company agrees that in the event that, during the Term, it undertakes any change in corporate form, including if it sells, merges or transfers business operations that are material to the Company's consolidated operations, or to the operations of any subsidiaries or affiliates involved in the conduct described in the Statement of Facts, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer or other change in corporate form, it shall include in any contract for sale, merger, transfer or other change in corporate form a provision binding the purchaser, or any successor in interest thereto,

17

Exh. 1-018

DocuSign Envelope ID: 9D71BB7D-5A23-4BD1-A695-96939F53DF476

to the obligations described in this Agreement. The Company shall obtain approval from the Office at least thirty (30) days prior to undertaking any such sale, merger, transfer or other change in corporate form, including dissolution, in order to give the Office an opportunity to determine if such change in corporate form would impact the terms or obligations of the Agreement.

Public Statements by Company

25. The Company expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Company, make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Company set forth above or the facts described in the Statement of Facts. Any such contradictory statement shall, subject to the Company's right to cure as described below, constitute a breach of this Agreement, and the Company thereafter shall be subject to prosecution as set forth in Paragraphs 19 through 23 of this Agreement. The decision whether any public statement by any such person contradicting the foregoing will be imputed to the Company for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Office. If the Office determines that a public statement by any such person contradicts in whole or in part the acceptance of responsibility by the Company set forth above or the conduct described in the Statement of Facts, the Office shall so notify the Company, and the Company may avoid a breach of this Agreement by publicly repudiating such statement(s) within five (5) business days after notification. The Company shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a factual statement contained in the Statement of Facts. This paragraph does not apply to

18

Exh. 1-019

any statement made by any present or former officer, director, employee or agent of the Company in the course of any criminal, regulatory or civil case initiated against such individual, unless such individual is speaking on behalf of the Company.

26. The Company agrees that if it, or any of its direct or indirect subsidiaries or affiliates, issues a press release or holds any press conference in connection with this Agreement, the Company shall first consult with the Office to determine: (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Office and the Company; and (b) whether the Office has any objection to the release with respect to matters between the Office and the Company.

27. The Office agrees, if requested to do so by the Company, to bring to the attention of law enforcement and regulatory authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of the Company's cooperation and remediation. By agreeing to provide this information to such authorities, the Office is not agreeing to advocate on behalf of the Company, but rather is agreeing to provide facts to be evaluated independently by such authorities.

<u>Limitations on Binding Effect of Agreement</u>

28. This Agreement is binding on the Company and the Office but specifically does not bind any other component of the Department of Justice, other federal agencies, or any state, local or foreign law enforcement or regulatory agencies, or any other authorities, although the Office will bring the cooperation of the Company and its compliance with its other

19

Exh. 1-020

DocuSign Envelope ID: 0D71BB7D-5A23-4BD1-A695-96939E3DF476

obligations under this Agreement to the attention of such agencies and authorities if requested to do so by the Company.

Notice

29.     Any notice to the Office under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to Chief, Business and Securities Fraud Section, United States Attorney's Office, Eastern District of New York, 271-A Cadman Plaza East, Brooklyn, New York 11201.  Any notice to the Company under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to Eric Corngold and/or Jeffrey Wang, Esq., Friedman Kaplan Seiler Adelman & Robbins LLP, 7 Times Square, New York, New York 10036.  Notice shall be effective upon actual receipt by the Office or the Company.

Complete Agreement

30.     This Agreement, including its attachments, sets forth all the terms of the agreement between the Company and the Office.  No amendments, modifications or additions

20

Exh. 1-021

DocuSign Envelope ID: 0D71BB7D-5A23-4BD1-A595-96939E3DF476

to this Agreement shall be valid unless they are in writing and signed by the Office, the

attorneys for the Company and a duly authorized representative of the Company.

Dated:        Brooklyn, New York
              _____, 2023

                                    BREON PEACE
                                    United States Attorney
                                    Eastern District of New York

                    By:  **HIRAL MEHTA** Digitally signed by HIRAL MEHTA
                                         Date: 2023.11.10 11:23:57 -05'00'
                         _____
                         Hiral Mehta
                         Gillian Kassner
                         Genny Ngai
                         Tara McGrath
                         Assistant United States Attorneys

For Aylo Holdings S.à.r.l.:

                    *Andreas Alkiviades Andreou*                    *Anis Baba*
                    —9DD6F37FAA284FE...                             —AFEB174E7EB14EA...
                    Andreas Alkiviades Andreou                      Anis Baba

                    11/10/2023                                      11/10/2023
                    By:_____
                         Aylo Holdings S.à.r.l.



                    By:  _____
                         Eric Corngold, Esq.
                         Jeffrey R. Wang, Esq.
                         Friedman Kaplan Seiler Adelman & Robbins LLP
                         7 Times Square
                         New York, New York 10036

Exh. 1-022

DocuSign Envelope ID: 0F32C811-0E0E-4AEE-09CC-0057E3E7A359

COMPANY OFFICERS' CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for Aylo Holdings S.à.r.l. (the "Company"). I understand the terms of this Agreement and voluntarily agree on behalf of the Company, to each of its terms. Before signing this Agreement, I consulted outside counsel for the Company. Counsel fully advised me of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the Board of Directors of the Company. I have advised and caused outside counsel for the Company to advise the Board of Directors fully of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of the Company, in any way to enter into this Agreement.

I am also satisfied with outside counsel's representation in this matter. I certify that I a Class A Manager of the Company and that I have been duly authorized by the Company to execute this Agreement on behalf of the Company.

Date ___11/10/2023___     Aylo Holdings S.à r.l.

By: ___*Andreas Alkiviades Andreou*___
             9DD6F37FAA284FE...
Andreas Alkiviades Andreou
Class A Manager

Exh. 1-023

DocuSign Envelope ID: 0D71BB7D-5A23-4BD1-A595-96939E3DF476

## CERTIFICATE OF COUNSEL

I am counsel for Aylo Holdings S.à.r.l. (the "Company") in the matter covered by this Agreement. In connection with such representation, I have examined relevant Company documents and have discussed the terms of this Agreement with the Company's Board of Directors. Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of the Company has been duly authorized to enter into this Agreement on behalf of the Company and that this Agreement has been duly and validly authorized, executed and delivered on behalf of the Company and is a valid and binding obligation of the Company. Further, I have carefully reviewed the terms of this Agreement with the Board of Directors and the Chief Legal Officer of the Company. I have fully advised them of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement. To my knowledge, the decision of the Company to enter into this Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date 11/10/2023

By: _Eric Corngold_

Eric Corngold, Esq.
Jeffrey R. Wang, Esq.
Friedman Kaplan Seiler Adelman & Robbins LLP
7 Times Square
New York, New York 10036

23

DocuSign Envelope ID: 0D71BB7D-5A23-4BD1-A695-96939E3DF476

ATTACHMENT A

BOARD OF DIRECTORS RESOLUTION

Exh. 1-025

DocuSign Envelope ID: 0F32C811-050E-4AEE-99CC-0957E3E7A359

**Aylo Holdings S.à r.l.**

*Société à responsabilité limitée*

32, boulevard Royal, L-2449 Luxembourg

R.C.S. Luxembourg: B 181.337

(the "**Company**")

---

**WRITTEN RESOLUTIONS OF THE BOARD OF MANAGERS OF THE COMPANY
TAKEN ON NOVEMBER 10, 2023**

---

**THE UNDERSIGNED**

1. **Mr. Anis BABA**, class A manager

2. **Mr. Andreas Alkiviades ANDREOU**, class A manager, and

3. **Mr. Claude FAVRE**, class B manager,

being all of the managers composing the Company's board of managers (the "**Managers**" and the "**Board of Managers**"), hereby consent to the adoption of the following resolutions, in accordance with Article 12 of the articles of association of the Company (the "**Articles**").

1. Acknowledgement, authorization and to the extent necessary ratification, and/or approval, as the case may be, of the terms of the transactions contemplated by and the entry into, execution, delivery and performance by the Company of its obligations under a deferred prosecution agreement with the United States Attorney's Office for the Eastern District of New York (the **"DPA"**);

2. Approval of the entry into and execution, delivery and performance by the Company of its obligations under any documents to be entered, or which have already been entered, into by the Company, including, without limitation, any instruments, deeds, agreements, acknowledgments, statements, certificates, powers of attorney, letters of representation, shareholders resolutions, , letters or any other documents, in relation to the deferred prosecution agreement, and which may be necessary, appropriate, required, desirable or useful thereto, or referred to thereby and the undertaking of all such acts and matters where appropriate, as may be required in order to implement the above referred documents or the transactions contemplated thereby, referred to therein or incidental thereto;

3. Appointment of authorized signatories; and

4. Miscellaneous.

**DECLARATIONS:**

**WHEREAS**, Aylo Holdings S.à r.l., formerly known as "MindGeek S.à r.l.", and its subsidiaries Aylo USA Inc., formerly known as "MindGeek USA, Inc.", and Aylo Freesites Ltd, formerly known as "MG Freesites Ltd.", have been engaged in discussions with the United States Attorney's Office for the Eastern District of New York regarding issues arising in relation to engaging in certain monetary transaction in property derived from specified unlawful activity;

**WHEREAS**, in order to resolve such discussions, it is proposed that the Company enter into the DPA with the United States Attorney Office for the Eastern District of New York;

**WHEREAS**, the Company's in-house counsel together with outside counsel for the Company, have advised the Board of Managers of the Company of its rights, possible defenses, the Sentencing

Exh. 1-026

DocuSign Envelope ID: 0F32C811-050E-4AEE-99CC-0957E3E7A359

**Aylo Holdings S.à r.l.**
*Société à responsabilité limitée*
32, boulevard Royal, L-2449 Luxembourg
R.C.S. Luxembourg: B 181.337
(the "**Company**")

Guidelines' provisions, and the consequences of entering into such agreement with the United States Attorney Office for the Eastern District of New York;

**DOCUMENTATION**:

**WHEREAS**, the Board of Managers has reviewed and considered the DPA and Ancillary Documents, including, but not limited to:

a)  the DPA, a draft of which is attached hereto as **Schedule A.**

b)  a statement of facts, a draft of which is attached hereto as **Schedule B.**

c)  a press release, a draft of which is attached hereto as **Schedule C.**

**WHEREAS**, all available information and documents in connection with the DPA, including, but not limited to, the statement of facts and the press release have been produced to the Board of Managers in their latest available draft form, execution version or executed version.

**WHEREAS**, the Board of Managers acknowledges and agrees that the DPA and the ancillary documents may still be subject to further negotiation.

**WHEREAS**, the Board of Managers confirms by signing these resolutions that it has no opposite interest in the matters referred to in the present resolutions.

**WHEREAS**, after having carefully considered and reviewed the DPA and the statement of facts, and considering all relevant circumstances and considered the consequences for the affairs of the Company, the Board of Managers is satisfied that:

a)  the Company is to receive benefits and will derive economic benefits from the DPA;

b)  the DPA is not disproportionate to the financial means of the Company and the benefits to be derived from the DPA; and

c)  the DPA is for the corporate benefit of the Company and in its corporate interest (*intérêt social*).

**WHEREAS**, the Board of Managers declares to be satisfied that the commitments of the Company under the DPA (as applicable) are unlikely to cause its bankruptcy, on the one hand, and do not constitute a misuse of corporate assets, on the other hand.

**WHEREAS**, the Board of Managers is of the opinion that the matters referred therein:

a)  are in compliance with the articles of association of the Company (the "**Articles**") and the applicable legal provisions and, in particular, (i) conducive to the Company's corporate object, (ii) in the Company's corporate interest and (iii) within the Company's corporate powers;

b)  would not result in any breach of any restriction imposed by law, the Articles or any agreement to which the Company is a party or by which the Company is bound; and

c)  would materially benefit the Company and would be for the purpose of carrying on its business.

Exh. 1-027

DocuSign Envelope ID: 0F32C811-050E-4AEE-99CC-0957E3E7A359

**Aylo Holdings S.à r.l.**
*Société à responsabilité limitée*
32, boulevard Royal, L-2449 Luxembourg
R.C.S. Luxembourg: B 181.337
(the "**Company**")

---

**FOLLOWING DUE CAREFUL CONSIDERATION AND REVIEW OF THE DPA, THE BOARD OF MANAGERS ADOPTS THE FOLLOWING RESOLUTIONS:**

**FIRST RESOLUTION**

The Company (a) acknowledges the filing of the one-count Information charging the Company with one count of engaging in an unlawful monetary transaction, in violation of Title 18, United States Code, Section 1957; (b) waives indictment on such charge and enters into a deferred prosecution agreement with the United States Attorney Office for the Eastern District of New York; and (c) agrees to accept a criminal fine against Company totaling $974,692.06 and to pay such fine to the United States Treasury pursuant to Paragraph 8 of the DPA (d) agrees to pay criminal forfeiture in the amount of $870,260.77, and to pay such forfeiture to the United States Treasury pursuant to Paragraph 8 of the DPA.

**SECOND RESOLUTION**

The Company accepts the terms and conditions of the DPA, including, but not limited to, (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of this Agreement and any charges by the United States arising out of the conduct described in the Statement of Facts of any objection with respect to venue and consents to the filing of the Information, as provided under the terms of the DPA, in the United States District Court for the Eastern District of New York; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts, or relating to conduct known to the Offices prior to the date on which the DPA was signed that is not time-barred by the applicable statute of limitations on the date of the signing of the DPA.

**THIRD RESOLUTION**

The Board of Managers **RESOLVES** to acknowledge, approve, authorise, and to the extent required, ratify the DPA, any acts to be carried out or required, necessary or incidental in connection therewith, and (i) the terms of and the transactions contemplated by the DPA, (ii) the entry into, execution and delivery by the Company of the DPA and (ii) the performance by the Company of its obligations under the DPA.

**THIRD RESOLUTION**

The Board of Managers **RESOLVES** to approve the entry into and the execution, delivery, and performance by the Company of its obligations under any ancillary documents, and the undertaking of all such acts and matters where appropriate, as may be required in order to implement the above referred documents or the transactions contemplated thereby, referred to therein or incidental thereto.

**FOURTH RESOLUTION**

The Board of Managers **RESOLVES** to authorise and empower any present and future manager of the Company (including for the avoidance of doubt, Mr. Andreas Alkiviades Andreou, Mr. Claude Favre and Mr. Anis Baba), each acting individually and severally, and not jointly, with full power of substitution, in the name and on behalf of the Company, to negotiate, approve, finalise the terms of (and any amendments, however substantial, thereto), execute, deliver, dispatch and perform (as the case may be) (i) the DPA and any ancillary documents and generally any other documents necessary or desirable to implement the resolutions contained herein, (ii) all acts required in connection therewith (with such

Exh. 1-028

DocuSign Envelope ID: 0F32C811-050E-4AEE-99CC-0957E3E7A359

**Aylo Holdings S.à r.l.**
*Société à responsabilité limitée*
32, boulevard Royal, L-2449 Luxembourg
R.C.S. Luxembourg: B 181.337
(the "**Company**")

---

changes as the person executing the same shall approve, such approval to be conclusively evidenced by the execution thereof), (iii) any actions or formalities useful in relation to the DPA or the preceding resolutions, (iv) to make any amendments to, even substantial, the terms of the DPA as reviewed by the Board of Managers and to any ancillary documents as it deems in its absolute discretion as necessary or useful for the purpose of completing the transactions contemplated by the DPA and in the best interest of the Company and to execute such amended documents.

Each Manager may issue a copy or extract hereof to whomever necessary in order to provide, to the extent required, evidence of his/her authority and power by virtue hereof, such copy to constitute a valid power of attorney, it being understood that this power of attorney shall be governed by Luxembourg law.

## FIFTH RESOLUTION

All the actions of Andreas Alkiviades Andreou, Class A Manager, and Anis Baba, Class A Manager, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.

*[**Signature page follows**]*

Exh. 1-029

**Aylo Holdings S.à r.l.**
*Société à responsabilité limitée*
32, boulevard Royal, L-2449 Luxembourg
R.C.S. Luxembourg: B 181.337
(the "**Company**")

---

*[Signature page to the board resolutions of Aylo Holdings S.à r.l.]*

DocuSigned by:

*Andreas Alkiviades Andreou*
9DD6F37FAA284FE...

By: Andreas Alkiviades ANDREOU

Capacity: class A manager

Date:  11/10/2023

DocuSigned by:

*Anis Baba*
AFEB174E7EB14EA...

By: Anis BABA

Capacity: class A manager

Date:  11/10/2023

DocuSigned by:

*Claude FAVRE*
2266AB50250149C...

By: Claude FAVRE

Capacity: class B manager

Date:  11/10/2023

Exh. 1-030

**Aylo Holdings S.à r.l.**
*Société à responsabilité limitée*
32, boulevard Royal, L-2449 Luxembourg
R.C.S. Luxembourg: B 181.337
(the "**Company**")

---

**SCHEDULES:**

**SCHEDULE A -**     **DEFERRED PROSECUTION AGREEEMENT**

**SCHEDULE B -**     **STATEMENT OF FACTS**

Exh. 1-031

**Aylo Holdings S.à r.l.**
*Société à responsabilité limitée*
32, boulevard Royal, L-2449 Luxembourg
R.C.S. Luxembourg: B 181.337
(the "**Company**")

---

**SCHEDULE A - DEFERRED PROESECUTION AGREEMENT**

Exh. 1-032

**Aylo Holdings S.à r.l.**
*Société à responsabilité limitée*
32, boulevard Royal, L-2449 Luxembourg
R.C.S. Luxembourg: B 181.337
(the "**Company**")

---

**SCHEDULE B -    STATEMENT OF FACTS**

Exh. 1-033

DocuSign Envelope ID: 0D71BB7D-5A23-4BD1-A695-96939E3DF476

ATTACHMENT B

CRIMINAL INFORMATION

Exh. 1-034

DCP:HDM/GN/GK/TBM
F. #2020R01135

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

AYLO HOLDINGS S.À.R.L., formerly
known as "MindGeek S.à.r.l.,"

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

I N F O R M A T I O N

Cr. No. _____

(T. 18, U.S.C., §§ 982(a)(1), 982(b)(1),
 1957 and 3551 et seq.; T. 21, U.S.C.,
 § 853(p))

THE UNITED STATES CHARGES:

INTRODUCTION

At all times relevant to this Information, unless otherwise indicated:

I.    The Defendant and Relevant Entities and Individuals

1.    From in or about and between January 2009 and December 2020, MindGeek was a global, privately held group of entities (including MindGeek USA, Inc., MG Freesites Ltd. and MindGeek S.à.r.l.), the business of which included the maintenance and operation of websites that enabled third parties to post and distribute adult videos. MindGeek owned and operated numerous pornographic websites and brands including Pornhub.com ("Pornhub"). MindGeek's websites were accessible within the United States through an internet connection, including in the Eastern District of New York.

2.    MindGeek S.à.r.l. was the ultimate corporate parent company for MindGeek USA, Inc. and MG Freesites Ltd. MindGeek S.à.r.l. was a foreign entity organized and existing under the laws of Luxembourg. Although its corporate headquarters was in

Exh. 1-035

Luxembourg, MindGeek also had offices with employees in Montreal, Canada, and, among other places, Los Angeles, California.

3.     MindGeek offered to the public both free and paid adult websites. MindGeek allowed users to access content for free on certain of its websites, including on Pornhub, YouPorn.com, RedTube.com, Tube8.com and Thumbzilla.com (collectively the "Free Sites").    Pornhub was MindGeek's flagship video-sharing platform and its leading free, ad-supported, adult content hosting and streaming website, offering visitors the ability to view content uploaded by users, models and third-party adult entertainment companies.   MindGeek also owned or operated websites that required users to purchase a membership to access their content.   These sites included the MindGeek-owned PornhubPremium.com ("Pornhub Premium"), YouPornPremium.com and RedTubePremium.com (collectively, the "Premium Sites"), which provided paid subscribers with additional, exclusive model or third-party-studio-produced content in an ad-free environment behind a paywall.

4.     MindGeek offered third-party adult entertainment companies the ability to become content partners ("Content Partners") and members of its content partner program ("Content Partner Program").   Content Partners were generally third-party adult entertainment companies that operated their own website(s), which offered content to users for a fee or via paid subscription.   Under the Content Partner Program, when a third-party entertainment company signed up to be a Content Partner with MindGeek, MindGeek offered the Content Partner separate webpages that included channels on Pornhub and its other Free Sites.   Content Partners could upload content onto the Free Sites, and place advertisements on their channels and video watch pages with links to the Content Partners' websites.   MindGeek promoted the Content Partners to its users.   For example, each personalized channel contained a link to the Content

2

Exh. 1-036

Partner's website.   These advertisements and links directed users to go to the Content Partner's website where they could be converted to paying members of the Content Partner's website. When a user referred through such advertisements or links purchased a subscription to the Content Partner's website, where applicable, MindGeek earned a commission, or a share of the revenue earned by the Content Partner.

5.      MindGeek also offered its Content Partners the ability to join a view share program ("View Share Program") for Pornhub Premium by signing a content license agreement. The View Share Program was designed for Content Partners to promote their content and help them earn revenue based on views of their content by subscribers of Pornhub Premium.   Under the View Share Program, the Content Partner could upload videos that were locked behind a paywall and thus only available to users who purchased a subscription.   Content Partners in the View Share Program were compensated based on views of their videos.   MindGeek helped drive users to the Content Partners by, among other things, promoting links to its users to join the Content Partners' pay-sites.

6.      GirlsDoPorn.com ("Girls Do Porn" or "GDP") was a pornography website featuring videos of young women from 18 to 23 years old engaging in sexual intercourse with a male actor.   GDP promoted the women in the videos as amateur college-aged women filming pornography for the first time.   GDP's channel on Pornhub advertised: "Real amateur girls having sex on video for the very first time . . . .   You will not find these girls on any other website - all girls are 100% exclusive - this is the one and only time they do porn."   GDP earned money by selling subscriptions to view the complete video content in its members-only section. The Girls Do Porn channel on MindGeek's platforms, including Pornhub, was popular,

3

Exh. 1-037

with more than 700,000 subscribers and more than 60 million unique page views during the relevant time period.

7.     GirlsDoToys.com ("Girls Do Toys" or "GDT") was a pornographic website featuring young women in "solo" scenes (i.e., using sex toys).   GDT videos featured many of the same women who appeared in GDP videos.   The GDT channel on MindGeek's platforms had more than 780,000 unique page views between January 2009 and December 2020.

8.     Michael James Pratt ("Pratt") and Matthew Wolfe ("Wolfe"), both citizens of the United States, together with others (collectively, the "GDP Operators"), ran an online pornography business in which they operated several pornography websites, including Girls Do Porn and Girls Do Toys.   The GDP Operators used numerous entities to operate their pornography enterprise, including the following: BLL Media, Inc.; BLL Media Holdings, LLC; Domi Publications, LLC; and M1M Media, Inc.

9.     The GDP and GDT videos hosted by MindGeek were accessible in, and were, in fact, accessed by, users within the Eastern District of New York.

II.     The Unlawful Monetary Transactions

10.     In or about and between September 15, 2017 and October 2019, MindGeek operated and hosted GDP and GDT content on its Free Sites, including on Pornhub, and knowingly received payments of approximately $106,370.05 through United States financial institutions, from the GDP Operators.   Those proceeds were criminally derived from the GDP Operators' sex trafficking.   All the above-mentioned monetary transactions occurred in the United States, including in the Eastern District of New York.   Moreover, between September 2017 and December 2020, MindGeek received payments from advertisers attributable to GDP and GDT content totaling approximately $763,890.72.

4

Exh. 1-038

A.     <u>Contractual Relationships Between GDP Operators and MindGeek</u>

11.    Beginning in or about 2009, Pratt joined MindGeek's Content Partner Program.   On or about December 2, 2015, BLL Media, Inc. entered into a content license agreement ("Content License Agreement") with MindGeek.   Pratt signed the contract on behalf of BLL Media, Inc.

12.    On or about March 4, 2016, Domi Publications LLC entered into a Content License Agreement with MindGeek.   Pratt also signed the contract on behalf of Domi Publications LLC.

13.    In 2016, Wolfe joined MindGeek's Content Partner Program.   On or about October 11, 2016, M1M Media, Inc. entered into a Content License Agreement with MindGeek.   Wolfe signed the contract on behalf of M1M Media Inc.

14.    Pursuant to the above Content License Agreements, in or about and between September 14, 2009 and October 14, 2019, MindGeek created and operated GDP channels for Pratt and the GDP Operators on its Free Sites, including on Pornhub.   In or about and between January 28, 2016 and December 16, 2020, MindGeek also created and hosted a GDT channel for Wolfe and the GDP Operators on its Free Sites, including on Pornhub.   The GDP and GDT channels contained mostly 5- to 7-minute clips of videos filmed by the GDP Operators and included links to their paid websites so that users could access the full videos.

B.     <u>GDP Lawsuit</u>

15.    In June 2016, multiple plaintiffs filed a civil lawsuit in San Diego Superior Court against Pratt, Wolfe, Ruben Andre Garcia ("Garcia"), BLL Media, Inc., BLL Media Holdings, LLC, Domi Publications, LLC, M1M Media, LLC and others alleging that the civil defendants had tricked the plaintiffs into appearing in pornographic videos posted to Girls Do Porn (the "GDP Lawsuit").   The complaint alleged, among other things, that the civil defendants

5

Exh. 1-039

had offered the plaintiffs money for adult film work and assured them that the civil defendants would not post the videos online or distribute the videos within the United States, and would keep the plaintiffs' identities anonymous. The complaint further alleged that the civil defendants coerced the plaintiffs into signing consent release forms and having sex with one of the civil defendants. Moreover, the complaint alleged that some of the plaintiffs' videos had been posted to Pornhub without the plaintiffs' consent.

16. MindGeek was notified of the GDP Lawsuit, at the latest, on or about September 15, 2017, after it received a subpoena for production of business records from plaintiffs' counsel in the GDP Lawsuit.

17. Separately, after the filing of the GDP Lawsuit, between August 2016 to August 2019, MindGeek received at least 15 content removal requests, from at least 11 complainants seeking to have Pornhub remove GDP videos on its platform. The complainants stated that videos in which they appeared had been posted on Pornhub without their consent and that the producers who made the GDP videos lied to them about not posting the videos online. Some of the content removal requests also made reference to the GDP Lawsuit. MindGeek sought, and received, information from GDP that purported to establish that the complainants had given consent for their videos to be posted online, but MindGeek did not independently verify consent. MindGeek removed some, but not all, of the GDP videos as requested, including as follows:

(a) For example, on or about August 29, 2016, a complainant asked Pornhub to remove a GDP video, stating that GDP "made me believe that this will be distributed to foreign countries to private members only. It has strongly impacted my professional and social life." Pornhub did not remove the requested video and instead responded that the "following

6

Exh. 1-040

video(s) was/were uploaded by one of our Content Partners as part of our Content Partner Program" and directed the complainant to submit a Digital Millennium Copyright Act ("DMCA") takedown notice if she felt that the video violated copyright and wished to pursue the video removal.

(b)     On or about October 19, 2018, a complainant submitted a content removal request to Pornhub asking Pornhub to remove a video, stating that she "did not agree to have this content on pornhub."   Later that day, Pornhub informed the complainant that the video would be removed.

(c)     On or about November 1, 2018, a complainant submitted a content removal request to Pornhub asking the company to remove four videos.   In the complaint, the writer stated that the individual in the video was her friend and that her friend was "lied to," told "it would never go online," and "never told [] the company they work for."   In response, Pornhub stated that the complainant needed to "contact girls do porn to have the video removed, because the video is sponsored content."

(d)     On or about March 2, 2019, a complainant submitted a content removal request to Pornhub asking the company to remove a GDP video.   In the request, she stated that she "was told this video would never be online.   I did not consent to have this on Pornhub! Please take this down.   It is ruining my life."   Pornhub responded and stated that the "following video(s) was/were uploaded by one of our Content Partners as part of our Content Partner Program" and directed the complainant to submit a DMCA takedown notice if she felt that the video violated copyright and wished to pursue the video removal.

Exh. 1-041

(e)     On or about June 16, 2019, a complainant submitted a content removal request to Pornhub, stating that she "was lied to in order for this video to be filmed."   On June 17, 2019, Pornhub informed the complainant that the video had been removed.

18.     In or about and between June and July 2019, MindGeek executives also became aware, through public sources, that the GDP Lawsuit was proceeding to trial over allegations that women were tricked into making the GDP videos.   For example, on or about June 28, 2019, a senior MindGeek employee received an alert of a VICE article titled, "Girls Do Porn Goes to Trial Over Allegations Women Were Tricked into Videos."   The article was circulated and discussed among MindGeek's employees, including senior executives.

19.     In or about and between late June and July of 2019, MindGeek executives discussed whether to remove the GDP videos implicated in the GDP Lawsuit.   On July 15, 2019, a senior MindGeek employee explained that she has "contacted [Pratt] and let him know that we would suspend their channel at the end of the week if we don't hear back."

20.     On or about July 18, 2019, MindGeek separately contacted plaintiffs' counsel in the GDP Lawsuit and requested a list of GDP content that the company should remove from its website.   MindGeek then removed the videos identified by plaintiffs' counsel.

21.     MindGeek did not deactivate, suspend or remove the official GDP and GDT channels at that time.   Instead, on or about July 19, 2019, several MindGeek executives identified GDP as an "untrusted partner."   Specifically, a senior MindGeek employee emailed another senior MindGeek employee and stated that GDP was on its list of "untrusted partners." The MindGeek executives agreed that with respect to an "untrusted partner," upon receiving any complaints from the individuals who appeared in the videos, MindGeek would "inactivate the videos immediately and reach out to the Content Partner to tell them we've taken down the

8

Exh. 1-042

video.   If they contest it, it will be case by case.   For full DMCA requests, we will DMCA the video and the partner can counter."   MindGeek left the GDP and GDT channels on MindGeek's websites.

22.     On or about August 20, 2019, the bench trial in the GDP Lawsuit commenced in San Diego Superior Court.   Throughout the trial, MindGeek employees reviewed news media articles reporting on the trial.   For example, on or about August 30, 2019, a senior MindGeek employee received a news article reporting that a GDP videographer, Theodore "Teddy" Gyi ("Gyi"), had testified during trial that he, at the direction of the GDP Operators, lied to women that their sex videos would not appear online so that the women would agree to appear in the videos.   The article further stated that videos Gyi shot were posted on MindGeek's Free Sites such as Pornhub and YouPorn.

23.     On or about October 10, 2019, the U.S. Attorney's Office for the Southern District of California charged Pratt, Wolfe, Garcia and Valorie Moser by complaint on federal sex trafficking charges.   The criminal complaint specifically referenced Girls Do Porn and Girls Do Toys and also stated that pornographic videos posted to Girls Do Porn and Girls Do Toys were also posted on Pornhub.

24.     On or about October 14, 2019, MindGeek, at the direction of its Chief Operating Officer, removed the official Girls Do Porn channel from its platforms.   However, MindGeek did not remove the official Girls Do Toys channels from its platforms or seek to identify for removal all unofficial Girls Do Porn content from its websites at that time.   As a result, users could still access numerous GDP videos on MindGeek's Free Sites, including Pornhub.

9

Exh. 1-043

25.     MindGeek did not receive any payments from the GDP Operators after October 2019, including for GDT content.

26.     In or about November 2019, a federal grand jury returned an eight-count indictment against Pratt, Wolfe, Garcia, Gyi and other conspirators in the Southern District of California on charges of sex trafficking, conspiracy to commit sex trafficking, and production of child pornography.

27.     After the above referenced individuals were indicted, between November 2019 and January 2020, MindGeek continued to receive complaints from individuals seeking to remove GDP content from its platforms.   For example, in November 2019, one individual contacted Pornhub and explained that while Pornhub had removed the official channel, a simple search for "Girls Do Porn" or "GDP" on the website produced clips and compilations uploaded from Pornhub users.   Later, MindGeek removed all identified videos from its sites.

28.     On or about January 2, 2020, the court in the GDP Lawsuit issued a public Statement of Decision, finding the GDP Operators liable.   The Statement of Decision explained that the GDP Operators used a number of fraudulent and threatening practices to recruit women to make pornographic images, including posting misleading ads to recruit women, falsely promising more pay than they intended, lying to the women about how, where and to whom their videos would be distributed and using coercive tactics to force the women to perform sex when necessary.   The court noted that with respect to Girls Do Toys, "the women are usually the same as those who shoot boy-girl GDP videos because [the GDP Operators] do not separately recruit women for solo videos."

10

Exh. 1-044

29.     On or about January 3, 2020, a MindGeek executive received notification of the decision through a news alert with a link to an article titled, "Girls Do Porn Has to Pay Millions in Damages for Coercing Women Into Porn."

30.     On or about January 23, 2020, four MindGeek executives received an email from MindGeek's external consultant.   MindGeek's external consultant forwarded the executives a list of email inquiries from VICE magazine, including the following inquiry: "Girls Do Toys, a site that is owned and operated by the same people that own and operate Girls Do Porn, still has an official channel on Pornhub.   Some of the women in the Girls Do Toys videos are the same women from the Girls Do Porn videos.   Why has Pornhub allowed this channel to remain on its platform?"

31.     On or about February 10, 2020, Pornhub conducted a sweep to remove all existing GDP content from its site.   Nonetheless, users continued to post GDP-created content on Pornhub.   In or about and between May 2020 and December 9, 2020, MindGeek continued to receive content takedown requests from individuals seeking to remove user-posted GDP video content.   After receiving the requests, MindGeek then removed the identified videos.

32.     On or about June 18, 2020, a senior MindGeek employee forwarded to a MindGeek executive a May 1, 2019 email that had originally been sent from Pratt to a Pornhub account representative.   In the forwarded email, which discussed a female complainant who had submitted to MindGeek a content removal request to remove her GDP video, Pratt informed the Pornhub representative that the female complainant had also appeared in a GDT video.

33.     MindGeek did not remove the official GDT channel from its websites until on or about December 16, 2020, even though the company knew that the individuals

11

operating GDT were the same as those who operated GDP and that many of the individuals featured in GDP videos were also used to produce GDT content.

UNLAWFUL MONETARY TRANSACTIONS

34. The allegations contained in paragraphs one through 33 are realleged and incorporated as if fully set forth in this paragraph.

35. In or about and between September 15, 2017 and December 2020, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant AYLO HOLDINGS S.À.R.L., formerly known as "MindGeek S.à.r.l.," did knowingly and intentionally engage in one or more monetary transactions, to wit: deposits, withdrawals and transfers of funds and monetary instruments, in and affecting interstate and foreign commerce, by, through and to one or more financial institutions, in criminally derived property that was of a value greater than $10,000, which transactions in fact involved the proceeds of specified unlawful activity, to wit: sex trafficking, in violation of Title 18, United States Code, Section 1591.

(Title 18, United States Code, Sections 1957 and 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION

36. The United States hereby gives notice to the defendant that, upon its conviction of the offense charged herein, the government will seek forfeiture in accordance with Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any property, real or personal, involved in such offense, or any property traceable to such property.

37. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

12

Exh. 1-046

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be

divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as

incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other

property of the defendant up to the value of the forfeitable property described in this forfeiture

allegation.

(Title 18, United States Code, Sections 982(a)(1) and 982(b)(1); Title 21, United

States Code, Section 853(p))

BREON PEACE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

13

Exh. 1-047

F. #2020R01135
FORM DBD-34
JUN. 85

No.

## UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

CRIMINAL DIVISION

THE UNITED STATES OF AMERICA

*vs.*

AYLO HOLDINGS S.À.R.L, formerly known as "MindGeek S.à.r.l.,"

Defendant.

## INFORMATION

T. 18, U.S.C., §§ 982(a)(1), 982(b)(1), 1957, and 3551 et seq.; T. 21, U.S.C., § 853(p)

*A true bill.*

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
*Foreperson*

*Filed in open court this* _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ *day,*

*of* _ _ _ _ _ _ _ _ _ _ _ _ *A.D. 20* _ _ _ _ _

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
*Clerk*

*Bail, $* _ _ _ _ _ _ _ _ _ _ _

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

***Hiral D. Mehta, Genny Ngai, Gillian Kassner and Tara B. McGrath***
***Assistant U.S. Attorneys (718) 254-7000***

14

Exh. 1-048

ATTACHMENT C
**STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Attorney's Office for the Eastern District of New York (the "United States") and the defendant Aylo Holdings S.À.R.L., formerly known as "MindGeek S.à.r.l. (together with its wholly-owned subsidiaries and affiliated entities, "MindGeek" or the "Company"). Certain of the facts herein are based on information obtained by the United States from third parties, through its investigation, and described to MindGeek. MindGeek admits, accepts and acknowledges that it is responsible for the acts of its officers, directors, employees and agents as set forth below. Should the United States pursue the prosecution that is deferred by this Agreement, MindGeek agrees that it will neither contest the admissibility of, nor contradict, the facts in this Statement of Facts in any such proceeding. The following facts took place in or about and between January 2009 and December 2020, unless otherwise noted, and establish beyond a reasonable doubt the charges set forth in the Information attached to the Agreement.

**The Defendant MindGeek and Affiliated Entities**

1.      From in or about and between January 2009 and December 2020, MindGeek was a global, privately held group of entities (including MindGeek USA, Inc., MG Freesites Ltd., and MindGeek S.à.r.l.), the business of which included the maintenance and operation of websites that enabled third parties to post and distribute adult videos. MindGeek owned and operated numerous pornographic websites and brands including Pornhub.com ("Pornhub"). MindGeek's websites were accessible within the United States through an internet connection, including in the Eastern District of New York.

C-1

Exh. 1-049

2.      MindGeek S.à.r.l. was the ultimate corporate parent company for MindGeek USA, Inc. and MG Freesites Ltd.  MindGeek S.à.r.l. was a foreign entity organized and existing under the laws of Luxembourg.  Although its corporate headquarters was in Luxembourg, MindGeek also had offices with employees in Montreal, Canada, and, among other places, Los Angeles, California.

3.      MindGeek offered to the public both free and paid adult websites. MindGeek allowed users to access content for free on certain of its websites, including on Pornhub, YouPorn.com, RedTube.com, Tube8.com and Thumbzilla.com (collectively the "Free Sites"). Pornhub was MindGeek's flagship video-sharing platform and its leading free, ad-supported, adult content hosting and streaming website, offering visitors the ability to view content uploaded by users, models and third-party adult entertainment companies.  MindGeek also owned or operated websites that required users to purchase a membership to access their content.  These sites included the MindGeek-owned PornhubPremium.com ("Pornhub Premium"), YouPornPremium.com and RedTubePremium.com (collectively, the "Premium Sites"), which provided paid subscribers with additional exclusive model or third-party-studio-produced content in an ad-free environment behind a paywall.

4.      MindGeek offered third-party adult entertainment companies the ability to become content partners ("Content Partners") and members of its content partner program ("Content Partner Program").  Content Partners were generally third-party adult entertainment companies that operated their own website(s), which offered content to users for a fee or via paid subscription.  Under the Content Partner Program, when a third-party entertainment company signed up to be a Content Partner with MindGeek, MindGeek offered the Content Partner separate

C-2

webpages that included channels on Pornhub and its other Free Sites.  Content Partners could upload content onto the Free Sites, and place advertisements on their channels and video watch pages with links to the Content Partners' websites.  MindGeek promoted the Content Partners to its users.  For example, each personalized channel contained a link to the Content Partner's website.  These advertisements and links directed users to go to the Content Partner's website where they could be converted to paying members of the Content Partner's website.  When a user referred through such advertisements or links purchased a subscription to the Content Partner's website, where applicable, MindGeek earned a commission, or a share of the revenue earned by the Content Partner.

5.      MindGeek also offered its Content Partners the ability to join a view share program ("View Share Program") for Pornhub Premium by signing a content license agreement.  The View Share Program was designed for Content Partners to promote their content and help them earn revenue based on views of their content by subscribers of Pornhub Premium.  Under the View Share Program, the Content Partner could upload videos that were locked behind a paywall and thus only available to users who purchased a subscription.  Content Partners in the View Share Program were compensated based on views of their videos.  MindGeek helped drive users to the Content Partners by, among other things, promoting links to its users to join the Content Partners' pay-sites.

<u>**Other Relevant Entities and Individuals**</u>

6.      GirlsDoPorn.com ("Girls Do Porn" or "GDP") was a pornography website featuring videos of young women from 18 to 23 years old engaging in sexual intercourse with a male actor.  GDP promoted the women in the videos as amateur college-aged women filming

C-3

Exh. 1-051

pornography for the first time.  GDP's channel on Pornhub advertised: "Real amateur girls having sex on video for the very first time . . . .  You will not find these girls on any other website - all girls are 100% exclusive - this is the one and only time they do porn."  GDP earned money by selling subscriptions to view the complete video content in its members-only section.  The Girls Do Porn channel on MindGeek's platforms, including Pornhub, was popular, with more than 700,000 subscribers and more than 60 million unique page views during the relevant time period.

7.  GirlsDoToys.com ("Girls Do Toys" or "GDT") was a pornographic website featuring young women in "solo" scenes (i.e., using sex toys).  GDT videos featured many of the same women who appeared in GDP videos.  The GDT channel on MindGeek's platforms had more than 780,000 unique page views between January 2009 and December 2020.

8.  Michael James Pratt ("Pratt") and Matthew Wolfe ("Wolfe"), both citizens of the United States, together with others (collectively, the "GDP Operators"), ran an online pornography business in which they operated several pornography websites, including Girls Do Porn and Girls Do Toys.  The GDP Operators used numerous entities to operate their pornography enterprise, including the following: BLL Media, Inc.; BLL Media Holdings, LLC; Domi Publications, LLC; and M1M Media, Inc.

9.  The GDP and GDT videos hosted by MindGeek were accessible in and were, in fact, accessed by users within the Eastern District of New York.

### The Unlawful Monetary Transactions

10.  In or about and between September 15, 2017 and October 2019, MindGeek operated and hosted GDP and GDT content on its Free Sites, including on Pornhub, and knowingly received payments of approximately $106,370.05 through United States financial institutions, from

C-4

Exh. 1-052

the GDP Operators. Those proceeds were criminally derived from the GDP Operators' sex trafficking. All the above-mentioned monetary transactions occurred in the United States, including in the Eastern District of New York. Moreover, between September 2017 and December 2020, MindGeek received payments from advertisers attributable to GDP and GDT content totaling approximately $763,890.72.

## Background

A.    Contractual Relationships Between GDP Operators and MindGeek

11.    Beginning in or about 2009, Pratt joined MindGeek's Content Partner Program. On or about December 2, 2015, BLL Media, Inc. entered into a content license agreement ("Content License Agreement") with MindGeek. Pratt signed the contract on behalf of BLL Media, Inc.

12.    On or about March 4, 2016, Domi Publications LLC entered into a Content License Agreement with MindGeek. Pratt also signed the contract on behalf of Domi Publications LLC.

13.    In 2016, Wolfe joined MindGeek's Content Partner Program. On or about October 11, 2016, M1M Media, Inc. entered into a Content License Agreement with MindGeek. Wolfe signed the contract on behalf of M1M Media Inc.

14.    Pursuant to the above Content License Agreements, in or about and between September 14, 2009 and October 14, 2019, MindGeek created and operated GDP channels for Pratt and the GDP Operators on its Free Sites, including on Pornhub. In or about and between January 28, 2016 and December 16, 2020, MindGeek also created and hosted a GDT channel for Wolfe and the GDP Operators on its Free Sites, including on Pornhub. The GDP and GDT channels contained

C-5

Exh. 1-053

mostly 5- to 7-minute clips of videos filmed by the GDP Operators and included links to their paid websites so that users could access the full videos.

B.    GDP Lawsuit

15.    In June 2016, multiple plaintiffs filed a civil lawsuit in San Diego Superior Court against Pratt, Wolfe, Ruben Andre Garcia ("Garcia"), BLL Media, Inc., BLL Media Holdings, LLC, Domi Publications, LLC, M1M Media, LLC and others alleging that the civil defendants had tricked the plaintiffs into appearing in pornographic videos posted to Girls Do Porn (the "GDP Lawsuit").  The complaint alleged, among other things, that the civil defendants had offered the plaintiffs money for adult film work and assured them that the civil defendants would not post the videos online or distribute the videos within the United States, and would keep the plaintiffs' identities anonymous.  The complaint further alleged that the civil defendants coerced the plaintiffs into signing consent release forms and having sex with one of the civil defendants. Moreover, the complaint alleged that some of the plaintiffs' videos had been posted to Pornhub without the plaintiffs' consent.

16.    MindGeek was notified of the GDP Lawsuit, at the latest, on or about September 15, 2017, after it received a subpoena for production of business records from plaintiffs' counsel in the GDP Lawsuit.

17.    Separately, after the filing of the GDP Lawsuit, between August 2016 to August 2019, MindGeek received at least 15 content removal requests, from at least 11 complainants seeking to have Pornhub remove GDP videos on its platform.  The complainants stated that videos in which they appeared had been posted on Pornhub without their consent and that the producers who made the GDP videos lied to them about not posting the videos online.

C-6

Some of the content removal requests also made reference to the GDP Lawsuit. MindGeek sought, and received, information from GDP that purported to establish that the complainants had given consent for their videos to be posted online, but MindGeek did not independently verify consent. MindGeek removed some, but not all, of the GDP videos as requested.

18.     For example, on or about August 29, 2016, a complainant asked Pornhub to remove a GDP video, stating that GDP "made me believe that this will be distributed to foreign countries to private members only. It has strongly impacted my professional and social life." Pornhub did not remove the requested video and instead responded that the "following video(s) was/were uploaded by one of our Content Partners as part of our Content Partner Program" and directed the complainant to submit a Digital Millennium Copyright Act ("DMCA") takedown notice if she felt that the video violated copyright and wished to pursue the video removal.

19.     On or about October 19, 2018, a complainant submitted a content removal request to Pornhub asking Pornhub to remove a video, stating that she "did not agree to have this content on pornhub." Later that day, Pornhub informed the complainant that the video would be removed.

20.     On or about November 1, 2018, a complainant submitted a content removal request to Pornhub asking the company to remove four videos. In the complaint, the writer stated that the individual in the video was her friend and that her friend was "lied to," told "it would never go online" and "never told [] the company they work for." In response, Pornhub stated that the complainant needed to "contact girls do porn to have the video removed, because the video is sponsored content."

C-7

Exh. 1-055

21.     On or about March 2, 2019, a complainant submitted a content removal request to Pornhub asking the company to remove a GDP video.  In the request, she stated that she "was told this video would never be online.  I did not consent to have this on Pornhub!  Please take this down.  It is ruining my life."  Pornhub responded and stated that the "following video(s) was/were uploaded by one of our Content Partners as part of our Content Partner Program" and directed the complainant to submit a DMCA takedown notice if she felt that the video violated copyright and wished to pursue the video removal.

22.     On or about June 16, 2019, a complainant submitted a content removal request to Pornhub, stating that she "was lied to in order for this video to be filmed."  On June 17, 2019, Pornhub informed the complainant that the video had been removed.

23.     In or about and between June and July 2019, MindGeek executives also became aware, through public sources, that the GDP Lawsuit was proceeding to trial over allegations that women were tricked into making the GDP videos.  For example, on or about June 28, 2019, a senior MindGeek employee received an alert of a VICE article titled, "Girls Do Porn Goes to Trial Over Allegations Women Were Tricked into Videos."  The article was circulated and discussed among MindGeek's employees, including senior executives.

24.     In or about and between late June and July of 2019, MindGeek executives discussed whether to remove the GDP videos implicated in the GDP Lawsuit.  On July 15, 2019, a senior MindGeek employee explained that she has "contacted [Pratt] and let him know that we would suspend their channel at the end of the week if we don't hear back."

25.     On or about July 18, 2019, MindGeek separately contacted plaintiffs' counsel in the GDP Lawsuit and requested a list of GDP content that the company should remove

C-8

Exh. 1-056

from its website.  MindGeek then removed the videos identified by plaintiffs' counsel.

26.     However, MindGeek did not deactivate, suspend or remove the official GDP and GDT channels at that time.

27.     Instead, on or about July 19, 2019, several MindGeek executives identified GDP as an "untrusted partner."  Specifically, a senior MindGeek employee emailed another senior MindGeek employee and stated that GDP was on its list of "untrusted partners."  The MindGeek executives agreed that, with respect to an "untrusted partner," upon receiving any complaints from the individuals who appeared in the videos, MindGeek would "inactivate the videos immediately and reach out to the Content Partner to tell them we've taken down the video.  If they contest it, it will be case by case.  For full DMCA requests, we will DMCA the video and the partner can counter."  Despite this, MindGeek left the GDP and GDT channels on MindGeek's websites.

28.     On or about August 20, 2019, the bench trial in the GDP Lawsuit commenced in San Diego Superior Court.  Throughout the trial, MindGeek employees reviewed news media articles reporting on the trial.  For example, on or about August 30, 2019, a senior MindGeek employee received a news article reporting that a GDP videographer, Theodore "Teddy" Gyi ("Gyi"), had testified during trial that he, at the direction of the GDP Operators, lied to women that their sex videos would not appear online so that the women would agree to appear in the videos.  The article further stated that videos Gyi shot were posted on MindGeek's Free Sites such as Pornhub and YouPorn.

29.     On or about October 10, 2019, the U.S. Attorney's Office for the Southern District of California charged Pratt, Wolfe, Garcia and Valorie Moser by complaint on federal sex trafficking charges.  The criminal complaint specifically referenced Girls Do Porn and Girls Do

Exh. 1-057

Toys and also stated that pornographic videos posted to Girls Do Porn and Girls Do Toys were also posted on Pornhub.

30. On or about October 14, 2019, MindGeek, at the direction of its Chief Operating Officer, removed the official Girls Do Porn channel from its platforms. However, MindGeek did not remove the official Girls Do Toys channels from its platforms or seek to identify for removal all unofficial Girls Do Porn content from its websites at that time. As a result, users could still access numerous GDP videos on MindGeek's Free Sites, including Pornhub.

31. MindGeek did not receive any payments from the GDP Operators after October 2019, including for GDT content.

32. In or about November 2019, a federal grand jury returned an eight-count indictment against Pratt, Wolfe, Garcia, Gyi and other conspirators in the Southern District of California on charges of sex trafficking, conspiracy to commit sex trafficking, and production of child pornography.

33. After the above referenced individuals were indicted, between November 2019 and January 2020, MindGeek continued to receive complaints from individuals seeking to remove GDP content from its platforms. For example, in November 2019, one individual contacted Pornhub and explained that while Pornhub had removed the official channel, a simple search for "Girls Do Porn" or "GDP" on the website produced clips and compilations uploaded from Pornhub users. Later, MindGeek removed all identified videos from its sites.

34. On or about January 2, 2020, the court in the GDP Lawsuit issued a public Statement of Decision, finding the GDP Operators liable. The Statement of Decision explained that the GDP Operators used a number of fraudulent and threatening practices to recruit women to make

C-10

Exh. 1-058

pornographic images, including posting misleading ads to recruit women, falsely promising more pay than they intended, lying to the women about how, where and to whom their videos would be distributed and using coercive tactics to force the women to perform sex when necessary. The court noted that with respect to Girls Do Toys, "the women are usually the same as those who shoot boy-girl GDP videos because [the GDP Operators] do not separately recruit women for solo videos."

35.     On or about January 3, 2020, a MindGeek executive received notification of the decision through a news alert with a link to an article titled, "Girls Do Porn Has to Pay Millions in Damages for Coercing Women Into Porn."

36.     On or about January 23, 2020, four MindGeek executives received an email from MindGeek's external consultant. MindGeek's external consultant forwarded the executives a list of email inquiries from VICE magazine, including the following inquiry: "Girls Do Toys, a site that is owned and operated by the same people that own and operate Girls Do Porn, still has an official channel on Pornhub. Some of the women in the Girls Do Toys videos are the same women from the Girls Do Porn videos. Why has Pornhub allowed this channel to remain on its platform?"

37.     On or about February 10, 2020, Pornhub conducted a sweep to remove all existing GDP content from its site. Nonetheless, users continued to post GDP-created content on Pornhub. In or about and between May 2020 and December 9, 2020, MindGeek continued to receive content takedown requests from individuals seeking to remove user-posted GDP video content. After receiving the requests, MindGeek then removed the identified videos.

38.     On or about June 18, 2020, a senior MindGeek employee forwarded to a MindGeek executive a May 1, 2019 email that had originally been sent from Pratt to a Pornhub

C-11

account representative.  In the forwarded email, which discussed a female complainant who had submitted to MindGeek a content removal request to remove her GDP video, Pratt informed the Pornhub representative that the female complainant had also appeared in a GDT video.

39.     MindGeek did not remove the official GDT channel from its websites until on or about December 16, 2020, even though the company knew that the individuals operating GDT were the same as those who operated GDP and that many of the individuals featured in GDP videos were also used to produce GDT content.

C-12

Exh. 1-060

DocuSign Envelope ID: 0D71BB7D-5A23-4BD1-A695-96939E3DF476

ATTACHMENT D

INDEPENDENT COMPLIANCE MONITOR

The duties and authority of the Independent Compliance Monitor (the "Monitor"), and the obligations of Aylo Holdings S.À.R.L. ("MindGeek" or the "Company"), on behalf of itself and its subsidiaries and affiliates, with respect to the Monitor, and provisions of the deferred prosecution agreement (the "Agreement") between MindGeek and the United States Attorney's Office for the Eastern District of New York (the "Office") relating to the Monitor are as described below:

Monitor's Mandate

1.      MindGeek shall retain the Monitor for a period of thirty-six (36) months (the "Term of Monitorship"), unless the early termination provision of Paragraph 3 of the Agreement is triggered.

2.      The Monitor's primary responsibility is to assess and monitor MindGeek's compliance with the terms of the Agreement. During the Term of Monitorship, the Monitor will evaluate, in the manner set forth below, the effectiveness of the Company's internal controls as they relate to MindGeek's current and ongoing compliance with federal criminal law governing unlawful monetary transactions and content posted online (the "Internal Controls"), and take such reasonable steps as, in his or her view, may be necessary to fulfill the foregoing mandate (the "Mandate"). The Monitor's evaluation of the Internal Controls should include but not be limited to: the strength and thoroughness of the Company's due diligence protocols for its Content Partners and Content Programs; robustness of the Company's content screening and monitoring processes; the adequacy of the staffing and resources dedicated by the Company to content screening, monitoring and compliance; the effectiveness of internal mechanisms used

1

Exh. 1-061

DocuSign Envelope ID: 0D71BB7D-5A23-4BD1-A605-96939F3DF476

to address, mitigate and remediate takedown requests or allegations of the presence of illegal content on the Company's platforms; and the adequacy of the Company's disclosures to relevant law enforcement authorities regarding the presence of illegal content on the Company's platforms.  The Mandate shall include an assessment of the Board of Directors and senior management's commitment to, and effective implementation of, MindGeek's compliance program and Internal Controls.

3.     The Monitor will also be responsible for resolving disputes of fact and disputes concerning the appropriate monetary payment for individuals requesting compensation from MindGeek, as set forth in paragraph 9 of the Agreement.

MindGeek's Obligations

4.     MindGeek shall cooperate fully with the Monitor, and the Monitor shall have the authority to take such reasonable steps as, in his or her view, may be necessary to be fully informed about MindGeek's compliance program in accordance with the principles set forth herein and applicable law.  To that end, MindGeek shall: facilitate the Monitor's access to MindGeek's documents and resources, and not limit such access.  MindGeek shall provide the Monitor with access to all information, documents, records, facilities and employees, as reasonably requested by the Monitor, that fall within the scope of the Mandate of the Monitor under the Agreement.  MindGeek shall use its best efforts to provide the Monitor with access to MindGeek's former employees and its third-party vendors, agents and consultants.

5.     Any disclosure by MindGeek to the Monitor concerning fraudulent and/or criminal acts, misstatements, false books and records, and/or internal control failures shall not relieve MindGeek of any otherwise applicable obligation to truthfully disclose such matters to the Office pursuant to the Agreement.

2

Exh. 1-062

DocuSign Envelope ID: 9D71BB7D-5A23-4BD1-A695-96939F3DF476

Withholding Access

6. The parties agree that no attorney-client relationship shall be formed between MindGeek and the Monitor. In the event that MindGeek seeks to withhold from the Monitor access to information, documents, records, facilities or statements of current or former employees of MindGeek that may be subject to a claim of attorney-client privilege or the attorney work product doctrine, or where MindGeek reasonably believes production would otherwise be inconsistent with applicable law, MindGeek shall work cooperatively with the Monitor to resolve the matter to the satisfaction of the Monitor.

7. If the matter cannot be resolved, at the request of the Monitor, MindGeek shall promptly provide written notice to the Monitor and the Office. Such notice shall include a general description of the nature of the information, documents, records, facilities or current or former employees that are being withheld, as well as the legal basis for withholding access. The Office may then consider whether to make a further request for access to such information, documents, records, facilities or employees.

Monitor's Coordination with MindGeek and Review Methodology

8. To carry out the Mandate, the Monitor shall conduct an initial review and develop an understanding, to the extent the Monitor deems appropriate, of the facts and circumstances surrounding any federal law violations that may have occurred before the date of the Agreement. In developing such an understanding, the Monitor is to rely to the extent possible on available information and documents provided by MindGeek. It is not intended that the Monitor will conduct his or her own inquiry into the historical events that gave rise to the Agreement.

3

Exh. 1-063

DocuSign Envelope ID: 0D71BB7D-5A23-4BD1-A605-96939E3DF476

9. The Monitor's reviews should use a risk-based approach; thus, the Monitor is not expected to conduct a comprehensive review of all activities. In carrying out the Mandate, the Monitor should consider, for instance, risks presented by given categories of activities. In undertaking the reviews to carry out the Mandate, the Monitor shall formulate conclusions based on, among other things: (a) inspection of relevant documents, including MindGeek's current policies and procedures; (b) on-site observation of MindGeek procedures, including with regard to partnership programs, content monitoring, record-keeping and internal and external reporting; (c) meetings with, and interviews of, relevant current and, where appropriate, former directors, officers, employees, business partners, agents and other persons at mutually convenient times and places; and (d) analyses and testing of the Internal Controls.

10. In carrying out the Mandate, to the extent appropriate under the circumstances, the Monitor should coordinate with MindGeek personnel, including in-house counsel, compliance personnel and internal auditors, on an ongoing basis. The Monitor may rely on the product of MindGeek's processes, such as the results of investigations and analyses conducted by or on behalf of MindGeek, as well as MindGeek's internal resources (e.g., legal, compliance and internal audit), which can assist the Monitor in carrying out the Mandate through increased efficiency and MindGeek-specific expertise, provided that the Monitor has confidence in the quality of those resources.

### Monitor's Work Product

11. To carry out the Mandate, during the Term of the Monitorship, the Monitor should consider an initial review and prepare an initial report, followed by at least two follow-up reviews and reports, as described in Paragraphs 13 through 20 below. With respect to the initial report, after consultation with the Company and the Office, the Monitor shall prepare

4

Exh. 1-064

DocuSign Envelope ID: 0D71BB7D-5A23-4BD1-A595-96939F3DE476

the first written work plan within thirty (30) calendar days of being retained, and the Company and the Office shall provide comments within thirty (30) calendar days after receipt of the written work plan. With respect to each follow-up report, after consultation with the Company and the Office, the Monitor shall prepare a written work plan at least thirty (30) calendar days prior to commencing a review, and the Company and the Office shall provide comments within twenty (20) calendar days after receipt of the written work plan. Any disputes between the Company and the Monitor with respect to any written work plan shall be decided by the Office in its sole discretion.

12. All written work plans shall identify with reasonable specificity the activities the Monitor plans to undertake in execution of the Mandate, including a written request for documents. The Monitor's work plan for the initial review shall include such steps as are reasonably necessary to conduct an effective initial review in accordance with the Mandate, including by developing an understanding, to the extent the Monitor deems appropriate, of the facts and circumstances surrounding any violations that may have occurred before the date of the Agreement, in a manner consistent with Paragraph 8 above.

Initial Review

13. The initial review shall commence no later than one hundred twenty (120) calendar days from the date of the engagement of the Monitor (unless otherwise agreed by the Company, the Monitor and the Office). The Monitor shall issue a written report within one hundred twenty (120) calendar days of commencing the initial review, setting forth the Monitor's assessment and, if necessary, making recommendations reasonably designed to improve the effectiveness of the Company's program for ensuring compliance with federal criminal law relating to unlawful monetary transactions and other federal criminal offenses relating to content

5

Exh. 1-065

posted online.  The Monitor should consult with the Company concerning his or her findings and recommendations on an ongoing basis and should consider the Company's comments and input to the extent the Monitor deems appropriate.  The Monitor may also choose to share drafts of his or her reports with the Company prior to finalizing them.  The Monitor's reports need not recite or describe comprehensively the Company's history or compliance policies, procedures and practices, but rather may focus on those areas with respect to which the Monitor wishes to make recommendations, if any, for improvement or which the Monitor otherwise concludes merit particular attention.  The Monitor shall provide the report to the Board of Directors of the Company and contemporaneously transmit copies to the Chief, Business and Securities Fraud Section, United States Attorney's Office, Eastern District of New York, 271-A Cadman Plaza East, Brooklyn, New York 11201.  After consultation with the Company, the Monitor may extend the time period for issuance of the initial report for a brief period of time with prior written approval of the Office.

14.     Within one hundred twenty (120) calendar days after receiving the Monitor's initial report, the Company shall adopt and implement all recommendations in the report unless, within sixty (60) calendar days of receiving the report, the Company notifies in writing the Monitor and the Office of any recommendations that the Company considers unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive or otherwise inadvisable.  With respect to any such recommendation, the Company need not adopt that recommendation within one hundred twenty (120) days of receiving the report, but shall propose in writing to the Monitor and the Office an alternative policy, procedure or system designed to achieve the same objective or purpose.  As to any recommendation on which the

Exh. 1-066

Company and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within forty-five (45) calendar days after the Company serves the written notice.

15. In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the Office. The Office may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement. Pending such determination, the Company shall not be required to implement any contested recommendation(s).

16. With respect to any recommendation that the Monitor determines cannot reasonably be implemented within one hundred twenty (120) calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Office.

Follow-Up Reviews

17. A follow-up review shall commence no later than one hundred twenty (120) calendar days after the issuance of the initial report (unless otherwise agreed by the Company, the Monitor and the Office). The Monitor shall issue a written follow-up report within ninety (90) calendar days of commencing the follow-up review, setting forth the Monitor's assessment and, if necessary, making recommendations in the same fashion as set forth in Paragraph 13 with respect to the initial review. After consultation with the Company, the Monitor may extend the time period for issuance of the follow-up report for a brief period of time with prior written approval of the Office.

18. Within ninety (90) calendar days after receiving the Monitor's follow-up report, the Company shall adopt and implement all recommendations in the report, unless, within

7

Exh. 1-067

DocuSign Envelope ID: 0D71BB7D-5A23-4BD1-A595-96939F53DF476

thirty (30) calendar days after receiving the report, the Company notifies in writing the Monitor and the Office of its position concerning any recommendations that the Company considers unduly burdensome, inconsistent with applicable law or regulation, impractical, excessively expensive or otherwise inadvisable. With respect to any such recommendation, the Company need not adopt that recommendation within ninety (90) calendar days of receiving the report, but shall propose in writing to the Monitor and the Office an alternative policy, procedure or system designed to achieve the same objective or purpose. As to any recommendation on which the Company and the Monitor do not agree, such parties shall attempt in good faith to reach an agreement within thirty (30) calendar days after the Company serves the written notice.

19.     In the event the Company and the Monitor are unable to agree on an acceptable alternative proposal, the Company shall promptly consult with the Office. The Office may consider the Monitor's recommendation and the Company's reasons for not adopting the recommendation in determining whether the Company has fully complied with its obligations under the Agreement. Pending such determination, the Company shall not be required to implement any contested recommendation(s). With respect to any recommendation that the Monitor determines cannot reasonably be implemented within ninety (90) calendar days after receiving the report, the Monitor may extend the time period for implementation with prior written approval of the Office.

20.     The Monitor shall undertake a second follow-up review pursuant to the same procedures described in Paragraphs 17 through 19. Following the second follow-up review, the Monitor shall certify whether the Company's compliance program, including its policies and procedures, is reasonably designed and implemented to prevent and detect violations of federal criminal law relating to unlawful monetary transactions and other federal criminal

8

Exh. 1-068

DocuSign Envelope ID: 0D71BB7D-5A23-4BD1-A595-96939F53DF476

offenses relating to content posted online. The final follow-up review and report shall be completed and delivered to the Office no later than thirty (30) days before the end of the Term of Monitorship.

Monitor's Discovery of Misconduct

21. Should the Monitor discover information tending to show that during the course of his or her engagement: (a) the Company knowingly and intentionally distributed or permitted the uploading and distribution of Girls Do Porn or Girls Do Toys content on its platform; (b) the Company knowingly and intentionally violated federal criminal law relating to unlawful monetary transactions or other federal criminal offenses relating to content posted online; or (c) the Company failed to implement a system of internal controls that is sufficient to address and remediate the conduct set forth in the Statement of Facts (collectively, the "Misconduct"); then except as set forth below, the Monitor must immediately report the Misconduct to the Company's General Counsel, Chief Compliance Officer and Audit Committee for further action, unless the Misconduct was already so disclosed. If it is the Monitor's assessment that any Misconduct did actually occur, the Monitor must immediately report the Misconduct to the Office. When it is the Monitor's assessment that disclosure to the Company would be inappropriate under the circumstances, the Monitor should disclose the Misconduct solely to the Office, and, in such cases, disclosure of the Misconduct to the General Counsel, Chief Compliance Officer and/or the Audit Committee of the Company should occur as promptly and completely as the Office and the Monitor deem appropriate under the circumstances. The Monitor shall address in his or her reports the appropriateness of the Company's response to disclosed Misconduct, whether previously disclosed to the Office or not. Further, in the event that the Company, or any entity or person working directly or indirectly for

9

Exh. 1-069

or on behalf of the Company, withholds information necessary for the performance of the Monitor's responsibilities, if it is the Monitor's assessment that such withholding is without just cause, the Monitor shall disclose that fact to the Office. The Company shall not take any action to retaliate against the Monitor for any such disclosures or for any other reason. The Monitor shall report criminal or regulatory violations by the Company, or any other entity discovered in the course of performing his or her duties, in the same manner as described above.

Meetings During Pendency of Monitorship

22. The Monitor shall meet with the Office within thirty (30) calendar days after providing each report to the Office to discuss the report, to be followed by a meeting between the Office, the Monitor and the Company.

23. At least annually, and more frequently if appropriate, representatives from the Company and the Office will meet together to discuss the Monitorship and any suggestions, comments or improvements the Company may wish to discuss with or propose to the Office, including with respect to the scope or costs of the Monitorship.

Contemplated Confidentiality of Monitor's Reports

24. The Monitor's reports will likely include proprietary, financial, confidential and competitive business information. Moreover, public disclosure of the reports could discourage cooperation, or impede pending or potential government investigations and thus undermine the objectives of the Monitorship. For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent that the Office determines in its sole

10

Exh. 1-070

DocuSign Envelope ID: 0D71BB7D-5A23-4BD1-A595-96939F3DE476

discretion that disclosure would be in furtherance of the Office's discharge of its duties and

responsibilities or is otherwise required by law.

11

Exh. 1-071

DocuSign Envelope ID: 65BF8CAE-E668-468A-82C3-72963552D1ED

## Rider to Deferred Prosecution Agreement

This rider, and the accompanying attachment, are now hereby attached and made part of the Deferred Prosecution Agreement ("Agreement") entered into by the United States Attorney's Office for the Eastern District of New York, and AYLO HOLDINGS S.À.R.L, formerly known as MindGeek S.à.r.l., and its subsidiaries Aylo USA Inc., formerly known as "MindGeek USA, Inc.," and AYLO Freesites Ltd., formerly known as "MG Freesites Ltd." (collectively, "MindGeek" or the "Company") on November 10, 2023.

1. On November 10, 2023, a duly authorized Board of Managers for the Company passed written resolutions approving, inter alia, the entry into, execution, delivery and performance by the Company of its obligations under a deferred prosecution agreement with the United States Attorney's Office for the Eastern District of New York as well as ancillary actions and documents in relation thereto. These written resolutions are attached to the Agreement as Attachment A.

2. On November 16, 2023, a duly authorized Board of Managers for the Company passed supplemental written resolutions authorizing John Anthony Penhale to represent the Company at court hearings related to the Agreement and to take any other relevant actions in connection with the Agreement. These supplemental resolutions are attached to this rider as Attachment E, and are hereby made part of the Agreement.

Dated:    Brooklyn, New York
          December 20, 2023

BREON PEACE
United States Attorney
Eastern District of New York

By: _____

Hiral Mehta
Gillian Kassner
Genny Ngai
Tara McGrath
Assistant United States Attorneys

For Aylo Holdings S.à.r.l.:
        12/20/2023

DocuSigned by:

*Andreas Alkiviades Andreou*
0DD6F37FAA284FE...

By: _____

Andreas Alkiviades Andreou
Aylo Holdings S.à.r.l.

Exh. 1-072

DocuSign Envelope ID: 65BF8CAE-E668-468A-82C3-72963552D1ED

By: _____
Eric Corngold, Esq.
Jeffrey R. Wang, Esq.
Friedman Kaplan Seiler Adelman & Robbins LLP
7 Times Square
New York, New York 10036

DocuSign Envelope ID: 65BF8CAE-E668-468A-82C3-72963552D1ED

ATTACHMENT E

SUPPLEMENTAL BOARD OF DIRECTORS' RESOLUTION

Exh. 1-074

DocuSign Envelope ID: 3535861C-D3ED-40F6-8179-BCA23A671756

---

**Aylo Holdings S.à r.l.**
*société à responsabilité limitée*
Registered office: 32, boulevard Royal, L-2449 Luxembourg
Grand Duchy of Luxembourg
R.C.S. Luxembourg: B181337
(the "**Company**")

---

**WRITTEN RESOLUTIONS OF THE BOARD OF MANAGERS OF THE COMPANY
TAKEN ON NOVEMBER 16, 2023**

The undersigned:

1.  Mr. Andreas Andreou, Class A manager;

2.  Mr. Anis Baba, Class A manager; and

3.  Mr. Claude Favre, Class B manager,

being all the managers (collectively referred to as the "**Managers**" and individually as a "**Manager**") of the Company and together being the board of Managers of the Company (the "**Board of Managers**"), decide to pass the present resolutions of the Board of Managers in writing in accordance with the articles of association of the Company (the "**Articles**").

1.  **BACKGROUND AND CONSIDERATIONS**

    **WHEREAS**, it is recalled that the Board of Managers passed written resolutions on November 10, 2023 (the "**2023.11.10 WRM**") regarding the approval by the Board of Managers of, *inter alia*, the entry into, execution, delivery and performance by the Company of its obligations under a deferred prosecution agreement with the United States Attorney's Office for the Eastern District of New York (the "**DPA**") as well as ancillary actions and documents in relation thereto.

    **WHEREAS**, the DPA will have to be approved by the court of United States District Court for the Eastern District of New York and that a court hearing must take place in relation thereto (the "**Court Hearing**") at the occasion of which the Company must be represented. It is intended in this respect that the Company be represented by Mr. John Anthony Penhale, the chief legal officer of 9219-1568 Quebec Inc., a wholly owned subsidiary of the Company.

    **WHEREAS**, the purpose of the present resolutions is for the Board of Managers to grant authority to Mr. John Anthony Penhale to represent the Company at the Court Hearing and to take any other relevant actions in connection with the DPA.

2.  **DECLARATIONS**

    **WHEREAS**, having thoroughly considered the above, each of the Managers confirms by signing these resolutions they do not have opposite interest in the matters referred to in the present resolutions.

    **WHEREAS**, the Board of Managers is of the opinion that the matters referred to therein:

---

#23971v1 - Written Resolutions of the managers RE delegation to A. Penhale for court hearing in connection with a deferred prosecution agreement

Exh. 1-075

DocuSign Envelope ID: 3535861C-D3ED-40F6-8179-BCA23A671756

- 2 -

a) generally are in compliance with the Articles and the applicable legal provisions, and in particular (i) conducive to the Company's corporate object, (ii) in the Company's corporate interest and (iii) within the Company's corporate powers;

b) would not result in a breach of any restriction imposed by law, the Articles, or any agreement to which the Company is a party or by which the Company is bound; and

c) would materially benefit the Company and would be for the purpose of carrying on its business.

3. **RESOLUTIONS**

**FOLLOWING DUE CAREFUL CONSIDERATION, THE BOARD OF MANAGERS ADOPTS THE FOLLOWING RESOLUTIONS:**

**FIRST RESOLUTION**

The Board of Managers **RESOLVES** to authorise and empower Mr. John Anthony Penhale, acting individually, with full power of substitution, in the name and on behalf of the Company, to negotiate, approve, finalise the terms of (and any amendments, however substantial, thereto), execute, deliver, dispatch and perform (as the case may be) (i) the DPA and any ancillary documents and generally any other documents necessary or desirable to implement the resolutions contained herein, (ii) all acts required in connection therewith (with such changes as the person executing the same shall approve, such approval to be conclusively evidenced by the execution thereof), (iii) any actions or formalities useful in relation to the DPA, including, but not limited to, the representation of the Company at the Court Hearing, (iv) to make any amendments to, even substantial, the terms of the DPA as reviewed by the Board of Managers for the purpose of the passing of the 2023.11.10 WRM, and to any ancillary documents as he deems in his absolute discretion as necessary or useful for the purpose of completing the transactions contemplated by the DPA and in the best interest of the Company and to execute such amended documents.

The Board of Managers **RESOLVES** that each Manager may issue a copy or extract hereof to whomever necessary to provide, to the extent required, evidence of Mr. John Anthony Penhale's authority and power by virtue hereof, such copy to constitute a valid power of attorney, it being understood that this power of attorney shall be governed by Luxembourg law.

**SECOND RESOLUTION**

All the actions of any Manager and of Mr. John Anthony Penhale which actions would have been authorized by the foregoing resolution except that such actions were taken prior to the adoption of such resolution, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.

*[Signature page follows]*

#23971v1 - Written Resolutions of the managers RE delegation to A. Penhale for court hearing in connection with a deferred prosecution agreement

Exh. 1-076

SIGNATURE PAGE TO THE WRITTEN RESOLUTIONS OF THE BOARD OF MANAGERS OF THE COMPANY
TAKEN ON NOVEMBER 16, 2023

DocuSigned by:

*Andreas Alkiviades Andreou*
BC969CBBEAF2454...

Name: Mr. Andreas Alkiviades Andreou
Title: Class A manager
Date: 11/16/2023

DocuSigned by:

*Anis Baba*
34E4976E88A0424...

Name: Mr. Anis Baba
Title: Class A manager
Date: 11/16/2023

DocuSigned by:

*claude FAVRE*
2266AB50250149C...

Name: Mr. Claude Favre
Title: Class B manager
Date: 11/16/2023

#23971v1 - Written Resolutions of the managers RE delegation to A. Penhale for court hearing in connection with a deferred prosecution agreement

Exh. 1-077